TROUTMAN PEPPER LOCKE LLP
Justin D. Balser (SBN 027850)
justin.balser@troutman.com
Jennifer Mathis (*admitted Pro Hac Vice*)
jennifer.mathis@troutman.com
Sheila Z. Chen (*admitted Pro Hac Vice*)
sheila.chen@troutman.com
Lynda K. Bui (*admitted Pro Hac Vice*)
lynda.bui@troutman.com
100 Spectrum Center Drive, Suite 1500
Irvine, CA 92618
Telephone:    949.622.2700
Facsimile:    949.622.2739

*Attorneys for Defendant/Counterclaim Plaintiff*
*PartnerRe Ireland Insurance dac*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Tyler B. Wilson,<br><br>                    Plaintiff,<br><br>         vs.<br><br>PartnerRe Ireland Insurance dac, a foreign entity,<br><br>                    Defendant.<br>_____<br>PartnerRe Ireland Insurance dac, a foreign entity,<br><br>                    Counterclaim Plaintiff,<br><br>         vs.<br><br>Tyler B. Wilson,<br><br>                    Counterclaim Defendant. | Case No. 2:23-cv-00738-DGC<br><br>(Assigned to Hon. David G. Campbell)<br><br>**DECLARATION OF ANTONIOS DASKALAKIS IN SUPPORT OF DEFENDANT/COUNTERCLAIM PLAINTIFF PARTNERRE IRELAND INSURANCE DAC'S MOTION FOR SUMMARY JUDGMENT** |

- 1 -

TROUTMAN PEPPER LOCKE LLP
100 SPECTRUM CENTER DRIVE
SUITE 1500
IRVINE, CA 92618

313175822

**DECLARATION OF ANTONIOS DASKALAKIS**

I, Antonios Daskalakis, declare as follows:

1.      I am employed by Defendant/Counterclaim Plaintiff PartnerRe Ireland Insurance dac ("PartnerRe") as Vice President and Senior Claims Specialist of Managing General Agent Business ("VP of MGA Business").  In my role as VP of MGA Business and based upon my review of the documents and records contained in PartnerRe's files maintained by PartnerRe in connection with this matter, I have personal knowledge of the facts set forth in this declaration and, if called upon to testify as a witness, I could and would testify competently thereto.  I submit this Declaration in support of PartnerRe's Motion for Summary Judgment filed concurrently herewith.

**Background at PartnerRe**

2.      I joined PartnerRe as VP of MGA Business in February of 2023.  In that capacity, I manage claims for business generated by PartnerRe's managing general agents ("MGAs"), which are independent underwriting partners that are authorized to underwrite and bind coverage on PartnerRe's behalf.

3.      In my capacity as VP of MGA Business, I undertook claims handling responsibility in March of 2023 for a claim tendered for coverage by Plaintiff Tyler B. Wilson (the "Wilson Claim") under Forge Underwriting Limited Advanced Boardroom and Company Protection Policy Number B1724WLS20C237 (the "Policy") issued to Taronis Fuels, Inc. ("Fuels").  The Policy was underwritten and bound by Forge Underwriting, an external MGA, and thus falls within my purview as VP of MGA Business.  A true and correct copy of the Policy is attached hereto as **Exhibit 1**.

4.      When I became the responsible claims professional for the Wilson Claim in March of 2023, I conducted a thorough review of the existing claim file developed and maintained by PartnerRe, through the previously assigned claims professional, Corinne Vincentelli.  Since that time, I have maintained all claims handling responsibility for the Wilson Claim, including maintenance and knowledge of the materials contained within PartnerRe's claim file, as well as coordination with outside coverage counsel.

TROUTMAN PEPPER LOCKE LLP
100 SPECTRUM CENTER DRIVE
SUITE 1500
IRVINE, CA 92618

313175822

TROUTMAN PEPPER LOCKE LLP
100 SPECTRUM CENTER DRIVE
SUITE 1500
IRVINE, CA 92618

5.      Through my management and review of the materials contained within PartnerRe's file for the Wilson Claim in my capacity as VP of MGA Business and as the individual currently responsible for the handling of the Wilson Claim, I am familiar with each of the bases of PartnerRe's coverage decision in this matter, as well as the steps of PartnerRe's investigation and evaluation of coverage.  Where appropriate, I also continue to review and analyze any additional materials to determine whether there is any new information that would bear on coverage for the Wilson Claim.

## The SEC Investigation and Denial of Coverage

6.      The Wilson Claim seeks coverage for defense costs incurred by, and a portion of a consent judgment entered against, Mr. Wilson during the course of an investigation and subsequent enforcement action by the U.S. Securities and Exchange Commission ("SEC") against Mr. Wilson, Fuels, Scott Mahoney (Fuels' former CEO), and Taronis Technologies, Inc. ("Tech") (Fuels' former parent company).

7.      The Policy states that notice of any claim or circumstance must first be provided to PartnerRe's outside counsel at Kissel Straton & Wilmer ("KSW").  **Exhibit 1**, Policy, Declarations, Item I, at p. 2.  KSW was first notified of the SEC's investigation into the business practices of Fuels by Fuels' insurance broker, Marsh & McLennan ("Marsh") on May 11, 2021.  PartnerRe's claims team was, in turn, provided the notice on May 13, 2021.  *See* Correspondence Between Marsh, KSW, and PartnerRe, at PRIR_0004021-PRIR_0004022, a true and correct copy of which is attached hereto as **Exhibit 2**.  PartnerRe retained KSW to assist in the investigation and evaluation of coverage.

8.      In the initial claim notification email, Marsh provided copies of (1) an August 28, 2020 SEC Order Directing Private Investigation and Directing Officers to Take Testimony; (2) a December 14, 2020 Subpoena to Tech; (3) a January 11, 2021 Subpoena to Fuels; and (4) a February 12, 2021 Subpoena to Fuels.  *See* Correspondence Between KSW and Hogan Lovells, at PRIR_0000298, a true and correct copy of which is attached hereto as **Exhibit 3**; *see also* 08-28-2020 SEC Order, at PRIR_0000417, a true and correct copy of which is attached hereto as **Exhibit 4**; 12-14-2020 Subpoena, at PRIR_0000355, a

- 3 -

true and correct copy of which is attached hereto **Exhibit 5**; 01-11-2021 Subpoena, at PRIR_0000382, a true and correct copy of which is attached hereto **Exhibit 6**; and 02-12-2021 Subpoena, at PRIR_0000393, a true and correct copy of which is attached hereto **Exhibit 7**.

9.    Between May 19, 2021 and June 14, 2021, KSW and Hogan Lovells, Fuels' counsel, corresponded regarding the SEC investigation.    **Exhibit 3**, at PRIR_0000293-PRIR_0000298.    To facilitate the investigation of the scope and origin of the SEC's investigation, KSW, at PartnerRe's direction and request, acknowledged receipt of the tendered documents and requested that Fuels "forward copies of all communication received from the SEC by Taronis Tech and/or Taronis Fuels prior to the commencement of the formal investigation pursuant to the August 28, 2020 SEC Order for Investigation, in addition to copies of any communications from any Taronis entities in response." **Exhibit 3**, at PRIR_0000298.

10.    On June 2, 2021, Hogan Lovells, acting as Fuels' counsel, sent KSW copies of additional correspondence to and from the SEC including the following.    **Exhibit 3**, at PRIR_0000294.  These additional documents included:

- A June 30, 2020 Letter from the SEC, at PRIR_0000331, a true and correct copy of which is attached hereto as **Exhibit 8**.

- A January 13, 2021 SEC Letter to Tech, at PRIR_0000391, a true and correct copy of which is attached hereto as **Exhibit 9**.

- A Cover Letter to the SEC, at PRIR_0000420, a true and correct copy of which is attached hereto as **Exhibit 10**.

- A January 7, 2021 Letter from Wilson to the SEC, at PRIR_0000422, a true and correct copy of which is attached hereto as **Exhibit 11**.

- A January 19, 2021 Letter to the SEC from Wilson, at PRIR_0000426, a true and correct copy of which is attached hereto as **Exhibit 12.**

TROUTMAN PEPPER LOCKE LLP
100 SPECTRUM CENTRE DRIVE
SUITE 1300
IRVINE, CA 92618

313175822

- A February 15, 2021 Letter from Sallah Astarita Cox to the SEC, at PRIR_0000432, a true and correct copy of which is attached hereto as **Exhibit 13**.

- A February 16, 2021 Letter from Sallah Astarita Cox to the SEC, at PRIR_0000433, a true and correct copy of which is attached hereto as **Exhibit 14**.

- A March 25, 2021 Letter from Sallah Astarita Cox to the SEC, at PRIR_0000434, a true and correct copy of which is attached hereto as **Exhibit 15**.

- A March 26, 2021 Letter from Sallah Astarita Cox to the SEC, at PRIR_0000439, a true and correct copy of which is attached hereto as **Exhibit 16**.

11.    On June 3, 2021, Hogan Lovells corresponded with KSW to enclose a May 19, 2021 Subpoena to Fuels.  *See* 06-3-2021 Correspondence, at PRIR_0000442, a true and correct copy of which is attached hereto as **Exhibit 17**; 05-19-2021 Subpoena, at PRIR_0000449, a true and correct copy of which is attached hereto as **Exhibit 18**.

12.    On June 12, 2021, KSW requested copies of subpoenas propounded on individuals related to Fuels.  **Exhibit 3**, at PRIR_0000293.  In response, Hogan Lovells sent a copy of a March 24, 2021 SEC Subpoena to Mary Pat Thompson.  *See* 03-24-2021 Subpoena, at PRIR_0000300, a true and correct copy of which is attached hereto as **Exhibit 19**.

13.    On July 28, 2021, Adam Schwartz of the law firm Homer Bonner, counsel for Mr. Wilson, emailed an insurance broker who was involved in Fuels obtaining the Policy, Founders Professional, and stated that the SEC intended to subpoena Mr. Wilson, who was requesting indemnification from Fuels and coverage under the Policy.  Correspondence from Adam Schwartz, at PRIR_0000011, a true and correct copy of which is attached hereto as

TROUTMAN PEPPER LOCKE LLP
1005 SPECTRUM CENTER DRIVE
SUITE 1300
IRVINE, CA 92618

313175822

TROUTMAN PEPPER LOCKE LLP
100 SPECTRUM CENTER DRIVE
SUITE 1500
IRVINE, CA 92618

**Exhibit 20**. Mr. Schwartz's email attached Mr. Wilson's demands for indemnification from Fuels, which were forwarded to PartnerRe on or about August 4, 2021.[1] *Id.*

14. From the Fall of 2021 through January of 2022, KSW received subpoenas directed to former Fuels' directors and officers Kevin Pollack, Peter Molloy, and Richard Conz as well as invoices from Fuels' counsel for work performed for Fuels' officer Mary Pat Thompson and Fuels' employees Eric Newell and Jenna Stoneberg during the SEC's investigation. *See* PartnerRe's Coverage Position Letter, at PRIR_0000145-PRIR_0000146, a true and correct copy of which is attached hereto as **Exhibit 21**. These additional materials, along with the correspondence from the SEC investigation provided by Fuels and SEC filings relating to allegations of accounting fraud at the company, were analyzed and reviewed as part of the coverage investigation. *Id.* at PRIR_0000141-PRIR_0000146.

15. Based on the information reviewed, PartnerRe determined that it was appropriate to decline coverage on the basis of Exclusion III.B.3 of the Policy, which provides, in pertinent part, that coverage is precluded under the Policy for "any **Claim**, **Investigation** or **Inquiry** . . . based upon, arising out of, directly or indirectly resulting from . . . or in consequence of, or in any way involving . . . any written demand, suit, investigation or other proceeding pending, or order, decree or judgment entered, against any Insured prior to the date set forth in Item K. of the Declarations." **Exhibit 1**, Policy, Exclusion III.B.3 at pp. 47-48. The date set forth in Item K. of the Declarations is July 13, 2020. *Id.*, Declarations, Item K., at p.2.

16. The Policy's Representations and Severability Endorsement provides that "in the event that the **Application** contains misrepresentations made with the actual intent to deceive, or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by Underwriters under this Policy" PartnerRe may void coverage

---

[1] The basis for Mr. Wilson's request for indemnification from Fuels was that the SEC had advised on May 17, 2021 "that as part of its investigation the SEC intends to issue a subpoena for Mr. Wilson's testimony." *See* June 3, 2020 Indemnification Demand, at PRIR_0000736, a true and correct copy of which is attached hereto as **Exhibit 34**.

DECLARATION OF ANTONIOS DASKALAKIS
CASE NO. 2:23-CV-00738-DGC

313175822

*ab initio* under Insuring Clauses I.B and I.C.  **Exhibit 1**, Policy, Representations and Severability Endorsement, at p. 21.  The Endorsement further states that PartnerRe must "advance payments of **Loss** unless and until an order by a court of competent jurisdiction provides either that such advancement is not required or that coverage is void *ab initio,* subject to the condition that such advance payments by Underwriters shall be repaid to Underwriters by the **Company** or the **Insured Persons** according to their respective interests as soon as reasonably practicable after an order provides that such advancement is not required or that coverage is void *ab initio.*"  *Id.* The Endorsement concludes that "[a]ll other terms and conditions of the Policy remain unchanged." *Id.*

17.    Because PartnerRe did not seek to void coverage *ab initio* due to misrepresentations in the Application, PartnerRe determined that the Endorsement's advance payments clause was inapplicable.

18.    KSW then drafted a twenty-page coverage position letter that was reviewed and approved by PartnerRe and then sent by KSW to Fuels, care of Eric Newell, on February 11, 2022, copying several people at Marsh.  **Exhibit 21**, Coverage Position Letter, at PRIR_0000140.  Mr. Newell is the individual from Fuels who first reported this matter to Fuels' insurance broker.

19.    With respect to Mr. Wilson specifically, the coverage position letter states that PartnerRe understood that:

> Tyler Wilson was TFI's former CFO/Treasurer/Secretary/General Counsel, and a former Board member of Taronis Tech. On August 4, 2021, we received from PartnerRe notification of two letters from Mr. Wilson's counsel, Adam Schwartz ("Mr. Schwartz") of the law firm Homer Bonner Jacobs Ortiz in Miami, Florida. Mr. Schwartz's correspondence indicated that the SEC reached out to Mr. Wilson and "advised that it **intends** to subpoena Mr. Wilson for testimony related to Taronis Fuels[,]" (emphasis added). Accordingly, we understand that Mr. Wilson has demanded indemnification from this matter from TFI and also seeks payment of legal fees and expenses under the Policy.

> **Exhibit 21**, Coverage Position Letter, at PRIR_0000145.

TROUTMAN PEPPER LOCKE LLP
100 SPECTRUM CENTRE DRIVE
SUITE 1500
IRVINE, CA 92618

- 7 -

313175822

20.     The coverage position letter reflected PartnerRe's position that coverage was unavailable for Fuels and each of the **Insured Persons** pursuant to Exclusion III.B.3, because the SEC's investigation "commenced prior to the inception of the Policy on July 13, 2020" as evidenced by the June 30 Letter.  **Exhibit 21**, at PRIR_0000152.  Specifically, PartnerRe determined that the SEC's investigation was against Fuels, an **Insured**, because the "initial investigation prior to the Policy inception included seeking information about TFI's financial reporting and public filings and was directed, at least in part, at TFI." **Exhibit 21**, Coverage Position Letter, at PRIR_0000154.

21.     PartnerRe did not receive any challenge to its coverage position from either Fuels or Marsh.  To this day, other than Mr. Wilson, no **Insured** has disputed PartnerRe's coverage position.

## Renewed Analysis of the SEC Complaint

22.     On November 29, 2022, Adam Schwartz, Mr. Wilson's counsel, sent a letter to KSW responding to PartnerRe's February 11, 2022 coverage position letter and explaining that the SEC had filed suit against Mr. Wilson.  11-29-2022 Correspondence from Adam Schwartz, at PRIR_0000635-39, a true and correct copy of which is attached hereto as **Exhibit 22**.  Enclosed with the November 29 letter was a copy of the complaint filed by the SEC against Mr. Wilson.  *See* SEC Complaint Against Wilson, at PRIR_0000654, a true and correct copy of which is attached hereto as **Exhibit 23**.[2]

23.     After receipt of Mr. Schwartz's letter, PartnerRe promptly reopened its file and KSW contacted Mr. Schwartz.  On December 2, 2022, KSW called Mr. Schwartz to discuss his letter challenging the denial of coverage.  *See* 12-02-2022 Email from Adam Schwartz, at PRIR_0000733, a true and correct copy of which is attached hereto as **Exhibit**

---

[2] Prior to his November 29, 2022 letter, Mr. Schwartz also contacted Neil Sonnet of Forge Underwriting, PartnerRe's Managing General Agent, to request a status update and inform him that Fuels had been indemnifying Wilson, but had recently filed for bankruptcy.  *See* 11-14-2022 Correspondence from Adam Schwartz, at PRIR_0000040, a true and correct copy of which is attached hereto as **Exhibit 35**.  Mr. Sonnet promptly directed Mr. Schwartz to the brokers of record at Marsh, who would be able to more readily provide an update.  *Id.*

DECLARATION OF ANTONIOS DASKALAKIS
CASE NO. 2:23-CV-00738-DGC

TROUTMAN PEPPER LOCKE LLP
100 SPECTRUM CENTER DRIVE
SUITE 1500
IRVINE, CA 92618

313175822

**24**. Mr. Schwartz followed up by email to provide additional documentation. *Id.* Upon reviewing the additional documentation provided, including the SEC's complaint, PartnerRe concluded that this additional documentation did not alter PartnerRe's prior coverage position, because the SEC enforcement action against Wilson arose out of the same investigation that commenced on or before the sending of the June 30 Letter.

24. Mr. Schwartz emailed KSW again on January 20, 2023 enclosing "(1) an email sent to Fuels that includes the SEC's subpoena for Mr. Wilson's testimony; (2) a transcript of Mr. Wilson's testimony; (3) the SEC's Wells letter to Mr. Wilson (which relates solely to his role as CFO of Taronis Fuels; and (4) Mr. Wilson's Wells Submission." 01-20-2023 Email from Adam Schwartz, at PRIR_0000477, a true and correct copy of which is attached hereto as **Exhibit 25**; *see also* 09-27-2021 Subpoena to Wilson, at PRIR_0000480, a true and correct copy of which is attached hereto as **Exhibit 26**; Excerpts of 10-19-2021 Transcript, at PRIR_0000491, a true and correct copy of which is attached hereto as **Exhibit 27**; 03-02-2022 Wells Notice, at PRIR_0000609, a true and correct copy of which is attached hereto as **Exhibit 28**; 03-30-2022 Wells Submission, at PRIR_0000612, a true and correct copy of which is attached hereto as **Exhibit 29**.

25. Prior to January 20, 2023, PartnerRe had not received any copy of the subpoena to Wilson and was unaware that he had testified as part of the SEC's investigation or had received a Wells notice.

26. Upon review of the additional documentation provided on January 20, 2023, PartnerRe concluded that this additional documentation did not alter PartnerRe's prior coverage position, because Mr. Wilson's testimony and the Wells notice against Wilson arose out of the same investigation that commenced on or before the sending of the June 30 Letter.

27. On March 16, 2023, a mediation was held between PartnerRe and Tyler Wilson, which ended at an impasse. Mr. Wilson filed this lawsuit two weeks later, on March 30, 2023.

TROUTMAN PEPPER LOCKE LLP
100 SPECTRUM CENTER DRIVE
SUITE 1500
IRVINE, CA 92618

DECLARATION OF ANTONIOS DASKALAKIS
CASE NO. 2:23-CV-00738-DGC

313175822

28.     On that same day (March 30, 2023), litigation counsel for Mr. Wilson sent correspondence demanding that PartnerRe withdraw its denial because, among other reasons (1) the June 30 Letter did not constitute an **Investigation** as that term is defined in the Policy and (2) "SEC letter was addressed to Tech specifically, not Fuels or Mr. Wilson." *See* 03-30-2023 Correspondence from Troy Froderman, at PRIR_0000002-PRIR_0000003, a true and correct copy of which is attached hereto as **Exhibit 30**. Mr. Froderman sent additional correspondence on April 5, 2023 and April 11, 2023 to reiterate the demand for coverage. Correspondence from Troy Froderman, true and correct copies of which are attached hereto as **Exhibit 31**.

29.     I reviewed the March 30, 2023 and April correspondence from Mr. Froderman and concluded that the points and arguments of counsel did not warrant a change in PartnerRe's coverage position. PartnerRe, in turn, advised Mr. Froderman and Mr. Wilson on April 13, 2023 that PartnerRe would respectfully maintain its prior position. *See* 04-13-2023 Letter from Steven Brodie, a true and correct copy of which is attached hereto as **Exhibit 32**.[3]

### Consideration of Additional Materials Provided by Wilson's Counsel

30.     As the claims professional responsible for overseeing the Wilson Claim, I remain in contact with litigation counsel to consider any newly-disclosed information that might affect PartnerRe's coverage position. To date, I have not reviewed any information in this case that would warrant a change in PartnerRe's conclusion that Exclusion III.B.3 bars coverage for the Wilson Claim.

31.     I was provided a copy of correspondence from Mr. Froderman asserting that Mr. Wilson's position is that "PartnerRe failed to reassess its coverage position despite newly disclosed information." *See* 03-13-2025 Correspondence from Troy Froderman, a true and correct copy of which is attached hereto as **Exhibit 33**. Mr. Froderman specifically

---

[3] Mr. Brodie of the law firm Carlton Fields in Florida was coverage counsel for PartnerRe at the time of the April 13 correspondence.

DECLARATION OF ANTONIOS DASKALAKIS
CASE NO. 2:23-CV-00738-DGC

TROUTMAN PEPPER LOCKE LLP
100 SPECTRUM CENTRE DRIVE
SUITE 1500
IRVINE, CA 92618

313175822

highlighted what he characterized as "newly disclosed evidence" consisting of "Schwartz Deposition Testimony, J.K. Edmundson Expert Report, Rule 30(b)(6) Deposition Testimony, Wilson Deposition Testimony, Mahoney Deposition Testimony."

32.     In keeping with my role as the claims professional responsible for handling the Wilson Claim, I reviewed each of the documents identified by Mr. Froderman to determine whether any information contained therein would require PartnerRe to withdraw or alter its coverage position.  After review, I concluded that none of the tendered documents provided any additional information that would change the conclusion that Exclusion III.B.3 bars coverage for the Wilson Claim.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 16, 2025, in Stamford, Connecticut.

*Antonios Daskalakis*

Antonios Daskalakis

DECLARATION OF ANTONIOS DASKALAKIS
CASE NO. 2:23-CV-00738-DGC

TROUTMAN PEPPER LOCKE LLP
100 SPECTRUM CENTER DRIVE
SUITE 1500
IRVINE, CA 92618

313175822

**CERTIFICATE OF SERVICE**

I hereby certify that on May 16, 2025, I electronically transmitted this DECLARATION OF ANTONIOS DASKALAKIS IN SUPPORT OF DEFENDANT/COUNTERCLAIM PLAINTIFF PARTNERRE IRELAND INSURANCE DAC'S MOTION FOR SUMMARY JUDGMENT to the Clerk's office using the CM/ECF System for filing and transmittal of a notice of Electronic Filing to the following CM/ECF Registrants:

Troy B. Froderman
Scott C. Ryan
Rita M. Gara
Tamber Diefenbach
FR LAW GROUP, PLLC
4745 N. 7th Street, Suite 210
Phoenix, AZ 85014
tfroderman@frlawgroup.com
sryan@frlawgroup.com
rgara@frlawgroup.com
tdiefenbach@frlawgroup.com
*Attorneys for Plaintiff/Counterclaim Defendant Tyler B. Wilson*


TROUTMAN PEPPER LOCKE LLP



By: */s/ Jennifer Mathis*
      Jennifer Mathis

- 12 -

## <u>INDEX OF EXHIBITS 1-35 TO DECLARATION OF ANTONIOS DASKALAKIS</u>

| Exhibit Number | Brief Description | Bates Range |
|---|---|---|
| 1. | Directors & Officers Liability Insurance Policy No. B1724WLS20C237 | N/A |
| 2. | 05-07-2021 to 05-11-2021 Email Chain with Taronis Fuels, Inc. Brokers | PRIR_0004021-0004026 |
| 3. | 05-19-2021 to 06-12-2021 Email Chain with Taronis Fuels, Inc. Counsel | PRIR_0000293-0000299 |
| 4. | 08-28-2020 Order Directing Private Investigation and Designating Officers | PRIR_0000417-0000419 |
| 5. | 12-14-2020 Subpoena from SEC | PRIR_0000355-0000381 |
| 6. | 01-11-2021 Subpoena from SEC | PRIR_0000382-0000390 |
| 7. | 02-12-2021 Subpoena from SEC | PRIR_0000393-0000416 |
| 8. | 06-30-2020 Letter from SEC | PRIR_0000331-0000354 |
| 9. | 01-13-2020 Letter from SEC | PRIR_0000391-0000392 |
| 10. | Cover Letter to Chanel T. Rowe re: FL-04237 | PRIR_0000420-0000421 |
| 11. | 01-07-2021 Letter from Tyler B. Wilson | PRIR_0000422-0000425 |
| 12. | 01-19-2021 Letter from Tyler B. Wilson | PRIR_0000426-0000431 |
| 13. | 02-15-2021 Letter from James D. Salah | PRIR_0000432 |
| 14. | 02-16-2021 Letter from James D. Salah | PRIR_0000433 |

1

| Exhibit Number | Brief Description | Bates Range |
|---|---|---|
| 15. | 03-25-2021 Letter from Joshua Bautz | PRIR_0000434-0000437 |
| 16. | 03-25-2021 Letter from Joshua Bautz | PRIR_0000439-0000440 |
| 17. | 06-03-2021 Email from James Hennelly Attaching Subpoena | PRIR_0000442-0000448 |
| 18. | 05-19-2021 Subpoena from SEC | PRIR_0000449-0000473 |
| 19. | 03-24-2021 Subpoena from SEC | PRIR_0000300-0000330 |
| 20. | 07-28-2021 Email from Adam Schwartz | PRIR_0000011 |
| 21. | 02-11-2022 Coverage Position Letter | PRIR_0000140-0000160 |
| 22. | 11-29-2022 Letter from Adam Schwartz | PRIR_0000635-0000639 |
| 23. | 08-24-2022 Complaint Filed by SEC | PRIR_0000654-0000732 |
| 24. | 12-02-2022 Email from Adam Schwartz | PRIR_0000733-0000734 |
| 25. | 01-20-2023 Email from Adam Schwartz | PRIR_0000477-0000478 |
| 26. | 09-27-2021 Subpoena to Tyler B. Wilson | PRIR_0000480-0000490 |
| 27. | Excerpts of Transcript of 10-19-2021 Testimony of Tyler B. Wilson | PRIR_0000491-0000567 |
| 28. | 03-02-2022 Letter from SEC to Tyler B. Wilson | PRIR_0000609-0000611 |
| 29. | 03-30-2022 Wells Submission of Tyler B. Wilson | PRIR_0000612-0000632 |

2

| Exhibit Number | Brief Description | Bates Range |
|---|---|---|
| 30. | 03-30-2023 Correspondence from Troy B. Froderman | PRIR_0000001-0000006 |
| 31. | 04-05-2023 and 04-11-2023 Correspondence from Troy B. Froderman | WILSON-000197-WILSON-000200 |
| 32. | 05-13-2023 Correspondence from Steven Brodie | WILSON-000215-WILSON-000218 |
| 33. | 03-13-2025 Correspondence from Troy B. Froderman | N/A |
| 34. | 06-03-2021 Letter from Adam Schwartz to Tobias Welo | PRIR_0000736-0000750 |
| 35. | 11-14-2022 to 11-15-2022 Email Chain Between Adam Schwartz and Neil Sonnet | PRIR_0000040-0000041 |

3

# EXHIBIT
# 1

| 1724 BNA | BEACH AND ASSOCIATES LIMITED<br>on behalf of Beach Wholesale Ltd, an Appointed Representative | MARKET REFORM<br>CONTRACT |
|---|---|---|
| RISK REFERENCE<br>WLS20C237 | UNIQUE MARKET REFERENCE<br>B1724WLS20C237 | Risk Details/Declarations<br>Page 1 of 4 |

## RISK DETAILS / DECLARATIONS

THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS, THIS POLICY APPLIES ONLY TO ANY **CLAIM** FIRST MADE, ANY **INVESTIGATION** FIRST COMMENCED AND ANY **INQUIRY** FIRST REPORTED DURING THE **POLICY PERIOD** PROVIDED:

(1)     SUCH **CLAIM** OR **INVESTIGATION** IS REPORTED TO UNDERWRITERS IN ACCORDANCE WITH THE TERMS OF CLAUSE VI.A.; AND
(2)     SUCH **INQUIRY** IS FIRST RECEIVED BY THE **INSURED PERSONS** ON OR AFTER THE DATE SET FORTH IN ITEM J. OF THE DECLARATIONS.

AMOUNTS INCURRED AS **COSTS, CHARGES AND EXPENSES** AND **INQUIRY COSTS** SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY OR THE SUBLIMIT OF LIABILITY, IF APPLICABLE, AND ARE SUBJECT TO THE RETENTIONS. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY UNDERWRITERS TO DEFEND ANY OF THE **INSUREDS**.

These Declarations along with the completed and signed **Application** and the Policy with endorsements shall constitute the contract between the **Insureds** and Underwriters.

| | |
|---|---|
| UNIQUE MARKET<br>REFERENCE NUMBER: | B1724WLS20C237 |
| Type: | Directors & Officers Insurance |
| Interest: | Directors & Officers Insurance as more fully defined within the policy wording identified herein. |

**ITEM A.**
| | |
|---|---|
| **Parent Company:** | Taronis Fuels, Inc. |
| **Principal Address:** | 16165 N 83rd Avenue, Ste 200, Peoria, Arizona 85382, USA |
| **State of Incorporation:** | Delaware |
| **ITEM B. Policy Period:** | From:     13th July 2020<br>To:     13th July 2021<br>Both dates at 12:01 a.m. Local Time at the Principal Address stated in Item A. |

**ITEM C. Limit of Liability:** 1.   USD 2,000,000 in the aggregate for the **Policy Period**, but sublimited to:

|  |  |  |
|---|---|---|
| | 2.  USD 100,000 | in the aggregate for the **Policy Period** for all **Security Holder Demand Investigatory Costs** under Insuring Clause I.D. |
| | | Such Sublimit of Liability shall be part of, and not in addition to, the overall Limit of Liability stated in C.1. above. |
| **ITEM D. Retentions:** | USD 100,000 | each of the **Insured Persons** each **Claim, Investigation or Inquiry** but in no event exceeding |
| | NIL | in the aggregate each **Claim, Investigation** or **Inquiry** all **Insured Persons** under Insuring Clause I.A. |
| | USD 100,000 | each **Claim**, **Investigation** or **Inquiry** under Insuring Clause I.B., other than i) a **Securities Claim** or ii) a **Corporate Takeover Objection** |
| | USD 200,000 | each **Securities Claim** under Insuring Clause I.B., other than a **Corporate Takeover Objection** |
| | USD 200,000 | each **Securities Claim** under Insuring Clause I.C., other than a **Corporate Takeover Objection** |
| | USD 350,000 | each **Corporate Takeover Objection** |
| | NIL | each **Security Holder Demand** under Insuring Clause I.D. |

| 1724 BNA | BEACH AND ASSOCIATES LIMITED<br>on behalf of Beach Wholesale Ltd, an Appointed Representative | MARKET REFORM<br>CONTRACT |
|---|---|---|
| RISK REFERENCE<br>WLS20C237 | UNIQUE MARKET REFERENCE<br>B1724WLS20C237 | Risk Details/Declarations<br>Page 2 of 4 |

**ITEM E. Insured Percentage:**   100% of Loss in excess of retention under Insuring Clause I.A.

100% of Loss in excess of retention under Insuring Clause I.B.

100% of Loss in excess of retention under Insuring Clause I.C.

100% of Security Holder Demand Investigatory Costs under Insuring Clause I.D.

**ITEM F. Premium:**   USD 75,000.00 for the Policy period for 100% order hereon.

Premium Payment Terms:   Premium hereon is due in full at Inception subject to 623AFB00082 Premium Payment Warranty (70 days).

**ITEM G.**
1. Premium for **Optional Extension Period:**
   150% of the total annual premium for the Policy

2. Length of **Optional Extension Period:**       12 months

**ITEM H.**
1. Premium for **Predetermined Run-Off Period:**
   150% of the total premium as provided in Clause IX.

2. Length of **Predetermined Run-Off Period:**       12 months.

**ITEM I. Notification pursuant to Clause VI. shall be given to:**
Richard A. Kissel
Attorney at Law
Kissel Straton & Wilmer LLP
580 White Plains Rd., Tarrytown, NY 10591, USA

**ITEM J. Inquiry Coverage Date:**   13th July 2020

**ITEM K. Prior and Pending Litigation Date:**   13th July 2020

**ITEM L. Outside Entities:**   As detailed in the Entity Organizational Chart (attached).

**ITEM M. Service of process in any suit shall be made upon:**
Mendes & Mount,
750 Seventh Avenue, New York, NY 10019-6829, USA

**ITEM N. Choice of Law:**   The State of New York, as per **XVI. CHOICE OF LAW**

Jurisdiction:       The United States of America as per **XV. SERVICE OF SUIT**

Territorial Limits:   Worldwide

Notices:   LMA 9027A    ARIZONA SURPLUS LINES NOTICE
and as may exist in this document or in the Policy Wording that forms part of this contract document.

Conditions Precedent:   None – other than as may exist in this document or in the Policy Wording that forms part of this contract document.

Express Warranties:   None – other than as may exist in this document or in the Policy Wording that forms part of this contract document.

| 1724 BNA | BEACH AND ASSOCIATES LIMITED<br>on behalf of Beach Wholesale Ltd, an Appointed Representative | MARKET REFORM<br>CONTRACT |
|---|---|---|
| RISK REFERENCE<br>WLS20C237 | UNIQUE MARKET REFERENCE<br>B1724WLS20C237 | Risk Details/Declarations<br>Page 3 of 4 |

**Conditions:** **Policy Wording:** **LSW 4000 Advanced Boardroom and Company Protection,**
plus the following all as detailed herein:

| | |
|---|---|
| NMA 1256 | Nuclear Incident Exclusion Clause-Liability-Direct (Broad) (U.S.A.) |
| NMA 1477 | Radioactive Contamination Exclusion Clause-Liability-Direct (U.S.A.) |
| NMA 45 | New Short Rate Cancellation Table Endorsement (U.S.A.) |
| LMA 3333 | Several Liability Notice |
| NMA 2918 | War and Terrorism Exclusion Endorsement |
| | |
| LSW 4050 | Professional Services Exclusion. |
| LSW 4021 | Delete Automatic Side A Reinstatement Endorsement. |
| LSW 4053 | Representations and Severability Amended to Actual Knowledge. |
| LSW 4169 | Amended "Inquiry" Definition to Include Sworn Testimony and Requests by a Party to any Litigation, Arbitration or Other Proceeding. |
| LSW 4173 | Amended "Costs, Charges and Expenses" Definition to Include SOX 304 and Dodd-Frank Costs. |
| LSW 4171 | Amended 'Other Insurance and Indemnification' Clause. |
| LSW 4015 | Amended Severability of Exclusions. |
| LSW 4008 | Amended "Application" Definition. |
| LSW 4029 | Increased Retention for Corporate Takeover Objection and amended Definition of "Loss" to Exclude Increased Consideration Endorsement. |
| LMA 3100 | Sanction Limitation and Exclusion Clause. |

Derivative Plaintiff Attorney Fees Coverage Endorsement.
Uplisting Endorsement.
Books and Records Costs / Deletion of Side A Reinstatement / Emergency Costs, Charges and Expenses Endorsement.

**All other terms and conditions as per Policy Wording identified above.**

Notice of Cancellation
Provisions:

As per C. Cancellation Clause and:

<u>Authority Provisions</u>
Where (re)insurers have the right to give notice of cancellation, in accordance with the provisions set in this Contract Document, then

To the extent provided by the contract, the Slip Leader is authorised to issue such notice on behalf of all participating (re)insurers; and (optionally)

Any (re)insurer may issue such notice in respect of its own participation.

<u>Format and Delivery Provisions</u>
Where (re)insurers have the right to give notice of cancellation, in accordance with the provisions of the contract, then to the extent provided by the contract the notice shall be provided to the broker by the following means:

*By an email to nfearon@beachgp.com*

**Failure to comply with this delivery requirement will make the notice null and void**. Satisfactory delivery of the notice will cause it to be effective irrespective of whether the broker has acknowledged receipt.

Taxes Payable by Named
Insured and administered
by Insurer(s):

None

Recording, Transmitting and
Storing Information:

Where Beach and Associated Limited maintains risk and claim data/ information/ documents Beach and Associated Limited will hold data/ information/ documents electronically.

| 1724 BNA | BEACH AND ASSOCIATES LIMITED<br>on behalf of Beach Wholesale Ltd, an Appointed Representative | MARKET REFORM<br>CONTRACT |
|---|---|---|
| RISK REFERENCE<br>WLS20C237 | UNIQUE MARKET REFERENCE<br>B1724WLS20C237 | Risk Details/Declarations<br>Page 4 of 4 |

Insurer Contract
Documentation:

This document details the contract terms entered into by the insurer(s), and constitutes the contract document.

Beach and Associated Limited to send a copy of this contract document to the Overseas Broker and Beach and Associated Limited to provide the Overseas Broker with copies of all applicable clauses and wording identified herein.

Any further documentation changing this contract of insurance, agreed in accordance with the contract change provisions set out in this contract document, shall form the evidence of such change.

This contract and any changes to it may be executed by:
a.  electronic signature technology employing computer software and a digital signature or digitiser pen pad to capture a person's handwritten signature in such a manner that the signature is unique to the person signing, is under the sole control of the person signing, is capable of verification to authenticate the signature and is linked to the document signed in such a manner that if the data is changed, such signature is invalidated;
b.  a unique authorisation provided via a secure electronic trading platform
c.  a timed and dated authorisation provided via an electronic message/system;
d.  an exchange of facsimile/scanned copies showing the original written ink signature of paper documents;
e.  an original written ink signature of paper documents (or a true representation of a signature, such as a rubber stamp).;

The use of any one or a combination of these methods of execution shall constitute a legally binding and valid signing of this contract. This contract may be executed in one or more of the above counterparts, each of which, when duly executed, shall be deemed an original.

| | | |
|---|---|---|
| 1724 BNA | BEACH AND ASSOCIATES LIMITED<br>on behalf of Beach Wholesale Ltd, an Appointed Representative | MARKET REFORM CONTRACT |
| RISK REFERENCE<br>WLS20A131 | UNIQUE MARKET REFERENCE<br>B1724WLS20A131 | Information<br>Page 1 of 1 |

**INFORMATION**

As held on file with Beach and Associated Limited, seen by Insurers hereon.


Signed Application Form dated 13th July 2020, seen Insurers hereon.

| 1724 BNA | BEACH AND ASSOCIATES LIMITED<br>on behalf of Beach Wholesale Ltd, an Appointed Representative | MARKET REFORM CONTRACT |
|---|---|---|
| RISK REFERENCE<br>WLS20C237 | UNIQUE MARKET REFERENCE<br>B1724WLS20C237 | Broker Remuneration & Deductions<br>Page 1 of 1 |

**BROKER REMUNERATION & DEDUCTIONS**

FEE PAYABLE BY CLIENT:     No

TOTAL BROKERAGE:     22.5%


OTHER DEDUCTIONS
FROM PREMIUM:     None.

| 1724 BNA | BEACH AND ASSOCIATES LIMITED<br>on behalf of Beach Wholesale Ltd, an Appointed Representative | MARKET REFORM<br>CONTRACT |
|---|---|---|
| RISK REFERENCE<br>WLS20C237 | UNIQUE MARKET REFERENCE<br>B1724WLS20C237 | Security Details<br>Page 1 of 2 |

**SECURITY DETAILS**

### (RE)INSURERS LIABILITY CLAUSE

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

LMA3333

21 June 2007

| 1724 BNA | BEACH AND ASSOCIATES LIMITED<br>on behalf of Beach Wholesale Ltd, an Appointed Representative | MARKET REFORM CONTRACT |
|---|---|---|
| RISK REFERENCE<br>WLS20C237 | UNIQUE MARKET REFERENCE<br>B1724WLS20C237 | Security Details<br>Page 2 of 2 |

**ORDER HEREON:**           **100.00% order hereon**

BASIS OF WRITTEN LINES: Percentage of whole.

BASIS OF SIGNED LINES:   Percentage of whole.

SIGNING PROVISIONS:      In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the (re)insurers.

However:

a)  in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

b)  the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the (re)insured and all (re)insurers whose lines are to be varied.  The variation to the contracts will take effect only when all such (re)insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

WRITTEN LINES /
(RE)INSURERS
PARTICIPATION:           In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the lead (re)insurer.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

The (Re)Insurers and their respective participation hereon is shown as per signing page(s) attaching to the rear of this Contract Document - Electronically signed.

| 1724 BNA | BEACH AND ASSOCIATES LIMITED<br>on behalf of Beach Wholesale Ltd, an Appointed Representative | MARKET REFORM<br>CONTRACT |
|---|---|---|
| RISK REFERENCE<br>WLS20C237 | UNIQUE MARKET REFERENCE<br>B1724WLS20C237 | Fiscal and Regulatory<br>Page 1 of 1 |

**FISCAL AND REGULATORY**

TAX PAYABLE BY
INSURER(S):              None

COUNTRY OF ORIGIN:       USA

REGULATORY RISK
LOCATION:                USA – 100%

OVERSEAS BROKER:         Founders Professional LLC
                         2038 1st Avenue South
                         St Petersburg FL 33712
                         USA

SURPLUS LINES
BROKER:                  Founders Professional LLC
                         2038 1st Avenue South
                         St Petersburg
                         FL 33712
                         USA

                         License No: 1800008968

STATE OF FILING:         Arizona

US CLASSIFICATION:       US Surplus Lines

ALLOCATION OF
PREMIUM TO YEAR
OF ACCOUNT:              2020

REGULATORY CLIENT
CLASSIFICATION:          Commercial - Other

| 1724 BNA | BEACH AND ASSOCIATES LIMITED<br>on behalf of Beach Wholesale Ltd, an Appointed Representative | MARKET REFORM<br>CONTRACT |
|---|---|---|
| RISK REFERENCE<br>WLS20C237 | UNIQUE MARKET REFERENCE<br>B1724WLS20C237 | Subscription Agreement<br>Page 1 of 2 |

## SUBSCRIPTION AGREEMENT

**SLIP LEADER:**            **Forge Underwriting Limited (on behalf of Partner Re Ireland)**

BASIS OF AGREEMENT TO
CONTRACT CHANGES:        GUA (Version 2.0 February 2014) with Non–Marine Schedule (October 2001).
Slip Leader only for any changes deemed by the Slip Leader not to increase
Underwriters' exposure.

OTHER AGREEMENT
PARTIES FOR CONTRACT
CHANGES, FOR PART 2
GUA CHANGES ONLY:        Slip Leader Only.

AGREEMENT PARTIES
FOR CONTRACT
CHANGES, FOR THEIR
PROPORTION ONLY:        None.

BASIS OF CLAIMS
AGREEMENT:            Claims to be managed in accordance with:

I)        the Lloyd's Claims Scheme (Combined), or as amended or any
successor thereto;
II)        IUA claims agreement practices;
III)        the practices of any company(ies) electing to agree claims in respect of
their own participation;

except as amended by the following:

a)    Claims Review - cost to be borne by insurers hereon.  It is further
agreed that any adjustments to reserves from such reviews are to be
advised to Leading Lloyd's and/or IUA insurers only and Xchanging
Claims Services.
b)    Projected payments to be agreed by the Slip Leader and Xchanging
Claims Services for entry purposes only.

CLAIMS AGREEMENT
PARTIES:

I)        For Lloyd's syndicates:
The leading Lloyd's syndicate and, where required by the applicable
Lloyd's Claims Scheme, the second Lloyd's syndicate and/or the
Scheme Service Provider.
The second Lloyd's syndicate is: **None**
II)        Those companies acting in accordance with the IUA claims agreement
practices, excepting those that may have opted out via iii) below.
III)        Those companies that have specifically elected to agree claims in
respect of their own participation.
IV)        All other subscribing (re)insurers that are not party to the   Lloyd's/IUA
claims agreement practices, each in respect of their own participation.

CLAIMS ADMINISTRATION: Beach and Associates Limited to handle all administration

RULES AND EXTENT
OF ANY OTHER
DELEGATED
CLAIMS AUTHORITY:        Not applicable.

| 1724 BNA | BEACH AND ASSOCIATES LIMITED<br>on behalf of Beach Wholesale Ltd, an Appointed Representative | MARKET REFORM CONTRACT |
|---|---|---|
| RISK REFERENCE<br>WLS20C237 | UNIQUE MARKET REFERENCE<br>B1724WLS20C237 | Subscription Agreement<br>Page 2 of 2 |

EXPERT(S) FEES
COLLECTION:        Beach and Associates Limited to collect fees, if any, for all contract security (insurers), including overseas.

**SETTLEMENT DUE DATE: 20th September 2020**

BUREAUX
ARRANGEMENTS:        **Premium Processing Clause**

Where the premium is to be paid through Xchanging Ins-sure Services (XIS), payment to Insurers will be deemed to occur on the day that a delinked premium is released for settlement by the Appointed Broker or in the case of non-delinked premiums, on the day that the error-free Premium Advice Note (PAN) is submitted to XIS.

Where premiums are to be paid by instalment under the Deferred Account Scheme, and the Appointed Broker does not receive the premium in time to comply with the agreed settlement date for the second or subsequent instalment, the Appointed Broker, if electing to suspend the automatic debiting of the relevant deferred instalment, shall advise the Slip Leader in writing and instruct XIS accordingly. XIS shall then notify Insurers. Payment to any entity within the same group of companies as the Appointed Broker will be deemed to be payment to the Appointed Broker.

Nothing in this clause shall be construed to override the terms of any Premium Payment Warranty or Clause or any Termination or Cancellation provision contained in this contract. Furthermore, any amendment to the settlement Due Date of a premium instalment as a result of the operation of this Premium Payment Warranty or Clause or Termination or Cancellation provision unless Insurers expressly agree otherwise.

Appointed Broker: Beach and Associates Limited on behalf of Beach Wholesale Ltd (an appointed representative)

LSW3003 14/12/09

Where any Settlement Due Date (SDD), Premium Payment Warranty (PPW) or Premium Payment Condition (PPC) due date falls on a weekend or public holiday, presentation to XIS or insurers hereon or release for settlement of a delinked premium as applicable on the next working day will be deemed to be in compliance with such SDD, PPW OR PPC.

NON-BUREAUX
ARRANGEMENTS:        Not applicable.

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **1**

## ARIZONA SURPLUS LINES NOTICE

**Pursuant to section 20-401.01, subsection B, paragraph 1, Arizona Revised Statutes, this policy is issued by an insurer that does not possess a certificate of authority from the director of the Arizona Department of Insurance. If the insurer that issued this policy becomes insolvent, insureds or claimants will not be eligible for insurance guaranty fund protection pursuant to title 20, Arizona Revised Statutes.**

**LMA9027A**
**26 July 2016**

Attaching to and forming part of UMR:     B1724WLS20C237
Page **1** of **1**


### PREMIUM PAYMENT WARRANTY


IT IS HEREBY WARRANTED that all premium due to Underwriters under this policy is paid within 70 days from inception.

Non-receipt by Underwriters of such premium, by midnight (local standard time) on the premium due date, shall render this policy void with effect from Inception.

623AFB00082

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **2**

### NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

> Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.    Under any Liability Coverage, to injury, sickness, disease, death or destruction

(a) with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.    Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.    As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means

(a)  any nuclear reactor,

Attaching to and forming part of UMR:    B1724WLS20C237
Page **2** of **2**

    (b)  any equipment or device designed or used for (1) separating the    isotopes of uranium or plutonium, (2) processing or utilizing spent    fuel,   or   (3)   handling, processing or packaging waste,

    (c)  any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

    (d)  any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.  With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

NMA1256
17/03/1960

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **2**

### NEW SHORT RATE CANCELLATION TABLE ENDORSEMENT (U.S.A.)

Notwithstanding anything to the contrary contained herein and in consideration of the premium for which this Insurance is written it is agreed that in the event of cancellation thereof by the Assured the Earned Premium shall be computed as follows:-

### SHORT RATE CANCELLATION TABLE

A.   For insurances written for one year:-

| Days Insurance in Force | Per cent. of One Year Premium | Days Insurance in Force | Per cent. of One Year Premium |
|---|---|---|---|
| 1 | 5 | 154 - 156 | 53 |
| 2 | 6 | 157 - 160 | 54 |
| 3 -- 4 | 7 | 161 - 164 | 55 |
| 5 -- 6 | 8 | 165 - 167 | 56 |
| 7 -- 8 | 9 | 168 - 171 | 57 |
| 9 - 10 | 10 | 172 - 175 | 58 |
| 11 - 12 | 11 | 176 - 178 | 59 |
| 13 - 14 | 12 | 179 - 182 (6 months) | 60 |
| 15 - 16 | 13 | 183 - 187 | 61 |
| 17 - 18 | 14 | 188 - 191 | 62 |
| 19 - 20 | 15 | 192 - 196 | 63 |
| 21 - 22 | 16 | 197 - 200 | 64 |
| 23 - 25 | 17 | 201 - 205 | 65 |
| 26 - 29 | 18 | 206 - 209 | 66 |
| 30 - 32 (1 month) | 19 | 210 - 214 (7 months) | 67 |
| 33 - 36 | 20 | 215 - 218 | 68 |
| 37 - 40 | 21 | 219 - 223 | 69 |
| 41 - 43 | 22 | 224 - 228 | 70 |
| 44 - 47 | 23 | 229 - 232 | 71 |
| 48 - 51 | 24 | 233 - 237 | 72 |
| 52 - 54 | 25 | 238 - 241 | 73 |
| 55 - 58 | 26 | 242 - 246 (8 months) | 74 |
| 59 - 62 (2 months) | 27 | 247 - 250 | 75 |
| 63 - 65 | 28 | 251 - 255 | 76 |
| 66 - 69 | 29 | 256 - 260 | 77 |
| 70 - 73 | 30 | 261 - 264 | 78 |
| 74 - 76 | 31 | 265 - 269 | 79 |
| 77 - 80 | 32 | 270 - 273 (9 months) | 80 |
| 81 - 83 | 33 | 274 - 278 | 81 |
| 84 - 87 | 34 | 279 - 282 | 82 |
| 88 - 91 (3 months) | 35 | 283 - 287 | 83 |
| 92 - 94 | 36 | 288 - 291 | 84 |
| 95 - 98 | 37 | 292 - 296 | 85 |
| 99 - 102 | 38 | 297 - 301 | 86 |
| 103 - 105 | 39 | 302 - 305 (10 months) | 87 |
| 106 - 109 | 40 | 306 - 310 | 88 |
| 110 - 113 | 41 | 311 - 314 | 89 |
| 114 - 116 | 42 | 315 - 319 | 90 |
| 117 - 120 | 43 | 320 - 323 | 91 |
| 121 - 124 (4 months) | 44 | 324 - 328 | 92 |
| 125 - 127 | 45 | 329 - 332 | 93 |
| 128 - 131 | 46 | 333 - 337 (11 months) | 94 |
| 132 - 135 | 47 | 338 - 342 | 95 |
| 136 - 138 | 48 | 343 - 346 | 96 |
| 139 - 142 | 49 | 347 - 351 | 97 |
| 143 - 146 | 50 | 352 - 355 | 98 |
| 147 - 149 | 51 | 356 - 360 | 99 |
| 150 - 153 (5 months) | 52 | 361 - 365 (12 months) | 100 |

B.   For Insurances written for more or less than one year:-

1.   If insurance has been in force for 12 months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one year.

2.   If insurance has been in force for more than 12 months:

(a)   Determine full annual premium as for an insurance written for a term of one year.

(b)   Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata Earned Premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was

Attaching to and forming part of UMR:    B1724WLS20C237
Page **2** of **2**
    originally written.

  (c) Add premium produced in accordance with items (a) and (b) to obtain Earned Premium during full period insurance has been in force.

09/02/58
NMA45

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **1**

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

NMA1477

13/02/1960

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **1**

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1.    war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2.    any act of terrorism.

   For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2918

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **1**

## PROFESSIONAL SERVICES EXCLUSION

This endorsement modifies insurance provided under the following:

**ADVANCED BOARDROOM AND COMPANY PROTECTION**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that Clause **III. EXCLUSIONS** is amended by the addition of:

> based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way relating to any act, error or omission in connection with the performance of any professional services by or on behalf of the **Company** for the benefit of any other entity or person.

All other terms and conditions of this Policy remain unchanged.

01/14
LSW4050

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **1**

## REPRESENTATIONS AND SEVERABILITY AMENDED TO ACTUAL KNOWLEDGE

This endorsement modifies insurance provided under the following:

**ADVANCED BOARDROOM AND COMPANY PROTECTION**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that Clause **VIII. GENERAL CONDTIONS** A. Representations and Severability is deleted in its entirety and replaced with the following:

A.    Representations and Severability

The particulars and statements contained in the **Application** are incorporated into and constitute a part of this Policy.

By acceptance of this Policy, the **Insureds** agree:

1.    that the statements in the **Application** are their representations and that this Policy is issued in reliance upon the truth of such representations;

2.    that in the event that the **Application** contains misrepresentations made with the actual intent to deceive, or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by Underwriters under this Policy, Underwriters may only seek to void coverage, *ab initio*, under the following Insuring Clauses with respect to **Claims**, **Investigations** or **Inquiries** arising from such misrepresentations:

(a)    with respect to Insuring Clause I.B. to the extent the **Company** indemnifies any of the **Insured Persons** who had actual knowledge as at the Inception Date of this Policy of any such misrepresentations; and

(b)    with respect to Insuring Clause I.C. to the extent that the chief executive officer or chief financial officer of the **Parent Company** had actual knowledge as at the Inception Date of this Policy of any such misrepresentations; and

3.    that, notwithstanding the above, the **Application** shall be construed as a separate application for coverage by each of the **Insured Persons** and no knowledge possessed by any of the **Insured Persons** shall be imputed to any other natural person.

Notwithstanding the foregoing:

i)    this Policy shall not be voided, in whole or in part, with respect to Insuring Clause I.A.; and

ii)    this Policy shall be non-rescindable with respect to the coverage afforded under Insuring Clauses I.A., I.B., I.C. and I.D.

Underwriters agree to advance payments of **Loss** unless and until an order by a court of competent jurisdiction provides either that such advancement is not required or that coverage is void *ab initio*, subject to the condition that such advance payments by Underwriters shall be repaid to Underwriters by the **Company** or the **Insured Persons** according to their respective interests as soon as reasonably practicable after an order provides that such advancement is not required or that coverage is void *ab initio*.

All other terms and conditions of this Policy remain unchanged.

01/14
LSW4053

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **1**

<u>**AMENDED "INQUIRY" DEFINITION TO INCLUDE SWORN TESTIMONY AND REQUESTS BY A PARTY TO ANY LITIGATION, ARBITRATION OR OTHER PROCEEDING**</u>

This endorsement modifies insurance provided under the following:

**ADVANCED BOARDROOM AND COMPANY PROTECTION**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that Clause **II. DEFINITIONS** I. is deleted in its entirety and replaced with the following:

I.     **"Inquiry"** means:

    1.    a request by the **Company** or a **Regulatory Authority** for any of the **Insured Persons** to appear for an interview or meeting or to provide a sworn testimony or to produce documents in connection with:

        (a)    an inquiry or investigation of any of the **Insureds** by a **Regulatory Authority**, or

        (b)    a **Security Holder Demand**, or

    2.    a request by the **Company** or a **Regulatory Authority** for any of the **Insured Persons** to appear as a witness in a trial or a court hearing of any criminal proceeding solely against the **Company** under the UK Corporate Manslaughter & Homicide Act 2007 or its equivalent in any jurisdiction, or

    3.    in respect of Insuring Clause I.A. only, a request by or on behalf of a party to any litigation, arbitration or other type of proceeding against the **Company** for any of the **Insured Persons** to appear for an interview or meeting or to provide a sworn testimony or to produce documents in connection with such litigation, arbitration or proceeding,

regarding such **Insured Persons** capacity as such or the business of the **Company**, but shall not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production or audit, including any request for mandatory information from a regulatory entity.

All other terms and conditions of this Policy remain unchanged.

01/14
LSW4169

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **1**

## AMENDED 'OTHER INSURANCE AND INDEMNIFICATION' CLAUSE

This endorsement modifies insurance provided under the following:

**ADVANCED BOARDROOM AND COMPANY PROTECTION**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that Clause **VII. OTHER INSURANCE AND INDEMNIFICATION** is deleted in its entirety and replaced with the following:

The **Insureds** and Underwriters agree that all coverage under this Policy is excess over and will not contribute with all other valid and collectible Directors and Officers Liability, Employment Practices Liability, General Liability or Fiduciary Liability insurance, whenever purchased, whether such other insurance is stated to be primary, contributing, excess, contingent or otherwise, unless such other Directors and Officers Liability insurance is written as specific excess insurance over the Limit of Liability provided by this Policy.  However, the coverage under this Policy shall apply as primary to any personal directorship liability insurance of any of the **Insured Persons** or any Directors and Officers Liability insurance issued to any equity holder of the **Company**.

In the event any **Claim** made against, or any **Investigation** of, the **Insured Persons** while acting in their capacity as, or any matter claimed against any of the **Insured Persons** solely by reason of their serving as a director, officer, manager, trustee, governor or executive director or in a functionally equivalent position of any **Outside Entity**, the coverage under this Policy is excess over and will not contribute with:

A.   any indemnification provided by the **Outside Entity**; and

B.   all other valid and collectible insurance, whenever purchased, whether such other insurance is stated to be primary, contributing, excess, contingent or otherwise.


ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

01/14
LSW4171

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **1**

<u>**AMENDED SEVERABILITY OF EXCLUSIONS**</u>

This endorsement modifies insurance provided under the following:

**ADVANCED BOARDROOM AND COMPANY PROTECTION**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that the final paragraph of Clause **III. EXCLUSIONS** is deleted in its entirety and replaced with the following:

For the purpose of determining the applicability of any of the Exclusions:

(a)     in respect of Insuring Clause I.A., no facts pertaining to, no knowledge possessed by, and no **Wrongful Act** of any of the **Insureds** shall be imputed to any other natural person,

(b)     in respect of Insuring Clause I.B., the **Wrongful Act** of any of the **Insured Persons** shall be imputed to the **Company** only to the extent that the **Company** indemnifies such **Insured Persons**, and

(c)     in respect of Insuring Clause I.C., only the **Wrongful Acts** of any of the **Insured Persons** who, at the time of the **Wrongful Act**, was the chief executive officer or chief financial officer of the **Parent Company** shall be imputed to the **Company**.

All other terms and conditions of this Policy remain unchanged.

01/14
LSW4015

Attaching to and forming part of UMR:     B1724WLS20C237
Page **1** of **1**

## <u>AMENDED "APPLICATION" DEFINITION</u>

This endorsement modifies insurance provided under the following:

**ADVANCED BOARDROOM AND COMPANY PROTECTION**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that Clause **II. DEFINITION** A. is deleted in its entirety and replaced with the following:

A.     **"Application"** means:

    1.  the application for this Policy including any materials submitted therewith, and

    2.  any public documents filed by the **Company** with the Securities and Exchange Commission during the twelve (12) month period prior to the inception date of this Policy,

    all of which shall be deemed part of this Policy, as if physically attached.


All other terms and conditions of this Policy remain unchanged.


01/14
LSW4008

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **1**

### AMENDED DEFINITION OF "LOSS" TO EXCLUDE INCREASED CONSIDERATION ENDORSEMENT FOR CORPORATE TAKEOVER OBJECTION

This endorsement modifies insurance provided under the following:

**ADVANCED BOARDROOM AND COMPANY PROTECTION**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that:

1)      Item D. of the Declarations is deleted in its entirety and replaced with the following:

| | |
|---|---|
| USD 100,000 | each of the **Insured Persons** each **Claim, Investigation or Inquiry** but in no event exceeding |
| NIL | in the aggregate each **Claim, Investigation** or **Inquiry** all **Insured Persons** under Insuring Clause I.A. |
| USD 100,000 | each **Claim**, **Investigation** or **Inquiry** under Insuring Clause I.B., other than i) a **Securities Claim** or ii) a **Corporate Takeover Objection** |
| USD 200,000 | each **Securities Claim** under Insuring Clause I.B., other than a **Corporate Takeover Objection** |
| USD 200,000 | each **Securities Claim** under Insuring Clause I.C., other than a **Corporate Takeover Objection** |
| USD 350,000 | each **Corporate Takeover Objection** |
| NIL | each **Security Holder Demand** under Insuring Clause I.D. |

2)      Clause **II. DEFINITIONS** is amended by the addition of:

"Corporate Takeover Objection" means:

1.  any **Claim**, **Investigation** or **Inquiry** under Insuring Clause I.B.; and/or

2.  any **Securities Claim** under Insuring Clause I.C.

in whole or in part based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any actual or proposed **Corporate Takeover**.

3)      Clause **II. DEFINITIONS** O. shall not include (other than **Costs, Charges and Expenses)** any amount that represents or is substantially equivalent to an increase in the consideration paid (or proposed to be paid) by the **Company** in connection with its purchase of any securities or assets.

All other terms and conditions of this Policy remain unchanged.

01/14
LSW4029

Attaching to and forming part of UMR:     B1724WLS20C237
Page **1** of **1**

## UPLISTING ENDORSEMENT

In the event that the **Company** undertakes  a registration to list any securities of the **Company** on any stock exchange, securities exchange or bourse other than the Over the Counter Markets in the United States (i.e. OTCQX, OTCQB and OTC Pink), then this Policy will be cancelled as of the effective date of such listing. If there has been no notification of any **Claim**, **Investigation**, **Inquiry** or of any fact, circumstance, situation or request to toll a period or statute of limitation, then the **Company** will be entitled to a return premium calculated at pro-rata.

All other terms and conditions of this Policy remain unchanged.

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **1**

### DERIVATIVE PLAINTIFF ATTORNEY FEES COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**ADVANCED BOARDROOM AND COMPANY PROTECTION**


In consideration of the premium charged for this Policy, it is hereby understood and agreed that:

1)    Clause **II. DEFINITION** F. is deleted in its entirety and replaced with the following:

    F.    **"Derivative Suit"** means any lawsuit brought derivatively on behalf of the **Company** by a security holder of the **Company**.

2)    Clause **II. DEFINITION** O. is amended by the addition of:

    4.    with respect to Insuring Clause I.C., plaintiff attorney fees and expenses awarded or approved by the court in a **Derivative Suit**.


All other terms and conditions of this Policy remain unchanged.

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **1**

## AMENDED "COSTS, CHARGES AND EXPENSES" DEFINITION TO INCLUDE SOX 304 AND DODD-FRANK COSTS / CLASS CERTIFICATION FEES

This endorsement modifies insurance provided under the following:

**ADVANCED BOARDROOM AND COMPANY PROTECTION**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that Clause **II. DEFINITIONS** E. is deleted in its entirety and replaced with the following:

E.    **"Costs, Charges and Expenses"** means:

1.    reasonable and necessary legal fees and expenses incurred by the **Insureds** in defense and appeal of any **Claim** or **Investigation** and cost of attachment or similar bonds, including:

   (a)    reasonable and necessary expert fees and **Class Certification Fees** incurred by the **Insureds** in defense and appeal of any **Claim** or **Investigation**, and

   (b)    reasonable and necessary legal fees and expenses incurred by the **Insureds** in defense and appeal of:

      (i)    any **Claim** made against the chief executive officer or chief financial officer of the **Parent Company** seeking repayment of compensation as a result of a financial restatement of the **Company** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002, or

      (ii)    any **Claim** made against the **Insured Persons** seeking repayment of compensation as a result of a financial restatement of the **Company** pursuant to Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act or any internal policy of the **Company** promulgated in accordance therewith; and

2.    in respect of coverages afforded under Clause II.B.2., reasonable costs (other than collateral) for a bond or other financial instrument to guarantee the contingent obligation of the **Insured Persons** for bail or its equivalent required by a court in any foreign jurisdiction,

but shall not include salaries, wages, overhead or benefit expenses associated with directors, officers or employees of the **Company**.

Clause **II. DEFINITIONS** is amended by the addition of the following:

_.    "**Class Certification Fees**" means reasonable and necessary expert fees incurred by the **Insureds** to conduct an event study filed with the court in opposition to class certification in any **Securities Claim**.

All other terms and conditions of this Policy remain unchanged

Attaching to and forming part of UMR:    B1724WLS20C237
Page **1** of **4**

### BOOKS AND RECORDS COSTS / DELETION OF SIDE A REINSTATEMENT AND EMERGENCY COSTS, CHARGES AND EXPENSES ENDORSEMENT

This endorsement modifies insurance provided under the following:

**ADVANCED BOARDROOM AND COMPANY PROTECTION**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that:

1)    the first paragraph of the DECLARATIONS is deleted in its entirety and replaced with the following:

THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS, THIS POLICY APPLIES ONLY TO ANY **CLAIM** FIRST MADE, ANY **INVESTIGATION** FIRST COMMENCED, ANY **INQUIRY** FIRST REPORTED AND ANY **BOOKS AND RECORDS DEMAND** FIRST MADE DURING THE **POLICY PERIOD** PROVIDED:

(3)    SUCH **CLAIM** OR **INVESTIGATION** IS REPORTED TO UNDERWRITERS IN ACCORDANCE WITH THE TERMS OF CLAUSE VI.A.; AND

(4)    SUCH **INQUIRY** IS FIRST RECEIVED BY THE **INSURED PERSONS** ON OR AFTER THE DATE SET FORTH IN ITEM J. OF THE DECLARATIONS; AND

(5)    SUCH **BOOKS AND RECORDS DEMAND** IS REPORTED TO UNDERWRITERS IN ACCORDANCE WITH THE TERMS OF CLAUSE VI.B.

AMOUNTS INCURRED AS **COSTS, CHARGES AND EXPENSES** AND **INQUIRY COSTS** SHALL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY OR THE SUBLIMIT OF LIABILITY, IF APPLICABLE, AND ARE SUBJECT TO THE RETENTIONS. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY UNDERWRITERS TO DEFEND ANY OF THE **INSUREDS**.

2)    Clause **I. INSURING CLAUSE** D. is deleted in its entirety and replaced with the following:

D.    Underwriters shall pay on behalf of the **Company**:
1. all **Security Holder Demand Investigatory Costs** resulting from any **Security Holder Demand** first made during the **Policy Period** for a **Wrongful Act**; or
2. all **Books and Records Costs** resulting from any **Books and Records Demand** first made against the **Company** during the **Policy Period**.

3)    Clause **II. DEFINITION** O.3. is deleted in its entirety and replaced with the following:

3.    with respect to Insuring Clause I.D., **Security Holder Demand Investigatory Costs** or **Books and Records Costs** incurred by the **Company**,

4)    Clause **II. DEFINITION** X. is deleted in its entirety and replaced with the following:

X.    **"Securities Claim"** means:

1. (a)    any demand or proceeding described in Clause II.B.1. against any of the **Insureds**, other than an administrative or regulatory proceeding, or

(b)    any administrative or regulatory proceeding initiated:

(i)    against any of the **Insured Persons**, or

(ii)    against any of the **Insured Persons** and the **Company** but only during the time the **Insured Persons** and the **Company** are continuously maintained in such proceeding,

alleging any violation of the Securities Act of 1933, the Securities Exchange Act of 1934, rules or regulations of the Securities and Exchange Commission under either or both Acts, similar securities laws or regulations of any federal, state (including any state blue sky laws), local or any foreign jurisdiction, any other laws, rules, regulations or statutes regulating securities or any common law arising out of, involving, or relating to the ownership, purchase or sale of or

offer to purchase or sell any securities of the **Company**, including any debt or equity securities, whether on the open market or through a public or private offering, or

2.    any demand or proceeding described in Clause II.B.1. against any of the **Insureds** which is brought by a security holder of the **Company** in their capacity as such, including a **Derivative Suit**,

but shall not include any **Security Holder Demand** or **Books and Records Demand**.

5)    Clause **II. DEFINITIONS** is amended by the addition of the following:

_.    "**Books and Records Costs**" means reasonable and necessary fees and expenses incurred by the **Company** in response to a **Book and Records Demand**, but shall not include salaries, wages, overhead or benefit expenses associated with directors, officers or employees of the **Company**.

_.    "**Books and Records Demand**" means a written demand made by one more security holders of the **Company** solely to inspect the books and records of the **Company** pursuant to Section 220 of the Delaware General Corporation Law or any similar statute in any other jurisdiction.

6)    Clause **IV. LIMIT OF LIABILITY, RETENTIONS AND ORDER OF PAYMENTS** is deleted in its entirety and replaced with the following:

A.    Underwriters shall be liable to pay the percentage of **Loss** set forth in Item E. of the Declarations in excess of the amount of the applicable Retention up to the Limit of Liability or Sublimit of Liability, if applicable, it being warranted that the remaining percentage of **Loss** shall be uninsured. The Retention applicable to Insuring Clause I.B. shall apply to **Loss** payable under Insuring Clause I.A. if indemnification by the **Company** is required by law or is legally permissible to the fullest extent permitted by law.

No Retention shall apply to any **Loss** under Insuring Clause I.D.

If the **Company** fails or refuses to advance or indemnify the **Insured Persons** for any reason within sixty (60) days of **Loss** becoming due and payable and after specific written request is made by or on behalf of any **Insured Persons**, then Underwriters shall pay **Loss** on behalf of any **Insured Persons** within the Retention applicable to Insuring Clause I.B. after Underwriters have received written and itemised documentation of such **Loss** by means of invoices or otherwise, subject to the terms, conditions and limitations of this Policy. Any payments of **Loss** by Underwriters within the Retention applicable to Insuring Clause I.B. shall serve to reduce the Limit of Liability or Sublimit of Liability, if applicable of Underwriters under the Policy.  In such event, Underwriters shall be entitled to obtain reimbursement from the **Company** for all payments made by Underwriters that would not have been made had the indemnity in respect of the Retention been provided by the **Company**, unless the **Company** is unable to indemnify by reason of its insolvency.

Notwithstanding the above, if and to the extent any covered **Loss** which is within any applicable Retention under this Policy is paid on behalf of the **Insured Persons** by any other insurer pursuant to the terms and conditions of any Excess Difference in Conditions Side A policy which is specifically excess of this Policy, then such applicable Retention under this Policy shall be eroded by the amount of such payment.

B.    The amount shown in Item C.1. of the Declarations shall be the maximum aggregate Limit of Liability of Underwriters under the Policy.

The amount shown in Item C.2. of the Declarations shall be the maximum aggregate Sublimit of Liability of Underwriters under the Policy for (i) all **Security Holder Demand Investigatory Costs** arising from all **Security Holder Demands** and (ii) all **Books and Records Costs** arising from all **Books and Records Demands** under Insuring Clause I.D.  Such Sublimit of Liability shall be part of, and not in addition to, the Limit of Liability stated in Item C.1. of the Declarations.

C.    More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following dates:

1.    the date on which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

Attaching to and forming part of UMR:     B1724WLS20C237
Page **3** of **4**

    2.  the date on which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Clause VI.C.

D.    More than one **Investigation** having as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions shall be deemed to constitute a single **Investigation** and shall be deemed to have been commenced at the earliest of the following dates:

    1.  the date on which the earliest **Investigation** is first commenced; or

    2.  the date on which the **Investigation** shall be deemed to have been commenced pursuant to Clause VI.C.

E.    If an **Inquiry** is first reported to Underwriters during the **Policy Period** in accordance with Clause VI.B. then such **Inquiry** and any subsequent **Inquiry** having as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions shall be deemed a single **Inquiry** first reported on the date the earliest **Inquiry** is first reported.

F.    If a **Books and Records Demand** is first received by the **Company** during the **Policy Period** and is reported in accordance with Clause VI.b. then such **Books and Records Demand** and any subsequent **Books and Records Demand** having as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions shall be deemed a single **Books and Records Demand** first received on the date the earliest **Books and Records Demand** was first received.

G.    Any **Claim**, **Investigation**, **Inquiry** or **Books and Records Demand** having as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions shall be deemed a single **Claim** and shall be deemed to have been made at the earliest of the following dates:

    1.  the date on which the **Books and Records Demand** is first received;

    2.  the date on which the **Inquiry** is first reported;

    3.  the date on which the **Investigation** is first commenced; or

    4.  the date on which the **Claim** is first made.

H.    In the event more than one of the Insuring Clauses set forth in Clause I. are applicable to a **Claim**, **Investigation** or **Inquiry**, the Retentions set forth in Item D. of the Declarations shall be applied separately to that part of the **Loss** resulting from such **Claim**, **Investigation** or **Inquiry** covered by each Insuring Clause.  The sum of the Retentions so applied shall constitute the Retention applicable to such **Claim**, **Investigation** or **Inquiry**. The total Retention as finally determined shall in no event exceed the largest of the applicable Retentions for such **Claim**, **Investigation** or **Inquiry**.

I.    Payments of **Loss** by Underwriters shall reduce the Limit of Liability and any applicable Sublimit of Liability.
Underwriters shall pay **Loss** in the following order:

    1.  first, under Insuring Clause I.A., provided however that such **Loss** is allocable to any **Wrongful Act** committed or any conduct undertaken prior to the **Company** becoming a debtor in possession under the United States bankruptcy law or similar legal status under foreign law; and

    2.  second, under Insuring Clause I.A. where such **Loss** is allocable to any **Wrongful Act** committed or any conduct undertaken on or after the **Company** became a debtor in possession under the United States bankruptcy law or similar legal status under foreign law; and

    3.  third, at the written request of the chief executive officer of the **Parent Company**, Underwriters shall either pay or withhold **Loss** payable under Insuring Clause I.B.; and

    4.  lastly, at the written request of the chief executive officer of the **Parent Company**,

Attaching to and forming part of UMR:    B1724WLS20C237
Page **4** of **4**

Underwriters shall either pay or withhold **Loss** payable under Insuring Clauses I.C. and I.D.

In the event Underwriters withhold payment pursuant to sub-paragraphs 3. and 4. above, then Underwriters shall, at such time and in such manner as shall be set forth in the instructions of the chief executive officer of the **Parent Company**, remit such payment to the **Company** or directly to or on behalf of the **Insured Persons**.

Underwriters shall have no obligation to pay **Loss** after exhaustion of the Limit of Liability or Sublimit of Liability, if applicable, regardless of whether the **Parent Company** has withheld payment.

J.    Underwriters shall pay **Costs, Charges and Expenses** or **Inquiry Costs** on a current basis but no less than once every ninety (90) days.

7)    Clause **V. SETTLEMENTS AND DEFENSE** is deleted in its entirety and replaced with the following:

A.    No settlement shall be made and no **Costs, Charges and Expenses, Facilitation Costs, Inquiry Costs, Security Holder Demand Investigatory Costs** or **Books and Records Costs** shall be incurred without Underwriters' consent, such consent not to be unreasonably withheld.

However:

1.    if the **Insureds** cannot reasonably obtain Underwriters' consent prior to **incurring Costs, Charges and Expenses, Facilitation Costs or Inquiry Costs**, Underwriters will give retroactive consent, up to an amount of five percent (5%) of the applicable Retention, as long as Underwriters' consent is sought within fourteen (14) days of the first **Costs, Charges and Expenses, Facilitation Costs** or **Inquiry Costs** being incurred; and

2.    Underwriters' consent shall not be required for a settlement where such settlement is for an amount below the applicable Retention (inclusive of **Costs, Charges and Expenses**) provided the **Insureds** shall give Underwriters as soon as practicable details of the settlement amounts and the date the settlement is confirmed by the court.

B.    It shall be the duty of the **Insureds** and not the duty of the Underwriters to defend **Claims, Investigations** or **Inquiries**, including the investigation, review and evaluation of any **Security Holder Demand** or to respond to any **Books and Records Demand**.

8)    Clause **VI. NOTIFICATION** B. is deleted in its entirety and replaced with the following:

B.    If the **Insureds** elect to seek coverage for **Inquiry Costs** in connection with an **Inquiry** or **Books and Records Costs** in connection with a **Books and Records Demand**, the **Insureds** shall give to Underwriters notice in writing of such **Inquiry** or **Books and Records Demand**, but in no event later than:

1.    the end of the **Policy Period**, or

2.    in the event this Policy is non-renewed with Underwriters, sixty (60) days after the end of the **Policy Period**.

9)    Clause **XIV. WORLDWIDE** is deleted in its entirety and replaced with the following:

This Policy applies only to **Claims** first made, **Investigations** first commenced, **Inquiries** first reported and **Books and Records Demands** first made during the **Policy Period** anywhere in the world as permitted by law.

10)    reference to '**Security Holder Demand Investigatory Costs**' and '**Security Holder Demand**' in Items C., D. and E. of the Declarations are deemed amended to read '**Security Holder Demand Investigatory Costs** and **Books and Records Costs**' and '**Security Holder Demand** and **Books and Records Demand**'.

All other terms and conditions of this Policy remain unchanged.

Attaching to and forming part of UMR:     B1724WLS20C237
Page **1** of **1**

## SANCTION LIMITATION AND EXCLUSION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

LMA3100
15 September 2010

**ADVANCED BOARDROOM AND COMPANY PROTECTION**

In consideration of the payment of the premium, in reliance on the **Application** and subject to all of the provisions of this Policy, Underwriters and the **Insureds** agree as follows:

I.    **INSURING CLAUSES**

    A.    Underwriters shall pay on behalf of the **Insured Persons**:

        1.    **Loss** resulting from any **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act**; or

        2.    **Loss** resulting from any **Investigation** of the **Insured Persons** first commenced during the **Policy Period**; or

        3.    **Inquiry Costs** resulting from any **Inquiry** first reported to Underwriters during the **Policy Period** provided such **Inquiry** is first received by the **Insured Persons** on or after the date set forth in Item J. of the Declarations.

    B.    Underwriters shall pay on behalf of the **Company**:

        1.    **Loss** which the **Company** is required or permitted or has agreed to pay as indemnification to any of the **Insured Persons** resulting from any **Claim** first made against the **Insured Persons** during the **Policy Period** for a **Wrongful Act**; or

        2.    **Loss** which the **Company** is required or permitted or has agreed to pay as indemnification to any of the **Insured Persons** resulting from any **Investigation** of the **Insured Persons** first commenced during the **Policy Period**; or

        3.    **Inquiry Costs** which the **Company** is required or permitted or has agreed to pay as indemnification to any of the **Insured Persons** resulting from any **Inquiry** first reported to Underwriters during the **Policy Period** provided such **Inquiry** is first received by the **Insured Persons** on or after the date set forth in Item J. of the Declarations.

    C.    Underwriters shall pay on behalf of the **Company Loss** resulting from any **Securities Claim** first made against the **Company** during the **Policy Period** for a **Wrongful Act**.

    D.    Underwriters shall pay on behalf of the **Company** all **Security Holder Demand Investigatory Costs** resulting from any **Security Holder Demand** first made during the **Policy Period** for a **Wrongful Act.**

**II.    DEFINITIONS**

The following terms whenever used in this Policy in boldface type shall have the meanings indicated.

A.    **"Application"** means:

    1.    the application for this Policy including any materials submitted therewith, and

    2.    any public documents filed by the **Company** with the Securities and Exchange Commission or any similar foreign authority during the twelve (12) month period prior to the inception date of this Policy,

    all of which shall be deemed part of this Policy, as if physically attached.

B.    **"Claim"** means:

    1.    any written demand for monetary damages, non monetary relief, injunctive relief or other relief against any of the **Insureds**, or any civil, criminal, administrative, regulatory, arbitration or mediation proceeding or other alternative dispute resolution process initiated against any of the **Insureds**, including:

        (a)    any appeal from any such proceeding;

        (b)    any proceeding before the Equal Employment Opportunity Commission or any similar federal, state, local or foreign governmental body;

        (c)    any **Manslaughter Claim**;

        (d)    in respect of Insuring Clause I.A. only, any formal demand or proceeding arising out of any statutory liability of the **Insured Persons** due to the failure of the **Company** to deduct, withhold or remit taxes (including non-resident withholding taxes, goods and services taxes, salary or withholding taxes and employee source deductions), unemployment insurance contributions, or pension plan contributions; or

        (e)    in respect of Insuring Clause I.A. only, any formal demand or proceeding arising out of any statutory liability of the **Insured Persons** due to the failure of the **Company** to pay debts for services performed by an employee of the **Company** for salary, wages or related amounts such as vacation pay or holiday pay; or

    2.    any extradition proceeding initiated against any of the **Insured Persons**, or the arrest and detainment or incarceration for more than twenty-four (24) hours of any of the **Insured Persons**

solely with respect to their status as **Insured Persons** of the **Company**, by any law enforcement authority in a foreign jurisdiction in conjunction with any proceeding described in 1. above or an **Investigation** or **Inquiry**; or

3.  in respect of Insuring Clause I.D., any **Security Holder Demand**, but shall not include any **Investigation** or **Inquiry**.

C.  **"Company"** means:

1.  the **Parent Company**;

2.  any **Subsidiary**;

3.  the **Parent Company** or any **Subsidiary** as a debtor in possession under the United States bankruptcy law or similar legal status under foreign law; and

4.  any foundation, charitable trust or political action committee totally funded or controlled by the **Parent Company** or any **Subsidiary**.

D.  **"Corporate Takeover"** means:

1.  the acquisition by any person or entity of more than fifty percent (50%) of the outstanding securities of the **Parent Company** representing the present right to vote for the election of directors; or

2.  the merger of the **Parent Company** into another entity such that the **Parent Company** is not the surviving entity.

E.  **"Costs, Charges and Expenses"** means:

1.  reasonable and necessary legal fees and expenses including reasonable and necessary expert fees incurred by the **Insureds** in defense and appeal of any **Claim** or **Investigation** and cost of attachment or similar bonds, and

2.  in respect of coverages afforded under Clause II.B.2., reasonable costs (other than collateral) for a bond or other financial instrument to guarantee the contingent obligation of the **Insured Persons** for bail or its equivalent required by a court in any foreign jurisdiction,

but shall not include salaries, wages, overhead or benefit expenses associated with directors, officers or employees of the **Company**.

F.  **"Derivative Suit"** means any lawsuit brought derivatively on behalf of the **Company** by a security holder of the **Company** against any of the **Insured Persons**.

G.  **"Employment Practice Violation"** means any actual or alleged:

1.  wrongful dismissal, discharge or termination of employment whether actual or constructive;

2.  employment related misrepresentation;

3.  violation of any federal, state, local or foreign law prohibiting discrimination in employment, including the Americans with Disabilities Act of 1990, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Law of 1964, the Pregnancy Discrimination Act of 1978, the Civil Rights Act of 1866, the Equal Pay Act of 1963, the Genetic Information Nondiscrimination Act of 2008, the Family and Medical Leave Act of 1993, the Older Workers Benefit Protection Act of 1990, or any rule or regulation promulgated thereunder;

4.  sexual or other harassment in the workplace;

5.  abusive or hostile work environment;

6.  wrongful deprivation of career opportunity, failure to hire, promote, or grant tenure, or wrongful demotion;

7.  wrongful discipline or evaluation;

8.  breach of an implied employment contract or promissory estoppels;

9.  failure to adopt adequate employment or workplace policies and procedures;

10. retaliation against any of the **Insured Persons** including retaliation for filing claims under the Federal False Claims Act, retaliation in connection with whistleblowing, retaliation for exercising civil rights, retaliation for union activities or in connection with strikes or lockouts; or

11. negligent hiring or negligent supervision of others, including wrongful failure to provide adequate training, in connection with 1. through 10. above.

H. **"Facilitation Costs"** means reasonable and necessary fees, costs and expenses (including the premium or origination fee for a loan or bond) incurred by:

    1. the chief executive officer or chief financial officer of the **Parent Company** solely to facilitate the return of amounts required to be repaid pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002, or

    2. the **Insured Persons** solely to facilitate the return of amounts required to be repaid pursuant to Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act or any internal policy of the **Company** promulgated in accordance therewith,

provided that such fees, costs or expenses do not include the payment, return, reimbursement, disgorgement or restitution of any such amounts requested or required to be repaid pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act or any internal policy of the **Company** promulgated in accordance therewith.

I. **"Inquiry"** means:

    1. a request by the **Company** or a **Regulatory Authority** for any of the **Insured Persons** to appear for an interview or meeting or to produce documents in connection with:

(a)   an inquiry or investigation of any of the **Insureds** by a **Regulatory Authority**, or

(b)   a **Security Holder Demand**, or

2.   a request by the **Company** or a **Regulatory Authority** for any of the **Insured Persons** to appear as a witness in a trial or a court hearing of any criminal proceeding solely against the **Company** under the UK Corporate Manslaughter & Homicide Act 2007 or its equivalent in any jurisdiction,

regarding such **Insured Persons** capacity as such or the business of the **Company**, but shall not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production or audit, including any request for mandatory information from a regulatory entity.

J.   **"Inquiry Costs"** means reasonable and necessary fees and expenses incurred by the **Insured Persons** solely in connection with such **Insured Persons** preparation for and response to an **Inquiry**, but shall not include:

1.   salaries, wages, overhead or benefit expenses associated with directors, officers or employees of the **Company**;

2.   costs of complying with any discovery or other request seeking documents (including electronic information) in the possession or control of the **Company** or for which the **Company** has the direct financial responsibility to produce; or

3.   any amounts incurred prior to the time that the **Inquiry** is reported to Underwriters in accordance with Clause VI.B.

K.   **"Insured Persons"** means:

1.   all persons who were, now are, or shall be directors, officers or risk managers of the **Company** and all persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

2.   all persons who were, now are, or shall be managers or functionally equivalent roles of any limited liability company as defined in Clause II.AA.;

3.   all persons who were, now are, or shall be members of the board of managers of the **Company**;

4.   all persons who were, now are, or shall be employees of the **Company**, but only to the extent:

(a) any **Claim** or **Investigation** is for an **Employment Practice Violation** or is a **Securities Claim**, or

(b) such employee is named as a co-defendant in any **Claim** or **Investigation** with any of the persons set forth in the above provisions of this definition;

5. all natural persons who were, now are, or shall be shadow directors, as defined under Section 251 of the United Kingdom Companies Act 2006, of the **Parent Company** or any **Subsidiary** operating or incorporated in the United Kingdom or the Republic of Ireland;

6. any de facto or alleged de facto director of the **Company**; and

7. the lawful spouse or domestic partner of any of the persons set forth in the above provisions of this definition, but only to the extent the spouse or domestic partner is a party to any **Claim** or **Investigation** solely because of his or her status as the spouse or domestic partner of any such persons and only for the purposes of any **Claim** or **Investigation** seeking damages recoverable from marital community property, property jointly held by any such person and the spouse or domestic partner, or property transferred from any such person to the spouse or domestic partner,

including their estates, heirs, legal representatives, trusts, estate planning vehicles or assigns in the event of their death, incapacity or bankruptcy.

L.    **"Insureds"** means the **Company** and the **Insured Persons**.

M.    **"Interrelated Wrongful Acts"** means **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

N.    **"Investigation"** means:

1. any formal investigation of any of the **Insured Persons** by a **Regulatory Authority**:

(a) once any such **Insured Persons** are identified in writing by such **Regulatory Authority** as a person against whom a **Claim** may be brought, including without limitation receipt of a target letter, or

(b) after the service of a subpoena or other similar written request compelling witness testimony or document production upon any such **Insured Persons**, or

(c) after any such **Insured Persons** have been identified in a Wells Notice, target letter or other written notice describing actual or alleged violations of securities laws or other laws by any such **Insured Persons**; or

2. in respect of Insuring Clause I.A. only, any informal investigation of any of the **Insured Persons** by the Securities and Exchange Commission or any similar federal, state, local or foreign governmental body with jurisdiction over violations of securities laws after such **Insured Person** becomes aware that they are the subject of such investigation and, as a consequence of such investigation, retains legal counsel.

O.  **"Loss"** means:

1. (a)  damages, judgments, including pre and post-judgment interest, and settlements,

(b) **Inquiry Costs** and **Costs, Charges and Expenses**, and

(c) punitive, exemplary or multiplied damages where the applicable law allows coverage for punitive, exemplary or multiplied damages,

incurred by any of the **Insureds**, and

2. **Facilitation Costs**, and

3. with respect to Insuring Clause I.D., **Security Holder Demand Investigatory Costs** incurred by the **Company**,

but shall not include (other than **Inquiry Costs** and **Costs, Charges and Expenses)**:

(i) taxes or the loss of tax benefits except:

a. with respect to that portion of any tax assessment imposed on any of the **Insured Persons** by a foreign jurisdiction based on Underwriters' payment of such damages, judgments, settlements, **Inquiry Costs** or **Costs, Charges and Expenses** as a foreign or non-admitted carrier; or

b. with respect to any statutory liability for such taxes owed by any of the **Insured Persons** as described in Clause II.B.1.(d);

(ii) criminal or civil fines or penalties imposed by law, except:

a. fines or civil penalties assessed against any of the **Insureds** pursuant to Section 78dd 2(g)(2)(B) or Section 78ff (c)2(B) of the Foreign Corrupt Practices Act, 15 U.S.C. or Section 11(1)(a) of the United Kingdom Bribery Act of 2010, Chapter 23 or any statute or law similar to the foregoing in any jurisdiction,

b. civil penalties assessed against any of the **Insureds** for the benefit of shareholders pursuant to Section 308 of the Sarbanes Oxley Act of 2002, or

c. under Insuring Clause I.A. only, any other fine or civil penalty imposed against any of the **Insured Persons** where the applicable law allows coverage for such fine or civil penalty, subject to a maximum sublimit of USD 10,000 each of the **Insured Persons** but in no event exceeding USD 100,000 in the aggregate for the **Policy Period** all **Insured Persons**, such sublimit shall be part of, and not in addition to, the Limit of Liability stated in Item C.1. of the Declarations;

(iii) matters deemed uninsurable under the law pursuant to which this Policy shall be construed;

(iv) any wages, salary or benefits owed pursuant to the terms of any employment contract except with respect to any statutory liability for such wages, salary or benefits owed by any **Insured Persons** as described in Clause II.B.1.(e).

Notwithstanding the foregoing, Underwriters shall not assert that the portion of any judgment, settlement or **Costs, Charges and Expenses** incurred in connection with any **Securities Claim** alleging violations of Section 11 or 12 of the Securities Act of 1933 as amended, including without limitation such **Loss** of any **Insured Persons** deemed to be a controlling person within the meaning of Section 15 of the Securities Act of 1933, or any similar securities laws or common laws or regulations of any foreign jurisdiction, as amended, are uninsurable.

With respect to the coverage for punitive, exemplary or multiplied damages, and the insurability of fines or penalties under exception (ii) above or matters under exception (iii) above, any applicable law most favourable to the insurability of such damages, fines or penalties or matters shall apply, and where the **Insureds** are able to demonstrate in good faith that such damages, fines, penalties or matters are insurable under any applicable law, Underwriters shall not challenge that interpretation of insurability. For purposes of this provision, "any applicable law" shall include but not be limited to the law: a) where the **Claim** seeking such damages was brought, b) where the **Wrongful Acts** giving rise to the **Claim** seeking such damages took place, c) where the **Insureds** are incorporated, have their principal place of business or reside, and d) where Underwriters are incorporated or have their principal place of business.  If any of the **Insureds** present a written legal opinion stating that such damages, fines, penalties or matters are insurable under any applicable law, Underwriters shall not challenge that determination.

The determination of whether any of the **Insured Persons** have incurred any **Loss** shall be made without regard to:

(1)  any insurance (with the exception of insurance purchased by the **Company**), and

(2)  any indemnification that any of the **Insured Persons** may have from any source (other than from the **Company**), including without limitation from or as a result of any equity holder of the **Company**.

P.   **"Management Control"** means:

1.  owning interest representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of a majority of the board of directors of a corporation, the members of the management board of a limited liability corporation or with respect to entities operating or organized outside the United States, persons serving in a functionally equivalent role; or

2.  having the right, pursuant to written contract or the bylaws, charter, operating agreement or similar documents of the **Company** to elect, appoint or designate a majority of the board of directors of a corporation, the management board of a limited liability corporation or with respect to entities operating or organized outside of the United States, persons serving in a functionally equivalent role.

Q.   **"Manslaughter Claim"** means the prosecution of any of the **Insured Persons** for involuntary, constructive or gross negligence manslaughter before the Crown Prosecution Service, the Procurator Fiscal or any similar authority with jurisdiction over any corporate manslaughter violation.

R.   **"Optional Extension Period"** means the period described in Clause IX.A.

S.   **"Outside Entity"** means:

　　1.  any not-for-profit organization, community chest, fund or foundation;

　　2.  any for-profit organization whose securities are not publicly owned or traded where the **Insured Persons** serve with such organization at the specific request of the **Company**; or

　　3.  any other organization specified in Item L. of the Declarations.

T.   **"Parent Company"** means the entity named in Item A. of the Declarations.

U.   **"Policy Period"** means the period from the effective date and hour of this Policy to the Policy expiration date and hour as set forth in Item B. of the Declarations, or its earlier cancellation date and hour, if any, or the end of the **Optional Extension Period**, **Predetermined Run-Off Period** or the Retired and Resigned Insured Person Extension, if purchased.

V.   **"Predetermined Run-Off Period"** means the period described in Clause VIII.B.

W.   **"Regulatory Authority"** means any federal, state, local or foreign law enforcement or governmental authority (including the Department of Justice, the Securities and Exchange Commission and any attorney general) or the enforcement unit of any securities exchange or similar self-regulating body.

X.   **"Securities Claim"** means:

　　1.  (a)  any demand or proceeding described in Clause II.B.1. against any of the **Insureds**, other than an administrative or regulatory proceeding, or

　　　　(b)  any administrative or regulatory proceeding initiated:

　　　　　　(i)   against any of the **Insured Persons**, or

　　　　　　(ii)  against any of the **Insured Persons** and the **Company** but only during the time the **Insured Persons** and the **Company** are continuously maintained in such proceeding,

　　alleging any violation of the Securities Act of 1933, the Securities Exchange Act of 1934, rules or regulations of the Securities and Exchange Commission under either or both

Acts, similar securities laws or regulations of any federal, state (including any state blue sky laws), local or any foreign jurisdiction, any other laws, rules, regulations or statutes regulating securities or any common law arising out of, involving, or relating to the ownership, purchase or sale of or offer to purchase or sell any securities of the **Company**, including any debt or equity securities, whether on the open market or through a public or private offering, or

2. any demand or proceeding described in Clause II.B.1. against any of the **Insureds** which is brought by a security holder of the **Company** in their capacity as such, including a **Derivative Suit**,

but shall not include any **Security Holder Demand**.

Y. **"Security Holder Demand"** means any written demand made by one or more security holders of the **Company** upon the **Company's** Board of Directors to bring a civil proceeding against any of the **Insured Persons** for a **Wrongful Act**.

Z. **"Security Holder Demand Investigatory Costs"** means reasonable fees and expenses incurred by the **Company** in connection with the investigation, review or evaluation of any **Security Holder Demand**.

AA. **"Subsidiary"** means any entity, including but not limited to any limited liability company, over which the **Parent Company** directly or indirectly had or has **Management Control**, if the **Parent Company**:

1. had **Management Control** of such entity prior to or on the inception date of this Policy;

2. first has **Management Control** of such entity after the inception date of this Policy provided the assets of the entity do not exceed twenty-five percent (25%) of the consolidated assets of the **Company** as set forth in the **Company's** most recent audited financial statement; or

3. first has **Management Control** of such entity after the inception date of this Policy provided that if the assets of the entity exceed twenty-five percent (25%) of the consolidated assets of the **Company** as set forth in the **Company's** most recent audited financial statement, the provisions of Clause VIII.B.1. must be fulfilled,

provided, that this Policy only provides coverage for any **Wrongful Act** committed or any conduct undertaken while the **Parent Company** had **Management Control** of such entity.

BB. **"Wrongful Act"** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty:

1. by any of the **Insured Persons**, while acting in their capacity as such, or any matter claimed against any of the **Insured Persons** solely by reason of their serving in such capacity;

    2. by any of the **Insured Persons**, while acting in their capacity as, or any matter claimed against any of the **Insured Persons** solely by reason of their serving as:

        (a) a controlling person within the meaning of Section 15 of the Securities Act of 1933, as amended or Section 20(a) of the Securities Exchange Act 1934, as amended; or

        (b) a director, officer, manager, trustee, governor or executive director or in a functionally equivalent position of any **Outside Entity**; and

    3. by the **Company** involving a **Securities Claim**.

## III.    EXCLUSIONS

Underwriters shall not be liable to make any payment in connection with that portion of any **Claim**, **Investigation** or **Inquiry**:

A. for actual or alleged sickness, disease, death, false arrest, false imprisonment, damage to or destruction of tangible property (including loss of use thereof) or, except to the extent the **Claim** or **Investigation** is for an **Employment Practice Violation**, for bodily injury, assault, battery, invasion of privacy, mental anguish, emotional distress, libel, slander or defamation; provided, however, this exclusion shall not apply to:

    1. the coverage afforded under Insuring Clause I.A.,

    2. the coverage afforded under Insuring Clause I.B. or I.C. for a **Securities Claim**,

    3. a **Manslaughter Claim**, or

    4. an **Inquiry** brought by the **Company** or a **Regulatory Authority** for any of the **Insured Persons** to appear as a witness in a trial or a court hearing of any criminal proceeding solely against the **Company** under the UK Corporate Manslaughter & Homicide Act 2007 or its equivalent in any jurisdiction;

B. based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

    1. any **Wrongful Act** or any fact, circumstance or situation which has been the subject of any notice given prior to the **Policy Period** and accepted under any other Directors and Officers Liability or

Employment Practices Liability Policy of which this Policy is a renewal, replacement or which it succeeds in time,

2.  any other **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts**, or

3.  any written demand, suit, investigation or other proceeding pending, or order, decree or judgment entered, against any **Insured** prior to the date set forth in Item K. of the Declarations, or any **Wrongful Act**, fact, circumstance or situation underlying or alleged therein;

C.  for any actual or alleged seepage, pollution or contamination of any kind; provided, however, this exclusion shall not apply to:

1.  the coverage afforded under Insuring Clause I.A., or

2.  the coverage afforded under Insuring Clause I.B. or I.C. for a **Securities Claim**;

D.  for violation of the Employee Retirement Income Security Act of 1974 or the Fair Labor Standards Act of 1938 (except the Equal Pay Act), any regulations promulgated thereunder or similar provisions of any federal, state or local law; provided, however:

1.  this exclusion shall not apply to the coverage afforded under Insuring Clause I.A.; and

2.  this exclusion shall only apply with respect to benefit plans sponsored by the **Company**;

E.  by, on behalf of, or at the direction of the **Company**, except and to the extent that:

1.  such **Claim** is a **Derivative Suit**; or

2.  such **Claim** is brought in the event of the appointment of a trustee, examiner, receiver, liquidator, conservator, rehabilitator or similar official; or

3.  such **Claim** is brought by a creditors committee pursuant to 2. above or by the **Company** as a debtor in possession; or

4.  such **Claim** is brought against any former **Insured Persons**; or

5.  such **Inquiry** is brought in connection with an inquiry or investigation by a **Regulatory Authority**; or

6. such **Claim** is brought :

    (a)   against the chief executive officer or chief financial officer of the **Parent Company** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002, or

    (b)   against the **Insured Persons** pursuant to Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act or any internal policy of the **Company** promulgated in accordance therewith; or

7. such **Claim** is a **Security Holder Demand**; or

8. such **Claim** is brought subsequent to a **Corporate Takeover** by the person or entity who acquired more than fifty percent (50%) of the outstanding securities of the **Parent Company** or merged with the **Parent Company** such that the **Parent Company** is not the surviving entity; or

9. such **Claim** is brought outside the United States of America, Canada, or any other common law jurisdiction;

Notwithstanding the foregoing, Exclusion E. shall not apply to **Costs, Charges and Expenses** incurred in connection with any **Claim** or **Investigation** under Insuring Clause I.A.;

F.    brought about or contributed to by:

1. any deliberately fraudulent or deliberately criminal act or omission by any of the **Insureds**, or

2. any personal profit or financial advantage gained by any of the **Insured Persons** to which they were not legally entitled,

as determined by a final non-appealable adjudication in any action or proceeding (other than an action or proceeding initiated by Underwriters to determine coverage under this Policy);

G.    for the return by any of the **Insured Persons** of any remuneration paid to them without the previous approval of the appropriate governing body of the **Company**, which payment without such previous approval shall be determined by a final non-appealable adjudication in any action or proceeding (other than an action or proceeding initiated by Underwriters to determine coverage under this Policy) to be in violation of the law;

Notwithstanding the foregoing, Exclusions F.2 and G. shall not apply to:

1.  that portion of any **Securities Claim** alleging violations of Section 11 or 12 of the Securities Act of 1933 as amended including without limitation such **Loss** of any **Insured Persons** deemed to be a controlling person within the meaning of Section 15 of the Securities Act of 1933, or any similar securities laws or common laws or regulations of any foreign jurisdiction, as amended; or

2.  **Facilitation Costs** incurred in connection with that portion of any **Claim** alleging violations of Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act or any internal policy of the **Company** promulgated in accordance therewith.

With respect to Exclusion F.1. for acts or omissions which are treated as a criminal violation in a jurisdiction outside the United States of America that are not treated as a criminal violation in the United States of America, the imposition of a criminal fine or other criminal sanction in such jurisdiction will not, by itself, be conclusive proof that a deliberately fraudulent or deliberately criminal act or omission occurred.

H.  based upon, arising out of, directly or indirectly, resulting from or in consequence of, or in any way involving, any **Wrongful Act** actually or allegedly committed or any conduct actually or allegedly undertaken subsequent to a **Corporate Takeover**.

For the purpose of determining the applicability of any of the Exclusions:

(a)  in respect of Insuring Clause I.A., no facts pertaining to, no knowledge possessed by, and no **Wrongful Act** of any of the **Insureds** shall be imputed to any other natural person,

(b)  in respect of Insuring Clause I.B., the **Wrongful Act** of any of the **Insured Persons** shall be imputed to the **Company** only to the extent that the **Company** indemnifies such **Insured Persons**, and

(c)  in respect of Insuring Clause I.C., only the **Wrongful Acts** of any past, present or future chief executive officer or chief financial officer of the **Parent Company** shall be imputed to the **Company**.

## IV.    LIMIT OF LIABILITY, RETENTIONS AND ORDER OF PAYMENTS

A.  Underwriters shall be liable to pay the percentage of **Loss** set forth in Item E. of the Declarations in excess of the amount of the applicable Retention up to the Limit of Liability or Sublimit of Liability, if applicable, it being warranted that the remaining percentage of **Loss** shall be uninsured. The Retention applicable to Insuring Clause I.B. shall apply to **Loss** payable under Insuring Clause I.A. if indemnification by the **Company** is required by law or is legally permissible to the fullest extent permitted by law.

No Retention shall apply to any **Loss** under Insuring Clause I.D.

If the Limit of Liability of this Policy is exhausted or partially eroded by payment of **Loss**, then the Limit of Liability of this Policy shall be automatically reinstated equal to an amount by which the Limit of Liability is exhausted or eroded, provided always that:

1. such reinstated limit shall only apply to **Loss** payable under Insuring Clause I.A. and shall be excess of the limit of liability of all policies of insurance providing excess coverage above this Policy, and

2. such reinstated limit shall not apply to the **Claim**, **Investigation** or **Inquiry** which exhausted or partially eroded such Limit of Liability.

If the **Company** fails or refuses to advance or indemnify the **Insured Persons** for any reason within sixty (60) days of **Loss** becoming due and payable and after specific written request is made by or on behalf of any **Insured Persons**, then Underwriters shall pay **Loss** on behalf of any **Insured Persons** within the Retention applicable to Insuring Clause I.B. after Underwriters have received written and itemised documentation of such **Loss** by means of invoices or otherwise, subject to the terms, conditions and limitations of this Policy. Any payments of **Loss** by Underwriters within the Retention applicable to Insuring Clause I.B. shall serve to reduce the Limit of Liability or Sublimit of Liability, if applicable of Underwriters under the Policy.  In such event, Underwriters shall be entitled to obtain reimbursement from the **Company** for all payments made by Underwriters that would not have been made had the indemnity in respect of the Retention been provided by the **Company**, unless the **Company** is unable to indemnify by reason of its insolvency.


Notwithstanding the above, if and to the extent any covered **Loss** which is within any applicable Retention under this Policy is paid on behalf of the **Insured Persons** by any other insurer pursuant to the terms and conditions of any Excess Difference in Conditions Side A policy which is specifically excess of this Policy, then such applicable Retention under this Policy shall be eroded by the amount of such payment.


B.  The amount shown in Item C.1. of the Declarations shall be the maximum aggregate Limit of Liability of Underwriters under the Policy.  If the Limit of Liability is reinstated, in accordance with the third paragraph of Clause IV.A., then the maximum aggregate Limit of Liability of the Underwriters under this Policy shall be an amount twice that shown in Item C.1. of the Declarations; provided, however, the maximum aggregate Limit of Liability of the Underwriters under this Policy in connection with any single **Claim**, **Investigation** or **Inquiry** shall be the amount shown in Item C.1. of the Declarations.


The amount shown in Item C.2. of the Declarations shall be the maximum aggregate Sublimit of Liability of Underwriters under the Policy for all **Security Holder Demand Investigatory Costs** arising from all **Security Holder Demands** under Insuring Clause I.D. Such Sublimit of Liability shall be part of, and not in addition to, the Limit of Liability stated in Item C.1. of the Declarations.

C. More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following dates:

    1. the date on which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

    2. the date on which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Clause VI.C.

D. More than one **Investigation** having as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions shall be deemed to constitute a single **Investigation** and shall be deemed to have been commenced at the earliest of the following dates:

    1. the date on which the earliest **Investigation** is first commenced; or

    2. the date on which the **Investigation** shall be deemed to have been commenced pursuant to Clause VI.C.

E. If an **Inquiry** is first reported to Underwriters during the **Policy Period** in accordance with Clause VI.B. then such **Inquiry** and any subsequent **Inquiry** having as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions shall be deemed a single **Inquiry** first reported on the date the earliest **Inquiry** is first reported.

F. Any **Claim**, **Investigation** or **Inquiry** having as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions shall be deemed a single **Claim** and shall be deemed to have been made at the earliest of the following dates:

    1. the date on which the **Inquiry** is first reported;

    2. the date on which the **Investigation** is first commenced; or

    3. the date on which the **Claim** is first made.

G. In the event more than one of the Insuring Clauses set forth in Clause I. are applicable to a **Claim**, **Investigation** or **Inquiry**, the Retentions set forth in Item D. of the Declarations shall be applied separately to that part of the **Loss** resulting from such **Claim**, **Investigation** or **Inquiry** covered by each Insuring Clause.  The sum of the Retentions so applied shall constitute the Retention applicable to such **Claim**, **Investigation** or **Inquiry**. The total Retention as finally determined shall in no event exceed the largest of the applicable Retentions for such **Claim**, **Investigation** or **Inquiry**.

H. Payments of **Loss** by Underwriters shall reduce the Limit of Liability and any applicable Sublimit of Liability.

68

Underwriters shall pay **Loss** in the following order:

1. first, under Insuring Clause I.A., provided however that such **Loss** is allocable to any **Wrongful Act** committed or any conduct undertaken prior to the **Company** becoming a debtor in possession under the United States bankruptcy law or similar legal status under foreign law; and

2. second, under Insuring Clause I.A. where such **Loss** is allocable to any **Wrongful Act** committed or any conduct undertaken on or after the **Company** became a debtor in possession under the United States bankruptcy law or similar legal status under foreign law; and

3. third, at the written request of the chief executive officer of the **Parent Company**, Underwriters shall either pay or withhold **Loss** payable under Insuring Clause I.B.; and

4. lastly, at the written request of the chief executive officer of the **Parent Company**, Underwriters shall either pay or withhold **Loss** payable under Insuring Clauses I.C. and I.D.

In the event Underwriters withhold payment pursuant to sub-paragraphs 3. and 4. above, then Underwriters shall, at such time and in such manner as shall be set forth in the instructions of the chief executive officer of the **Parent Company**, remit such payment to the **Company** or directly to or on behalf of the **Insured Persons**.

Underwriters shall have no obligation to pay **Loss** after exhaustion of the Limit of Liability or Sublimit of Liability, if applicable, regardless of whether the **Parent Company** has withheld payment.

I. Underwriters shall pay **Costs, Charges and Expenses** or **Inquiry Costs** on a current basis but no less than once every ninety (90) days.

## V.    SETTLEMENTS AND DEFENSE

A. No settlement shall be made and no **Costs, Charges and Expenses**, **Facilitation Costs**, **Inquiry Costs** or **Security Holder Demand Investigatory Costs** shall be incurred without Underwriters' consent, such consent not to be unreasonably withheld.    However, Underwriters' consent shall not be required for a settlement where such settlement is for an amount below the applicable Retention (inclusive of **Costs, Charges and Expenses**) provided the **Insureds** shall give Underwriters as soon as practicable details of the settlement amounts and the date the settlement is confirmed by the court.

B. It shall be the duty of the **Insureds** and not the duty of the Underwriters to defend **Claims**, **Investigations** or **Inquiries**, including the investigation, review and evaluation of any **Shareholder Derivative Demand**.

**VI.    NOTIFICATION**

A.  The **Insureds** shall, as a condition precedent to their rights to payment under this Policy, give to Underwriters notice in writing of any **Claim** or **Investigation** as soon as practicable after the risk manager, general counsel, chief executive officer or chief financial officer or equivalent of the **Parent Company** first becomes aware of such **Claim** or **Investigation**, but in no event later than:

1.  sixty (60) days after the end of the **Policy Period**, or

2.  in the event this Policy is renewed with Underwriters, one hundred and eighty (180) days after the end of the **Policy Period**.

B.  If the **Insureds** elect to seek coverage for **Inquiry Costs** in connection with an **Inquiry**, the **Insureds** shall give to Underwriters notice in writing of such **Inquiry**, but in no event later than:

1.  the end of the **Policy Period**, or

2.  in the event this Policy is non-renewed with Underwriters, sixty (60) days after the end of the **Policy Period**.

C.  If the **Insureds**:

1.  become aware of a specific fact, circumstance or situation which could reasonably give rise to a **Claim** or **Investigation**, or

2.  receive any request to toll a period or statute of limitation which may be applicable to any **Claim** or **Investigation**,

and if the **Insureds** during the **Policy Period** give written notice to Underwriters of:

(a)  the specific ı the request to toll a period or statute of limitation;

(b)  the consequences which have resulted or may result therefrom; and

(c) the circumstances by which the **Insureds** first became aware thereof,

then any **Claim** or **Investigation** made subsequently arising out of such ı the request to toll a period or statute of limitation shall be deemed for the purposes of this Policy to have been made or commenced at the time such notice was first given.

D.  Notice to Underwriters provided for in Clause VII. shall only be deemed effective if given to the firm shown under Item I. of the Declarations.

**VII.     OTHER INSURANCE AND INDEMNIFICATION**

The **Insureds** and Underwriters agree that all coverage under this Policy is excess over and will not contribute with all other valid and collectible Directors and Officers Liability, Employment Practices Liability, General Liability or Fiduciary Liability insurance, whenever purchased, whether such other insurance is stated to be primary, contributing, excess, contingent or otherwise.  However, the coverage under this Policy shall apply as primary to any personal directorship liability insurance of any of the **Insured Persons** or any Directors and Officers Liability insurance issued to any equity holder of the **Company**.

In the event any **Claim** made against, or any **Investigation** of, the **Insured Persons** while acting in their capacity as, or any matter claimed against any of the **Insured Persons** solely by reason of their serving as a director, officer, manager, trustee, governor or executive director or in a functionally equivalent position of any **Outside Entity**, the coverage under this Policy is excess over and will not contribute with:

A.    any indemnification provided by the **Outside Entity**; and

B.    all other valid and collectible insurance, whenever purchased, whether such other insurance is stated to be primary, contributing, excess, contingent or otherwise.

**VIII.     GENERAL CONDITIONS**

A.    Representations and Severability

The particulars and statements contained in the **Application** are incorporated into and constitute a part of this Policy.

By acceptance of this Policy, the **Insureds** agree:

1.    that the statements in the **Application** are their representations and that this Policy is issued in reliance upon the truth of such representations;

2.    that in the event that the **Application** contains misrepresentations made with the actual intent to deceive, or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by Underwriters under this Policy, Underwriters may only seek to void coverage, *ab initio*, under the following Insuring Clauses with respect to **Claims**, **Investigations** or **Inquiries** arising from such misrepresentations:

(a) with respect to Insuring Clause I.B. to the extent the **Company** indemnifies any of the **Insured Persons** who had knowledge as at the Inception Date of this Policy of any such misrepresentations; and

(b) with respect to Insuring Clause I.C. to the extent that the chief executive officer or chief financial officer of the **Parent Company** had knowledge as at the Inception Date of this Policy of any such misrepresentations; and

3. that, notwithstanding the above, the **Application** shall be construed as a separate application for coverage by each of the **Insured Persons** and no knowledge possessed by any of the **Insured Persons** shall be imputed to any other natural person.

Notwithstanding the foregoing:

i) this Policy shall not be voided, in whole or in part, with respect to Insuring Clause I.A.; and

ii) this Policy shall be non-rescindable with respect to the coverage afforded under Insuring Clauses I.A., I.B., I.C. and I.D.

Underwriters agree to advance payments of **Loss** unless and until an order by a court of competent jurisdiction provides either that such advancement is not required or that coverage is void *ab initio*, subject to the condition that such advance payments by Underwriters shall be repaid to Underwriters by the **Company** or the **Insured Persons** according to their respective interests as soon as reasonably practicable after an order provides that such advancement is not required or that coverage is void *ab initio*.

B. Adjustment Clause

1. This Policy is issued and the premium computed on the basis of the information submitted to Underwriters as part of the **Application**.

In the event the **Company**:

(a) acquires any other entity or acquires substantially all of the assets of another entity where such assets acquired exceed twenty-five percent (25%) of the consolidated assets of the **Company** as set forth in the **Company's** most recent audited financial statement, or

(b) merges with another entity such that the **Company** is the surviving entity where such assets of the merged entity exceed twenty-five percent (25%) of the

consolidated assets of the **Company** as set forth in the **Company's** most recent audited financial statement, or

(c)  acquires a **Subsidiary** as defined in Clause II.AA.3.

after the inception of this Policy, coverage shall be afforded for a period of ninety (90) days for any **Loss** in any way involving the assets acquired or the assets, liabilities, directors, officers or employees of the entity acquired or merged with, or such **Subsidiary**, but only with respect to any **Wrongful Act** committed or any conduct undertaken on or after the date such entity is acquired, merged with or became a **Subsidiary**.  Coverage beyond such ninety (90) day period shall only be available if:

i)  written notice of such transaction or event is given to Underwriters by the **Parent Company**;

ii)  the **Parent Company** provides Underwriters with such information in connection therewith as Underwriters may deem necessary;

iii)  the **Insureds** accept any special terms, conditions, exclusions or additional premium charge as may be required by Underwriters; and

iv)  Underwriters, at their sole discretion, agree to provide such coverage.

2.  In the event any entity ceased to be a **Subsidiary** as defined herein after the inception date of this Policy, or of any policy of which this Policy is a renewal or replacement, this Policy, subject to its terms, shall continue to apply to any of the **Insured Persons** who were covered under this Policy because of their service with such entity and to such **Subsidiary** but only with respect to any **Wrongful Act** committed or allegedly committed or any conduct undertaken or allegedly undertaken prior to the time such entity ceased to be a **Subsidiary**.

3.  Except if an **Predetermined Run-Off Period** is purchased in accordance with Clause IX.B., in the event of a **Corporate Takeover** after the inception date of this Policy or of any policy issued by Underwriters of which this Policy is a renewal or replacement, this Policy, subject to its terms, shall continue to apply to the **Insured Persons** and to the **Company** but only with respect to any **Wrongful Act** committed or allegedly committed or any conduct undertaken or allegedly undertaken prior to the **Corporate Takeover**.

C.  Cancellation Clause

1.  By acceptance of this Policy, the **Insureds** hereby confer the exclusive power and authority to cancel this Policy on their behalf to the **Parent Company**.  Such entity may cancel this Policy by surrender thereof to Underwriters, or by mailing to Underwriters written notice stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**.  Delivery of such written notice shall be equivalent to mailing.

2.  Underwriters may cancel this Policy only for nonpayment of premium by mailing to the **Parent Company** written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective.  The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**.  Delivery of such written notice by Underwriters shall be equivalent to mailing.  If the foregoing notice period is in conflict with any governing law or regulation, then such period shall be amended to afford the minimum notice period permitted thereunder.

3.  If this Policy is cancelled pursuant to 1. hereinabove, Underwriters shall retain the customary short rate proportion of the premium hereon.  If this Policy is cancelled pursuant to 2. hereinabove, Underwriters shall retain the pro rata proportion of the premium hereon.  Payment or tender of any

unearned premium by Underwriters shall not be a condition precedent to the effectiveness of cancellation.

D.   Company Authorization Clause

By acceptance of this Policy the **Insureds** agree that the **Parent Company** will act on their behalf with respect to the giving of all notices to Underwriters, the receiving of notices from Underwriters, the payment of the premium and the receipt of any return premium.

E.    Valuation and Currency Clause

All premiums, limits, retentions and **Loss** under this Policy are expressed and payable in the currency of the United States.   If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States dollars or if **Costs, Charges and Expenses** or **Inquiry Costs** are paid in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final or payment of the settlement or other element of **Loss** is due or the date such **Costs, Charges and Expenses** or **Inquiry Costs** are paid.

F.    Bankruptcy Clause

Bankruptcy or insolvency of the **Company** or any of the **Insured Persons** shall not relieve Underwriters of any of their obligations under this Policy.

The coverage provided under this Policy is intended to protect and benefit the **Insured Persons**. If a liquidation or reorganization proceeding is commenced by the **Company** (whether voluntarily or involuntarily) under Title 11 of the United States Code (as amended), or any similar state, local or foreign law, then, in regard to a covered **Claim**, **Investigation** or **Inquiry** under this Policy, Underwriters and the **Insureds** hereby agree not to oppose or object to any efforts by Underwriters or any of the **Insureds** to obtain relief from any stay or injunction applicable to the proceeds of this Policy as a result of the commencement of such liquidation or reorganization proceeding.

G.   Recovery Clause

In the event the Underwriters recover amounts they have paid under this Policy, the Underwriters will reinstate the Limit of Liability of this Policy to the extent of such recovery, less its costs incurred in administering and obtaining such recovery.  The Underwriters assume no duty to seek a recovery of any amounts paid under this Policy.

**IX.     EXTENSIONS TO THE POLICY PERIOD**

A.   **Optional Extension Period**

If this Policy is not renewed by the **Parent Company** or by Underwriters, then the **Parent Company** shall have the right, upon payment of an additional premium calculated at that percentage shown in Item G.1. of the Declarations of the total premium for this Policy, to an extension of the coverage granted by this Policy with respect to:

1.   any **Claim** first made or **Investigation** first commenced during the period of time set forth in Item G.2. of the Declarations after the Policy expiration date, but only with respect to any **Wrongful Act** committed or any conduct undertaken before the Policy expiration date; or

2.   any **Inquiry** first reported to Underwriters during the period of time set forth in Item G.2. of the Declarations after the Policy expiration date, but only with respect to any **Inquiry** first received on or after the date set forth in Item J. of the Declarations for any conduct undertaken before the Policy expiration date.

B.   **Predetermined Run-Off Period**

In the event of a **Corporate Takeover**, the **Parent Company** shall have the right, upon payment of an additional premium calculated at that applicable percentage shown in Item H.1. of the Declarations of the total premium for this Policy (less any unearned premium calculated at pro rata for the period from the date of such **Corporate Takeover**), to an extension of the coverage granted by this Policy with respect to:

1.   any **Claim** first made or **Investigation** first commenced during the applicable period of time set forth in Item H.2. of the Declarations after the date of such **Corporate Takeover**, but only with respect to any **Wrongful Act** committed or any conduct undertaken before the date of such **Corporate Takeover**; or

2.   any **Inquiry** first reported to Underwriters during the applicable period of time set forth in Item H.2. of the Declarations after the date of such **Corporate Takeover**, but only with respect to any **Inquiry** first received on or after the date set forth in Item J. of the Declarations for any conduct undertaken before the date of such **Corporate Takeover**.

C.   Retired and Resigned Insured Person Extension

If this Policy is not renewed by the **Parent Company** or by Underwriters, then any of the **Insured Persons** who have retired or resigned prior to or during the **Policy Period** shall have an automatic extension of the coverage granted by this Policy with respect to:

1.   any **Claim** first made or **Investigation** first commenced during the seventy two (72) month period following the end of the **Policy Period**, but only with respect to any **Wrongful Act** committed or any conduct undertaken before the Policy expiration date; or

2.   any **Inquiry** first reported to the Underwriters during the seventy two (72) month period following the end of the **Policy Period**, but only with respect to any **Inquiry** first received on or after the date set forth in Item J. of the Declarations for any conduct undertaken before the Policy expiration date.

The above automatic extension of coverage shall not apply in the event the **Parent Company** has purchased other insurance to replace, in whole or in part, the insurance provided under this Policy.

D.   Extension Conditions

1.   As a condition precedent to the right to purchase the **Optional Extension Period**, the **Predetermined Run-Off Period** or the coverage afforded under Retired and Resigned Insured Person Extension the total premium for this Policy must have been paid.

The right to purchase the **Optional Extension Period** shall terminate (i) in the event written notice together with full payment of the premium for the **Optional Extension Period** is not given to Underwriters within thirty (30) days after the Policy expiration date or (ii) in the event the **Predetermined Run-Off Period** is purchased.

The right to purchase the **Predetermined Run-Off Period** shall terminate (i) in the event written notice together with full payment of the premium for the **Predetermined Run-Off Period** is not given to Underwriters within thirty (30) days after the date of the **Corporate Takeover** or (ii) in the event the **Optional Extension Period** is purchased.

If such notice and premium payment is not so given to Underwriters, there shall be no right to purchase the **Optional Extension Period** or the **Predetermined Run-Off Period**.

2.   In the event of the purchase of the **Optional Extension Period** or the **Predetermined Run-Off Period**, the entire premium therefor shall be deemed earned at its commencement.

3.  The exercise of the **Optional Extension Period**, the **Predetermined Run-Off Period** or the Retired and Resigned Insured Person Extension shall not in any way increase the Limit of Liability of Underwriters.

## X.     ASSISTANCE, COOPERATION AND SUBROGATION

The **Insureds** agree to provide Underwriters with such information, assistance and cooperation as Underwriters or their counsel may reasonably request, and they further agree that, after a **Claim** has been made against them, an **Investigation** has been commenced against them or an **Inquiry** has been received by them, they shall not take any action which in any way increases Underwriters' exposure under this Policy.   The failure of any of the **Insured Persons** to give Underwriters or their counsel the information, assistance and cooperation that they may reasonably request shall not impair the rights of any other natural person under this Policy.

In the event of any payment under this Policy, Underwriters shall be subrogated to the **Insureds'** rights of recovery therefor against any person or entity.   The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights including the execution of such documents as are necessary to enable Underwriters effectively to bring suit in their name, and shall provide all other assistance and cooperation which Underwriters may reasonably require.

Notwithstanding the foregoing, Underwriters agree to waive their rights of subrogation against any of the **Insured Persons** except where a final non-appealable adjudication in any action or proceeding (other than an action or proceeding initiated by Underwriters to determine coverage under this Policy) adverse to the relevant **Insured Persons** establishes that the relevant **Insured Persons** have committed a deliberately fraudulent or deliberately criminal act or omission.

## XI.     ASSIGNMENTS AND ACTION AGAINST UNDERWRITERS

No action shall lie against Underwriters unless, as a condition precedent thereto, the **Insureds** shall have fully complied with all of the terms of this Policy, nor until the amount of the **Insureds'** obligation to pay shall have been fully and finally determined either by judgment against them or by written agreement between them, the claimant and Underwriters.   Nothing contained herein shall give any person or organization any right to join Underwriters as a party to any **Claim**, **Investigation** or **Inquiry** against the **Insureds** to determine their liability, nor shall Underwriters be impleaded by the **Insureds** or their legal representative in any **Claim**, **Investigation** or **Inquiry**.   Assignment of interest under this Policy shall not bind Underwriters unless their consent is endorsed hereon.

## XII.     ENTIRE AGREEMENT

By acceptance of this Policy, the **Insureds** agree that this Policy embodies all agreements existing between them and Underwriters or any of their agents relating to this Insurance.   Notice to any agent or knowledge possessed by any agent or other person acting on behalf of Underwriters

shall not effect a waiver or a change in any part of this Policy or estop Underwriters from asserting any right under the terms of this Policy, nor shall the terms be waived or changed except by written endorsement or rider issued by Underwriters to form a part of this Policy.

**XIII.    ALLOCATION**

If both **Loss** covered by this Policy and loss uncovered by this Policy are incurred, either because the **Claim**, **Investigation** or **Inquiry** includes both covered and uncovered allegations or because it includes both insured and uninsured parties, then the **Insureds** and Underwriters agree to use their best efforts to fairly and reasonably allocate such amount between covered **Loss** and uncovered loss.

In the event that a method of allocation cannot be agreed upon by Underwriters and the **Insureds**, then:

A.    in any arbitration, suit or other proceeding, no presumption shall exist concerning what is a fair and reasonable allocation;

B.    Underwriters shall advance the amount of **Costs, Charges and Expenses** or **Inquiry Costs** which they deem fair and proper until a different amount is negotiated by the parties, determined pursuant to the arbitration process set forth in subparagraph C. below, or determined judicially;

C.    Underwriters, solely if requested by the **Insureds**, shall submit the dispute to binding arbitration. The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel, which shall consist of one arbitrator selected by the **Insureds**, one arbitrator selected by Underwriters, and a third independent arbitrator selected by the first two arbitrators.

Any negotiated, arbitrated or judicially determined allocation of **Costs, Charges and Expenses** or **Inquiry Costs** on account of a **Claim**, **Investigation** or **Inquiry** shall be applied retroactively to all **Costs, Charges and Expenses** or **Inquiry Costs** on account of such **Claim**, **Investigation** or **Inquiry**, notwithstanding any prior advancement to the contrary. Any allocation or advancement of **Costs, Charges and Expenses** or **Inquiry Costs** on account of a **Claim**, **Investigation** or **Inquiry** shall not apply to or create any presumption with respect to the allocation of other **Loss** on account of such **Claim**, **Investigation** or **Inquiry**.

**XIV.    WORLDWIDE**

This Policy applies only to **Claims** first made, **Investigations** first commenced and **Inquiries** first reported during the **Policy Period** anywhere in the world as permitted by law.

**XV.    SERVICE OF SUIT**

It is agreed that in the event of the failure of Underwriters to pay any amount claimed to be due hereunder, Underwriters at the request of any of the **Insureds** will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction.  Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.  It is further agreed that service of process in such suit may be made upon the firm shown under Item M. of the Declarations, and that in such suit instituted against any one of the Underwriters upon this Policy, Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.

The firm shown under Item M. of the Declarations is authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of any of the **Insureds** to give a written undertaking to such **Insured** that it will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to the statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officers specified for that purpose in the statute, or any of their successors in office, as their true and lawful attorney, upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of any of the **Insureds** or any beneficiary hereunder arising out of this Policy, and hereby designate the firm shown in Item M. of the Declaration as the firm to whom the said officer is authorized to mail such process or a true copy thereof.

**XVI.    CHOICE OF LAW**

Except with respect to the insurability of damages under Clause II.O., any dispute involving this Policy shall be resolved by applying the law of the state designated in Item N. of the Declarations.

01/14

LSW4000



## Entity Organizational Chart (post mergers)



**Taronis Technologies, Inc.**

- **Taronis Fuels, Inc**
- **MagneGas IP, LLC**
- **Taronis Water Technologies, Inc.**

Under Taronis Fuels, Inc / branch:

- **MagneGas Ireland Limited (Ireland)**
- **MagneGas Limited (UK)**
- **MagneGas Welding Supply – South, LLC (fka Green Arc/TWS et al)**
- **MagneGas Welding Supply – Southeast, LLC (fka ESSI)**
- **MagneGas Welding Supply – West, LLC (fka NG/Trico/LA)**
- **MagneGas Real Estate Holdings, LLC**
- **MagneGas Production, LLC**

80

Policy Number: (UMR) B1724WLS20C237

## SECURITY DETAILS

**REFERENCES**

UMR (Unique Market Reference): B1724WLS20C237

Date contract printed to PDF: 09:12 10 September 2020

## SIGNED UNDERWRITERS

**Forge Underwriting Limited**

Neil Sonnet

| **Written Line** | 100.00% | **Signed Line** | 100.00% |
|---|---|---|---|
| **Agreed on** | 19:56 09 September 2020 | | |

| **For and on behalf of:** | | **Written Line** | **Signed Line** |
|---|---|---|---|
| Forge Underwriting Security: PartnerRe Ireland Insurance dac (100%) | | 100.00% | 100.00% |

**Bound as Slip Leader**

| | *Reference:* | 20BF11005760058 |
|---|---|---|
| | *Description:* | Taronis Fuels |

**TYSERS**

## CONTRACT ENDORSEMENT

| | |
|---|---|
| **Unique Market Reference:** | B0572MR206903 |
| **Endorsement Reference:** | 02 |
| **Original Insured:** | **Taronis Fuels, Inc** |

## CONTRACT CHANGES

<u>**RUN-OFF ENDORSEMENT**</u>

This endorsement modifies insurance provided under the following:

**ADVANCED BOARDROOM AND COMPANY PROTECTION**

In consideration of an additional premium of USD 209,795, it is hereby understood and agreed that:

1)     Item B. of the Declarations is amended to read as follows:

      **Item B.     Policy Period:**

           **From:**   13th July 2020

           **To:**   30th April 2027

           Both days 12.01 a.m. Local Time at the Principal Address stated in Item A.

2)     Clause **II. DEFINITIONS** D., R. and V. are deleted in their entirety.

3)     Clause **II. DEFINITIONS** U. is amended by deleting the words "or the end of the **Optional Extension Period**, **Predetermined Run-Off Period** or the Retired and Resigned Insured Person Extension, if purchased" from the end thereof.

4)     Clause **II. DEFINTIONS** AA. paragraphs 2. and 3. are deleted in their entirety.

5)     Clause **III. EXCLUSIONS** is amended by the addition of:

      &lt;_&gt;.          based upon, arising out of, directly or indirectly resulting from or in consequence of or in any way involving any **Wrongful Act** actually or allegedly committed or any conduct actually or allegedly undertaken on or after 30th April 2021.

6)     Clause **VIII. GENERAL CONDITIONS** B. Adjustment Clause is deleted in its entirety.

7)     Clause **VIII. GENERAL CONDITIONS** C.3. is deleted in its entirety and replaced with the following:

      3.     If this Policy is cancelled pursuant to 1. hereinabove, Underwriters shall retain the total premium for this Policy, such total premium to be deemed earned upon inception of the Policy.  If this Policy is cancelled pursuant to 2. hereinabove, Underwriters shall retain the pro rata portion of the premium hereon.  Payment or tender of any unearned premium by Underwriters shall not be a condition precedent to the effectiveness of cancellation.



8)      Clause **IX. EXTENSIONS TO THE POLICY PERIOD** is deleted in its entirety and consequently Item G. and H. of the DECLARATIONS are also deleted.

All other terms and conditions of this Policy remain unchanged.

01/14
LSW4059

<div align="center">

**AGREEMENT**

</div>

| **GENERAL UNDERWRITERS AGREEMENT (GUA)** | | |
|---|---|---|
| Each Underwriter's proportion is several not joint | | |
| Slip Leader Only | Slip Leader And Agreement Parties | All Underwriters |
| | | |
| Box 1 | Box 2 | Box3 |

<div align="center">

Page 1 of 1

</div>

Tysers is a trading name of Integro Insurance Brokers Limited which is authorised and regulated by the Financial Conduct Authority.
Registered Office: 71 Fenchurch Street, London, EC3M 4BS. Registered Company in England: 2957627



UMR: B0572MR206903

## SECURITY DETAILS

| | |
|---|---|
| **Endorsement Version Date** | 06 May 2021 09:07 |
| **UMR** | B0572MR206903 |
| **Broker Endorsement Reference** | 02 |
| **Endorsement Name** | Invoking Run off |
| **(Re)Insured** | Taronis Fuels, Inc |
| **Agreement Practice** | GUA A |
| **Agreement Instructions** | All Underwriters |

**Leader**                                                                                                       Agreed 06 May 2021 13:29

| Underwriter Company | Underwriter | Stamp | Underwriter Ref |
|---|---|---|---|
| Forge Underwriting Limited | Neil Sonnet | Forge Underwriting Security: PartnerRe Ireland Insurance dac (100%) | * |

**7/28/2020**

**Taronis Fuel, Inc.**
**24980 N 83rd Ave, Suite 100**
**Peoria, AZ 85383**

Re:    Proposal for **D&O**
         Proposed Effective Dates:  **7/13/20-7/13/21**

To Whom It May Concern:

The Applicant declares that no director, officer, or other proposed insured is aware of any acts, circumstances, incidents, or suspected incidents that reasonably might give rise to a claim or loss under the proposed insurance.

By:   _Tyler Wilson_____
         Must be signed by corporate officer with
         authority to sign on Applicant's behalf

# EXHIBIT
# 2

Message

| | |
|---|---|
| **From**: | Neil Sonnet [nsonnet@forgeunderwriting.com] |
| **Sent**: | 5/13/2021 12:45:04 PM |
| **To**: | Pierre Guerin [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=1bcd828e8f1148308059bb76933a2e86-Pierre Guer]; Corinne Vincentelli [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=06d5fb1b4c3d4b769165a928a9670196-Corinne Vin] |
| **CC**: | Forge.Claims.mga [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c46c1b3f00ac47e6bc1c5e00d48738f6-Forge.Claim]; David Politi [dpoliti@forgeunderwriting.com] |
| **Subject**: | FW: Taronis Fuels - D&O Claim (policy #B1724WLS20C237) |
| **Attachments**: | 28 August 2020 Tech - Formal Order w OS signature.pdf; 2020-12-14 SEC Subpoena - Tech.pdf; 2021-01-11 SEC Corr Encl Subpoena - Taronis Fuels.pdf; 2021-02-12 SEC Corr Encl Subpoena - Taronis Fuels.pdf |

Dear all,

Please see attached a new notification for Taronis Fuels. Please note this is a second and separate notification on the 2020 policy which was recently placed into run-off.

Please reach out with any questions.

Thanks,

Neil

Neil Sonnet
Forge Underwriting Limited
34 Lime Street, London, EC3M 7AT
M: +44 (0) 7471 504270

---

**From:** Barbara Agulnek <bagulnek@kphwlaw.com>
**Sent:** Tuesday, May 11, 2021 10:03 PM
**To:** Neil Sonnet <nsonnet@forgeunderwriting.com>
**Cc:** Rich Kissel <rkissel@kphwlaw.com>; Amanda Carpenter <acarpenter@kphwlaw.com>; Eric Gottschalk <egottschalk@kphwlaw.com>; Cindy Kelly <ckelly@kphwlaw.com>
**Subject:** Taronis Fuels - D&O Claim (policy #B1724WLS20C237)

PRIR_0004021



**Barbara Agulnek**
Attorney at Law
Kissel Straton & Wilmer LLP
580 White Plains Rd.
Tarrytown, NY 10591

www.kswlaw.com
direct tel: 914-733-7760
main tel: 914-750-5933
main fax: 914-617-1522

IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages to clients of Kissel Straton & Wilmer, LLP presumptively contain information that is confidential and legally privileged; e-mail messages to non-clients are normally confidential and may also be legally privileged. If you have received this message in error, please forward it back without copying, storing or forwarding this message to any other party. Kissel Straton & Wilmer, LLP is a limited liability partnership organized in the United States under the laws of the State of New York, which laws limit the personal liability of partners.

**From:** Egan, Christina (MMA) [mailto:Christina.Egan@MarshMMA.com]
**Sent:** Tuesday, May 11, 2021 5:36 PM
**To:** Amanda Carpenter; Williams, David (MMA); Crandall, David R.
**Cc:** bagulnek@kphwlaw.com; Zaiser, Sam (MMA); Comtois, Michele (MMA); Beaubien, Yvette (MMA)
**Subject:** RE: FW: Taronis Fuels - D&O Claim (policy #B1724WLS20C237)

Hi Amanda,

Thank you for the information. The subpoenas the insured received pertaining to the pending SEC investigation are attached hereto. We are hereby formally tendering and request a supplemental coverage position as the insured is seeking coverage for these matters. Please let us know if any questions in this regard.

David Crandall at Hogan is added hereto to provide the updates/information requested per your email below.

PRIR_0004022

Thank you,
Christina

**Christina N. Egan, Esq.**
**Associate, Business Insurance Claims | Business Insurance Division**
Marsh & McLennan Insurance Agency LLC
1 Polaris Way | Suite 300 | Aliso Viejo, CA 92656
+1 949 362 7202 | m: +1 949 434 7772 | f: +1 858 452 7530
christina.egan@marshmma.com | www.MarshMMA.com

business insurance | risk management center | map | events | vCard

CA Insurance LIC 0H18131

 **MARSH & McLENNAN**
**AGENCY**

---

**From:** Amanda Carpenter <acarpenter@kphwlaw.com>
**Sent:** Tuesday, May 11, 2021 1:48 PM
**To:** Williams, David (MMA) <David.Williams@MarshMMA.com>
**Cc:** bagulnek@kphwlaw.com; Zaiser, Sam (MMA) <Sam.Zaiser@MarshMMA.com>; Comtois, Michele (MMA) <Michele.Comtois@MarshMMA.com>; Beaubien, Yvette (MMA) <Yvette.Beaubien@MarshMMA.com>; Egan, Christina (MMA) <Christina.Egan@MarshMMA.com>
**Subject:** Re: FW: Taronis Fuels - D&O Claim (policy #B1724WLS20C237)

> CAUTION: This email originated outside the company. Do not click links or open attachments unless you are expecting them from the sender.

Good afternoon David,

Generally, notification was received on March 24, 2021 of a Consent Solicitation, Stocklist Demand, and related Delaware litigation filed by two Taronis shareholders. Following our initial call with the Insured and defense counsel from O'Melveny & Myers LLP, on April 14, 2021, we learned that the litigation had been resolved and culminated in a change of the Board, except for one incumbent Board member. On April 20, 2021, we participated in a call with the new Board and its defense counsel Hogan Lovells US LLP ("Hogan") and were advised of a pending SEC investigation.

The Insured advised it would be reviewing the matters discussed, and would follow up with us to advise regarding whether or not the Insured would be pursing coverage for the matters initially notified under the Policy by the previous Board and/or whether it seeks to provide notification of any other matters, including potentially the SEC investigation, under the Policy. The Insured and Hogan advised that it would be back in touch once a determination regarding how to proceed was made, and would then provide us with any relevant information and copies of documentation.

At this time, we are continuing to await receipt of a response from the Insured regarding the above.

Please let us know if you would like to discuss or have any further questions.

Thank you,
Barbara and Amanda

On 5/10/2021 10:42 AM, Williams, David (MMA) wrote:

Barbara / Amanda-

Per below, can you please assist us in getting more of the specifics of the matter that you are currently handling?

PRIR_0004023

Thanks,
David

**David Williams**
**Client Executive** | **Executive Liability Division**
Marsh & McLennan Insurance Agency LLC
9171 Towne Centre Drive, Suite 100 | San Diego, CA 92122
+1 858 587 7514 | m: +1 858 732 1257 | f: +1 858 909 9770
David.Williams@MarshMMA.com | MMA-West.com

property & casualty | map | events | vCard

CA Insurance LIC 0H18131



---

**From:** Richard Kissel <rkissel@kphwlaw.com>
**Sent:** Saturday, May 08, 2021 11:52 AM
**To:** Williams, David (MMA) <David.Williams@MarshMMA.com>
**Cc:** Zaiser, Sam (MMA) <Sam.Zaiser@MarshMMA.com>; Comtois, Michele (MMA)
<Michele.Comtois@MarshMMA.com>; bagulnek@kphwlaw.com; Amanda Carpenter <acarpenter@kphwlaw.com>;
rkissel@kphwlaw.com
**Subject:** RE: Taronis Fuels - D&O Claim (policy #B1724WLS20C237)

> CAUTION: This email originated outside the company. Do not click links or open attachments unless you are expecting them
> from the sender.

David,

My colleagues Barbara Agulnek and Amanda Carpenter, copied on this email, are handling this matter.

I am sure they would be happy to update you.

Kind regards,

Rich

**Richard A. Kissel**
Attorney at Law
Kissel Straton & Wilmer LLP

direct tel:914-733-7750
mobile: 914-329-7904

**From:** Williams, David (MMA) [mailto:David.Williams@MarshMMA.com]
**Sent:** Friday, May 07, 2021 3:32 PM
**To:** rkissel@kphwlaw.com
**Cc:** Zaiser, Sam (MMA); Comtois, Michele (MMA)
**Subject:** Taronis Fuels - D&O Claim (policy #B1724WLS20C237)

PRIR_0004024

Hi Richard-

Not sure who's handling the above matter at your firm but we would appreciate it if you could provide details on the claim that was previously filed by the prior insurance broker. As the current broker we don't have this information and we are trying to get up to speed on this matter.

Thanks for your help.

**David Williams**
**Client Executive** | **Executive Liability Division**
Marsh & McLennan Insurance Agency LLC
9171 Towne Centre Drive, Suite 100 | San Diego, CA 92122
+1 858 587 7514 | m: +1 858 732 1257 | f: +1 858 909 9770
David.Williams@MarshMMA.com | MMA-West.com

property & casualty | map | events | vCard

CA Insurance LIC 0H18131



This e-mail transmission and any attachments that accompany it may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law and is intended solely for the use of the individual(s) to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, any disclosure, dissemination, distribution, copying or other use or retention of this communication or its substance is prohibited. If you have received this communication in error, please immediately reply to the author via e-mail that you received this message by mistake and also permanently delete the original and all copies of this e-mail and any attachments from your computer.

Please note that coverage cannot be bound or altered by sending an email. You must speak with or receive written confirmation from a licensed representative of our firm to put coverage in force or make changes to your existing program. Thank you.

This e-mail transmission and any attachments that accompany it may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law and is intended solely for the use of the individual(s) to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, any disclosure, dissemination, distribution, copying or other use or retention of this communication or its substance is prohibited. If you have received this communication in error, please immediately reply to the author via e-mail that you received this message by mistake and also permanently delete the original and all copies of this e-mail and any attachments from your computer.

Please note that coverage cannot be bound or altered by sending an email. You must speak with or receive written confirmation from a licensed representative of our firm to put coverage in force or make changes to your existing program. Thank you.

--
Amanda Carpenter
Attorney at Law
Kissel Straton & Wilmer LLP
580 White Plains Rd.
Tarrytown, NY 10591

www.kswlaw.com

main tel: 914-750-5933
main fax: 914-617-1522

IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages to clients of Kissel Straton & Wilmer, LLP presumptively contain information that is confidential and legally privileged; e-mail messages to non-clients are normally confidential and may also be legally privileged. If you have received this message in error, please forward it back without copying, storing or forwarding this message to any other party. Kissel Straton & Wilmer, LLP is a limited liability partnership organized in the United States under the laws of the State of New York, which laws limit the personal liability of partners.

PRIR_0004025

This e-mail transmission and any attachments that accompany it may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law and is intended solely for the use of the individual(s) to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, any disclosure, dissemination, distribution, copying or other use or retention of this communication or its substance is prohibited. If you have received this communication in error, please immediately reply to the author via e-mail that you received this message by mistake and also permanently delete the original and all copies of this e-mail and any attachments from your computer.

Please note that coverage cannot be bound or altered by sending an email. You must speak with or receive written confirmation from a licensed representative of our firm to put coverage in force or make changes to your existing program. Thank you.

PRIR_0004026

# EXHIBIT
# 3

Message

---

| | |
|---|---|
| **From:** | Benjamin Gonson [bgonson@kswlaw.com] |
| **Sent:** | 3/30/2023 2:57:59 PM |
| **To:** | Cohen, Jeffrey Michael [/o=Carlton Fields/ou=CF/cn=Recipients/cn=JMCOH]; Chacon, Sandra [/o=Carlton Fields/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=3b522c1835334a77a46f44093649963c-Chacon, S]; Brodie, Steven J. [/o=Carlton Fields/ou=CF/cn=Recipients/cn=SBROD] |
| **Subject:** | Fwd: FW: Taronis Fuels - D&O Claim (policy #B1724WLS20C237) - KSW File No. 27332.00050 |
| **Attachments:** | Taronis Technologies_Mary Patricia Thompson_Subpoena.pdf |

-------- Forwarded Message --------
   **Subject:** RE: FW: Taronis Fuels - D&O Claim (policy #B1724WLS20C237) - KSW File No. 27332.00050
      **Date:** Mon, 14 Jun 2021 14:07:30 +0000
    **From:** Hennelly, James J. <james.hennelly@hoganlovells.com>
       **To:** Barbara Agulnek <bagulnek@kphwlaw.com>
      **CC:** 'Amanda Carpenter' <acarpenter@kphwlaw.com>, Kim, Ann C. <ann.kim@hoganlovells.com>, Crandall, David R. <david.crandall@hoganlovells.com>, 'Mary Pat Thompson' <mpthompson@taronisfuels.com>, Ben Gonson <bgonson@kphwlaw.com>

Hi Barbara,

Attached is the SEC subpoena to Mary Pat Thompson.  This is the only SEC subpoena for testimony from individuals that we have.

Best,
Jamie

---

**From:** Barbara Agulnek <bagulnek@kphwlaw.com>
**Sent:** Saturday, June 12, 2021 10:00 AM
**To:** Hennelly, James J. <james.hennelly@hoganlovells.com>
**Cc:** 'Amanda Carpenter' <acarpenter@kphwlaw.com>; Kim, Ann C. <ann.kim@hoganlovells.com>; Crandall, David R. <david.crandall@hoganlovells.com>; 'Mary Pat Thompson' <mpthompson@taronisfuels.com>; Ben Gonson <bgonson@kphwlaw.com>
**Subject:** RE: FW: Taronis Fuels - D&O Claim (policy #B1724WLS20C237) - KSW File No. 27332.00050

**[EXTERNAL]**
Hi James:

   Thank you for your emails providing correspondence with the SEC in regard to its investigation.  During our previous calls, we understood that Mary Pat Thompson also provided testimony pursuant to a subpoena in connection with this investigation. Would you kindly provide a copy of the subpoena for Ms. Thompson's testimony, in addition to any other subpoenas for testimony of other individuals.

   Please be reminded that  PartnerRe's rights are fully reserved under the Policy and at law, as we continue our  coverage investigation.

   Thank you,

Confidential

PRIR_0000293

Ben, Amanda and Barbara

**Barbara Agulnek**
Attorney at Law
Kissel Straton & Wilmer LLP
580 White Plains Rd.
Tarrytown, NY 10591

www.kswlaw.com
direct tel: 914-733-7760
main tel: 914-750-5933
main fax: 914-617-1522

IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages to clients of Kissel Straton & Wilmer, LLP presumptively contain information that is confidential and legally privileged; e-mail messages to non-clients are normally confidential and may also be legally privileged. If you have received this message in error, please forward it back without copying, storing or forwarding this message to any other party. Kissel Straton & Wilmer, LLP is a limited liability partnership organized in the United States under the laws of the State of New York, which laws limit the personal liability of partners.

**From:** Hennelly, James J. [mailto:james.hennelly@hoganlovells.com]
**Sent:** Wednesday, June 2, 2021 9:10 PM
**To:** Benjamin Gonson; 'Barbara Agulnek'
**Cc:** Amanda Carpenter; Kim, Ann C.; Crandall, David R.; Mary Pat Thompson
**Subject:** RE: FW: Taronis Fuels - D&O Claim (policy #B1724WLS20C237) - KSW File No. 27332.00050

Ben and Barbara,

As discussed, attached is a set of correspondence to or from the SEC related to its investigation, including the SEC's voluntary request for documents dated June 30, 2020 and subsequent subpoenas to Taronis Technologies or Taronis Fuels. We've also included correspondence to the SEC from Tyler Wilson, the former Taronis Fuels CFO and General Counsel, and from Sallah Astarita Cox LLC, the law firm Tyler Wilson and Scott Mahoney engaged to assist with responding to the SEC subpoenas.

At this time, the Hogan Lovells staffing for responding to the SEC subpoenas on behalf of Taronis Fuels includes the following personnel with the corresponding hourly rates. The rates reflect a 10% discount from our standard rates:

1. ███████████████
2. ████████████████████████
3. ██████████████████████
4. ███████████████████████
5. ████████████████

Best regards,
Jamie

---

**From:** Benjamin Gonson <bgonson@kphwlaw.com>
**Sent:** Tuesday, June 1, 2021 1:09 PM
**To:** Crandall, David R. <david.crandall@hoganlovells.com>; Mary Pat Thompson <mpthompson@taronisfuels.com>; ajm@andrewmccormick.com
**Cc:** 'Barbara Agulnek' <bagulnek@kphwlaw.com>; Amanda Carpenter <acarpenter@kphwlaw.com>; Egan, Christina (MMA) <Christina.Egan@MarshMMA.com>; Hennelly, James J. <james.hennelly@hoganlovells.com>; Kim, Ann C. <ann.kim@hoganlovells.com>
**Subject:** Re: E: FW: Taronis Fuels - D&O Claim (policy #B1724WLS20C237) - KSW File No. 27332.00050

[EXTERNAL]

David - Our side is available from noon to 4pm tomorrow.

Confidential

PRIR_0000294

Thanks,

Ben

--
**Benjamin N Gonson**
Attorney at Law
Kissel Straton & Wilmer LLP
580 White Plains Rd.
Tarrytown, NY 10591

direct tel: 914-733-7758
main tel: 914-750-5933
main fax: 914-617-1522

www.kswlaw.com
IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages to clients of Kissel Straton & Wilmer, LLP presumptively contain information that is confidential and legally privileged; e-mail messages to non-clients are normally confidential and may also be legally privileged. If you have received this message in error, please forward it back without copying, storing or forwarding this message to any other party. Kissel Straton & Wilmer, LLP is a limited liability partnership organized in the United States under the laws of the State of New York, which laws limit the personal liability of partners.

On 6/1/2021 12:58 PM, Crandall, David R. wrote:

Ben – The HL team is available today after 5pm ET, and tomorrow noon to 5pm ET. Copying in Ann and Jamie.

Mary Pat, please let us know your availability.

Thanks,
David

**David Crandall**
Partner
**Hogan Lovells US LLP**
Direct:  +1 303 454 2449
Email:   david.crandall@hoganlovells.com

---

**From:** Benjamin Gonson <bgonson@kphwlaw.com>
**Sent:** Tuesday, June 1, 2021 10:30 AM
**To:** Mary Pat Thompson <mpthompson@taronisfuels.com>; Crandall, David R. <david.crandall@hoganlovells.com>; ajm@andrewmccormick.com
**Cc:** 'Barbara Agulnek' <bagulnek@kphwlaw.com>; Amanda Carpenter <acarpenter@kphwlaw.com>; Egan, Christina (MMA) <Christina.Egan@MarshMMA.com>
**Subject:** Re: E: FW: Taronis Fuels - D&O Claim (policy #B1724WLS20C237) - KSW File No. 27332.00050

[EXTERNAL]

I think we already missed the call today, which would have been 9 am  on the West Coast.

On our end, sorry for the late response to try and get the call scheduled today after the holiday weekend.

David - do you want to try again and propose some more times for as early as possible?

Thank you.

--
**Benjamin N Gonson**
Attorney at Law
Kissel Straton & Wilmer LLP
580 White Plains Rd.
Tarrytown, NY 10591

Confidential

PRIR_0000295

direct tel: 914-733-7758
main tel: 914-750-5933
main fax: 914-617-1522
www.kswlaw.com
IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail
messages to clients of Kissel Straton & Wilmer, LLP presumptively contain information that is confidential and legally privileged; e-mail messages to non-clients
are normally confidential and may also be legally privileged. If you have received this message in error, please forward it back without copying, storing or
forwarding this message to any other party. Kissel Straton & Wilmer, LLP is a limited liability partnership organized in the United States under the laws of the State
of New York, which laws limit the personal liability of partners.

On 6/1/2021 12:26 PM, Mary Pat Thompson wrote:

Sure, I am open today 11:30PT onward. Have a scheduled call at 10:30PT that can't cancel.

**Mary Pat Thompson**



*CFO & Treasurer*

Direct: +1 (208) 867-7912

https://taronisfuels.com/



NOTE: This email and any attachments may contain information that is confidential. If you are not the intended recipient of this message, please do not read it or disclose it to others. Instead, please delete it and notify the sender immediately.

---

**From:** Benjamin Gonson <bgonson@kphwlaw.com>
**Sent:** Tuesday, June 1, 2021 7:45 AM
**To:** Crandall, David R. <david.crandall@hoganlovells.com>; Mary Pat Thompson <mpthompson@taronisfuels.com>; ajm@andrewmccormick.com <ajm@andrewmccormick.com>
**Cc:** 'Barbara Agulnek' <bagulnek@kphwlaw.com>; Amanda Carpenter <acarpenter@kphwlaw.com>; Egan, Christina (MMA) <Christina.Egan@MarshMMA.com>
**Subject:** Re: E: FW: Taronis Fuels - D&O Claim (policy #B1724WLS20C237) - KSW File No. 27332.00050

Would you like us to send dial in instructions?

Ben

On 6/1/2021 10:23 AM, Benjamin Gonson wrote:

Hi All,

If it is not too late, we can confirm for noon call ET today and will send dial in instructions?

Ben

--
**Benjamin N Gonson**
Attorney at Law
Kissel Straton & Wilmer LLP
580 White Plains Rd.
Tarrytown, NY 10591

direct tel: 914-733-7758
main tel: 914-750-5933
main fax: 914-617-1522

www.kswlaw.com
IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages to clients of Kissel Straton & Wilmer, LLP presumptively contain information that is confidential and legally privileged; e-mail messages to non-clients are normally confidential and may also be legally privileged. If you have received this message in error, please forward it back without copying, storing or forwarding this message to any other party. Kissel Straton & Wilmer, LLP is a limited liability partnership organized in the United States under the laws of the State of New York, which laws limit the personal liability of partners.

On 5/27/2021 8:59 PM, Crandall, David R. wrote:


Hi Ben and Barbara,

Would you have time tomorrow from 12:30 am to 3:30 pm ET / 10:30 am to 1:30 pm MT, or on Tuesday, June 1 noon to 1 pm ET / 10-11 am MT?

Thanks,
David

**David Crandall**
Partner
**Hogan Lovells US LLP**
Direct:  +1 303 454 2449
Email:   david.crandall@hoganlovells.com

---

**From:** Crandall, David R.
**Sent:** Thursday, May 27, 2021 4:28 PM
**To:** 'Benjamin Gonson' <bgonson@kphwlaw.com>; mpthompson@taronisfuels.com; ajm@andrewmccormick.com
**Cc:** 'Barbara Agulnek' <bagulnek@kphwlaw.com>; Amanda Carpenter <acarpenter@kphwlaw.com>; Egan, Christina (MMA) <Christina.Egan@MarshMMA.com>
**Subject:** RE: E: FW: Taronis Fuels - D&O Claim (policy #B1724WLS20C237) - KSW File No. 27332.00050

Hi Ben,

I have reached out to my colleagues who are assisting with the SEC investigation to provide an update. I will let you know once I hear back regarding their availability. On the call we can also discuss potential coverage regarding the consent solicitation.

Thanks,
David

**David Crandall**
Partner
**Hogan Lovells US LLP**
Direct:  +1 303 454 2449
Email:   david.crandall@hoganlovells.com

---

**From:** Benjamin Gonson <bgonson@kphwlaw.com>
**Sent:** Thursday, May 27, 2021 3:12 PM

PRIR_0000297

**To:** mpthompson@taronisfuels.com; ajm@andrewmccormick.com
**Cc:** 'Barbara Agulnek' <bagulnek@kphwlaw.com>; Amanda Carpenter <acarpenter@kphwlaw.com>; Egan, Christina (MMA) <Christina.Egan@MarshMMA.com>; Crandall, David R. <david.crandall@hoganlovells.com>
**Subject:** Re: E: FW: Taronis Fuels - D&O Claim (policy #B1724WLS20C237) - KSW File No. 27332.00050

[EXTERNAL]

Dear Andrew and Mary Pat,

We are following up on our email below.

Please let us know your of your availability for a call and if you have any questions.

--
Benjamin N Gonson
Attorney at Law
Kissel Straton & Wilmer LLP
580 White Plains Rd.
Tarrytown, NY 10591

direct tel: 914-733-7758
main tel: 914-750-5933
main fax: 914-617-1522

www.kswlaw.com
IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages to clients of Kissel Straton & Wilmer, LLP presumptively contain information that is confidential and legally privileged; e-mail messages to non-clients are normally confidential and may also be legally privileged. If you have received this message in error, please forward it back without copying, storing or forwarding this message to any other party. Kissel Straton & Wilmer, LLP is a limited liability partnership organized in the United States under the laws of the State of New York, which laws limit the personal liability of partners.

On 5/19/2021 9:58 PM, Benjamin Gonson wrote:

Dear Andrew and Mary Pat,
We are in receipt of an email from Christina Egan of Marsh dated May 11, 2021,  on behalf of Taronis Fuels, providing notification under the above-referenced Policy of a formal SEC investigation of Taronis Tech.  Ms. Egan's email attached copies of the following documents: (1) an August 28, 2020 SEC Order for Investigation of Taronis Tech; (2) a December 14, 2020 SEC subpoena issued to Taronis Tech; (3) a January 11, 2021 SEC subpoena issued to Taronis Fuels; and (4) a February 12, 2021 SEC subpoena issued to Taronis Fuels.
We have opened a file regarding the SEC investigation  (KSW File No. 27332.00050), and would like to schedule an initial call with Taronis to discuss this matter. While a general overview of the SEC investigation was provided during our conversation on April 20, 2021 regarding the Wetherald Consent Solicitation and related Delaware litigation that was previously notified under the Policy (KSW File No. 27332.00048), further information and documentation is necessary to complete our coverage evaluation of this matter.  As such, we would appreciate it if you would provide your availability to participate in a call.  In the meantime, if there is any additional information and/or documentation you believe is relevant to our review of this matter, please feel free to forward at any time. In that regard, we note that during our April 20, 2021 call, it was mentioned that informal inquiries were made by the SEC to Taronis Fuels' parent, Taronis Tech, prior to the commencement of a formal investigation.  As such, we would appreciate it if you would forward copies of all communications received from the SEC by Taronis Tech and/or Taronis Fuels prior to the commencement of the formal investigation pursuant to the August 28, 2020  SEC Order for Investigation, in addition to copies of any communications from any Taronis entities in response.
In addition, during our April 20, 2021 conversation, in light of the resolution of the Consent Solicitation and related Delaware litigation (KSW File No.; 27332.00048) ,Taronis Fuels stated it  would advise whether it is seeking coverage under the Policy for that matter, or withdrawing notification in light of the settlement. In the event that Taronis is seeking coverage, we understood that additional information and documentation would be provided, including details of what Taronis is seeking coverage for and any relevant documentation in support of same, including but not limited to copies of the settlement documents.  Since our conversation, we have not received any further communications regarding that matter and would appreciate if you would advise us accordingly.
Please let us know your of your availability for a call and if you have any questions.
We look forward to hearing from you, and discussing these matters further.
Please be advised that at this early stage of our coverage investigation, PartnerRe's rights and defenses under the Policy and at law are fully reserved.

Confidential

PRIR_0000298

Thank you, Barbara and Ben

--
**Benjamin N Gonson**
Attorney at Law
Kissel Straton & Wilmer LLP
580 White Plains Rd.
Tarrytown, NY 10591

direct tel: 914-733-7758
main tel: 914-750-5933
main fax: 914-617-1522

[www.kswlaw.com](www.kswlaw.com)

IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages to clients of Kissel Straton & Wilmer, LLP presumably contain information that is confidential and legally privileged; e-mail messages to non-clients are normally confidential and may also be legally privileged. If you have received this message in error, please forward it back without copying, storing or forwarding this message to any other party. Kissel Straton & Wilmer, LLP is a limited liability partnership organized in the United States under the laws of the State of New York, which laws limit the personal liability of partners.

---

If you would like to know more about how we are managing the impact of the COVID-19 pandemic on our firm then take a look at our brief Q&A. If you would like to know more about how to handle the COVID-19 issues facing your business then take a look at our information hub.

**About Hogan Lovells**
Hogan Lovells is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP. For more information, see [www.hoganlovells.com](www.hoganlovells.com).

CONFIDENTIALITY. This email and any attachments are confidential, except where the email states it can be disclosed; it may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system.

--
**Benjamin N Gonson**
Attorney at Law
Kissel Straton & Wilmer LLP
580 White Plains Rd.
Tarrytown, NY 10591

direct tel: 914-733-7758
main tel: 914-750-5933
main fax: 914-617-1522

[www.kswlaw.com](www.kswlaw.com)

IMPORTANT NOTICE: This e-mail message is intended to be received only by persons entitled to receive the confidential information it may contain. E-mail messages to clients of Kissel Straton & Wilmer, LLP presumably contain information that is confidential and legally privileged; e-mail messages to non-clients are normally confidential and may also be legally privileged. If you have received this message in error, please forward it back without copying, storing or forwarding this message to any other party. Kissel Straton & Wilmer, LLP is a limited liability partnership organized in the United States under the laws of the State of New York, which laws limit the personal liability of partners.

# EXHIBIT
# 4

# NON-PUBLIC

## UNITED STATES OF AMERICA
### Before the
## SECURITIES AND EXCHANGE COMMISSION

**August 28, 2020**

| In the Matter of | ORDER DIRECTING PRIVATE |
| --- | --- |

In the Matter of

    **Taronis Technologies, Inc.,**
    **f/k/a MagneGas Applied**
    **Technology Solutions, Inc.,**
    **n/k/a BBHC, Inc.**

**FL-04237**

**ORDER DIRECTING PRIVATE
INVESTIGATION AND DESIGNATING
OFFICERS TO TAKE TESTIMONY**

I.

The Commission's public official files disclose that:

A.    Taronis Technologies, Inc. ("Taronis"), f/k/a MagneGas Applied Technology Solutions, Inc., n/k/a BBHC, Inc., is a Delaware corporation headquartered in Peoria, Arizona and Clearwater, FL. Taronis' common stock is currently registered with the Commission pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act"). Taronis' common stock is quoted on the OTCMKTS and trades under the symbol TRNX, and was previously listed on NASDAQ until July 13, 2020. Taronis files periodic reports, including Form 10-K, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder.

II.

The Commission has information that tends to show that from at least January 2017:

A.    In possible violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, Taronis, its officers, directors, employees, partners, subsidiaries, and/or affiliates, may have been or may be filing or causing to be filed with the Commission annual reports on Form 10-K, current reports on Form 8-K, quarterly reports on Form 10-Q, and any amendments thereto that may have contained and may contain false statements of material fact or may have omitted and may omit to state material facts necessary, or may have failed to add such further material information as may be necessary, in order to make the statements made, in the light of the circumstances under which they were or are made, not misleading.

B.    In possible violation of Section 17(a) of the Securities Act, Taronis, its officers, directors, employees, partners, subsidiaries, and/or affiliates and/or other persons or entities, directly or indirectly, in the offer or sale of certain securities, may have been or may be employing devices, schemes, or artifices to defraud, obtaining money or property by means of untrue

statements of material fact or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were or are made, not misleading, or engaging in transactions, practices or courses of business which operated, operate, or would operate as a fraud or deceit upon the purchaser.  As part of or in connection with these activities, such persons or entities, directly or indirectly, may have been or may be, among other things, making false statements of material fact or failing to disclose material facts concerning, among other things, Taronis' increases in revenue, acquisitions, ownerships of patents, material developments in operations, and partnerships with various municipalities and corporations.  While engaged in the above-described activities, such persons or entities, directly or indirectly, may have been or may be using any means or instruments of transportation or communication in interstate commerce or using the mails.

C.    In possible violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Taronis, its officers, directors, employees, partners, subsidiaries, and/or affiliates and/or other persons or entities, directly or indirectly, in connection with the purchase or sale of certain securities, may have been or may be employing devices, schemes, or artifices to defraud, making untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were or are made, not misleading, or engaging in acts, practices or courses of business which operated, operate, or would operate as a fraud or deceit upon any person.  In connection with these activities, such persons or entities, directly or indirectly, may have been or may be, among other things, making false statements of material fact or failing to disclose material facts concerning, among other things, Taronis' increases in revenue, acquisitions, ownerships of patents, material developments in operations, and partnerships with various municipalities and corporations. While engaged in the above-described activities, such persons or entities, directly or indirectly, may have been or may be making use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange.

III.

The Commission, deeming such acts and practices, if true, to be possible violations of Sections 13(a) and 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act, finds it necessary and appropriate and hereby:

ORDERS, pursuant to the provisions of Section 20(a) of the Securities Act and Section 21(a) of the Exchange Act, that a private investigation be made to determine whether any persons or entities have engaged in, or are about to engage in, any of the reported acts or practices or any acts or practices of similar purport or object; and

FURTHER ORDERS, pursuant to the provisions of Section 19(c) of the Securities Act and Section 21(b) of the Exchange Act, that for purposes of such investigation, Eric I. Bustillo, Glenn S. Gordon, Thierry Olivier Desmet,  Chanel T. Rowe, Andre J. Zamorano, Michelle Bosworth, Fernando Torres, Mark S. Dee, Lina M. Fernandez, Timothy J. Galdencio, Crystal C. Ivory, Kathleen E. Strandell, Tonya E. Tullis, Andrew Schiff, Amie R. Berlin, Wilfredo Fernandez, Alise

2

PRIR_0000418

Johnson, Robert K. Levenson, Stephanie Moot, Christine Nestor, and each of them, are hereby designated as officers of the Commission and are empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records deemed relevant or material to the inquiry, and to perform all other duties in connection therewith as prescribed by law.

For the Commission, by the Division of Enforcement, pursuant to delegated authority.[1]

Vanessa A. Countryman
Secretary

By: Jill M. Peterson
         Assistant Secretary

---

[1]  17 CFR 200.30-4(a)(13)

PRIR_0000419

# EXHIBIT
# 5



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
801 BRICKELL AVENUE, SUITE 1950
MIAMI, FLORIDA 33131

MIAMI
REGIONAL OFFICE

DIVISION OF ENFORCEMENT

Chanel T. Rowe
Counsel
(305) 416-6277
rowech@sec.gov

December 14, 2020

<u>VIA OVERNIGHT DELIVERY</u>
Taronis Technologies, Inc.
c/o Tyler B. Wilson, General Counsel
11885 44th Street N
Clearwater, Florida 33762

Re: <u>Taronis Technologies, Inc. (FL-04237)</u>

Dear Mr. Wilson:

The enclosed subpoena has been issued pursuant to a formal order entered by the United States Securities and Exchange Commission. Pursuant to Rule 8 of the United States Securities and Exchange Commission's Rules Relating to Investigations, 17 C.F.R. § 203.8, I have enclosed a subpoena for documents issued to Taronis Technologies, Inc., in connection with the above-referenced investigation.

The enclosed subpoena requires Taronis Technologies, Inc. to produce documents to the SEC by January 11, 2021. Please deliver the materials by January 11, 2021 at 5:00 p.m. to:

ENF-CPU
U.S. Securities and Exchange Commission
6315 Bren Mar Drive, Suite 175
Alexandria, VA 22312

For smaller electronic productions under 10MB in size, the materials may be emailed to the following email address: <u>ENF-CPU@sec.gov</u>.

Please also provide a duplicate copy of any document production cover letters to me at rowech@sec.gov. Additionally, please include the SEC matter number and the name of the requesting attorney when responding.

Please carefully read the subpoena attachment, which contains, among other things, important instructions related to the manner of producing documents. In particular, if Taronis Technologies, Inc. prefers to send us copies of original documents, **the staff requests that you**

PRIR_0000355

scan and produce hard copy documents, as well as electronic documents, in an electronic format consistent with the **SEC Data Delivery Standards attached hereto. All electronic documents responsive to the subpoena, <u>including all metadata</u>, should also be produced in their native software format.** If you have any questions concerning the production of documents in an electronic format, please contact me as soon as possible and in any event before producing documents. For security reasons, we strongly encourage the encryption of sensitive documents before production.

In your cover letter(s) accompanying the production of responsive documents, please enclose a list briefly describing each item you send. The list should identify the paragraph(s) in the subpoena attachment to which each item responds. Please also state in the cover letter(s) whether you believe Taronis Technologies, Inc. has met the obligations of the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us.

A copy of the subpoena should be included with the documents that are produced. Correspondence should reference case number, case name and requesting SEC staff member.

Passwords for documents, files, compressed archives, and encrypted media should be provided separately either via email addressed to ENF-CPU@sec.gov, or in a separate cover letter mailed separately from the data. Password correspondence should reference case number, case name and requesting SEC staff member.

Please also provide a narrative description describing what was done to identify and collect documents responsive to the subpoena. At a minimum, the narrative should describe:

- who searched for documents;
- who reviewed documents found to determine whether they were responsive;
- which custodians were searched;
- what sources were searched (e.g., computer files, CDs, DVDs, thumb drives, flash drives, online storage media, hard copy files, diaries, datebooks, planners, filing cabinets, storage facilities, home offices, work offices, voice mails, home email, webmail, work email, backup tapes or other media);
- what search terms, if any, were employed to identify responsive documents;
- what firms and/or persons, if any, assisted in analyzing the data collected;
- what third parties, if any, were contacted to obtain responsive documents (e.g., phone companies for phone records, brokerage firms for brokerage records); and
- where the original electronic and hardcopy documents are maintained and by whom.

In addition, for any documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please have the appropriate representative(s) of Taronis Technologies, Inc. complete a business records certification (a sample of which is enclosed) and return it with the document production.

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission

2

PRIR_0000356

unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

Enclosed is a copy of the Commission's Form 1662, entitled "Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena." This form explains how we may use the information that Taronis Technologies, Inc. provides to the Commission and has other important information.

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation does not mean that we have concluded that anyone has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity, or security.

If you have any questions or would like to discuss this matter, you may contact me at (305) 416-6277.

Sincerely,

/s *Chanel T. Rowe*

Chanel T. Rowe
Counsel
Division of Enforcement

Enclosures:     Subpoena and Attachment
SEC Data Delivery Standards
SEC Form 1662
Business Records Certification

3

PRIR_0000357



# SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

**Taronis Technologies, Inc. (FL-04237)**

**To:**   Taronis Technologies, Inc.
c/o Tyler B. Wilson, General Counsel
11885 44th Street N
Clearwater, Florida 33762

---

☒    **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below:

ENF-CPU, U.S. Securities and Exchange Commission, 6315 Bren Mar Drive, Suite 175, Alexandria, VA 22312, no later than January 11, 2021 at 5:00 p.m.

---

☐    **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

---

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.**
If you do not comply with this subpoena, the SEC may bring an action in Federal Court to enforce this subpoena.
Failure to comply with a court order enforcing this subpoena may result in the court imposing a fine, imprisonment, or both.

By:   _/s Chanel T. Rowe_          Date:   December 14, 2020
Chanel T. Rowe, Counsel
U.S. Securities and Exchange Commission
Miami Regional Office
801 Brickell Avenue, Suite 1950
Miami, FL 33131

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS: If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

PRIR_0000358

## SUBPOENA ATTACHMENT FOR TARONIS TECHNOLOGIES, INC.

Taronis Technologies, Inc. (FL-04237)

December 14, 2020

### Definitions

As used in this subpoena, the words and phrases listed below shall have the following meanings:

1.  "Taronis" means the entity doing business under the name "Taronis Technologies, Inc.", including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

2.  "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

3.  A "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants, attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

4.  "Document" shall include, but is not limited to, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, facsimiles, messages of any type, telephone messages, text messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

5.  "Communication" means any correspondence, contact, discussion, e-mail, instant message, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

6.  "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in

PRIR_0000359

connection with, commenting on, relating to, regarding, discussing, showing, describing, analyzing or reflecting.

7.  An "Agreement" means any actual or contemplated (i) written or oral Agreement; (ii) term or provision of such Agreement; or (iii) amendment of any nature or termination of such Agreement. A request for any Agreement among or between specified parties includes a request for all Documents Concerning (i) any actual or contemplated Agreement among or between such parties, whether or not such Agreement included any other Person; (ii) the drafting or negotiation of any such Agreement; (iii) any actual or contemplated demand, request or application for any such Agreement, and any response thereto; and (iv) any actual or contemplated objection or refusal to enter into any such Agreement, and any response thereto.

8.  The term "you" and "your" means the Person to whom or entity to which this subpoena was issued.

9.  To the extent necessary to bring within the scope of this this subpoena any information or Documents that might otherwise be construed to be outside its scope:
    a.  the word "or" means "and/or";
    b.  the word "and" means "and/or";
    c.  the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;
    d.  the masculine gender includes the female gender and the female gender includes the masculine gender; and
    e.  the singular includes the plural and the plural includes the singular.

10. "Relevant Period" means the time period beginning January 1, 2017, or the earliest time for which records exist, whichever is earlier, and continuing to the present, unless otherwise specified.

### Instructions

1.  Unless otherwise specified, this subpoena calls for production of the original Documents and all copies and drafts of same. Documents responsive to this subpoena may be in electronic or paper form. Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All responsive electronic Documents, **including all metadata**, should also be produced in their native software format.

2.  For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us photocopies of the Documents in paper format. If you choose to send copies, you <u>must</u> secure and retain the originals and store them in a safe place. The staff may later request or require that you produce the

2

PRIR_0000360

originals.

3. Whether you scan or photocopy Documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a Document differ in any way, they are considered separate Documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

4. In producing a photocopy of an original Document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original Document, photocopies of the original Document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

5. Documents should be produced as they are kept in the ordinary course of business or be organized and labeled to correspond with the categories in this request. In that regard, Documents should be produced in a unitized manner, i.e., delineated with staples or paper clips to identify the Document boundaries.

6. Documents should be labeled with sequential numbering (bates-stamped).

7. You must produce all Documents created during, or Concerning, the period from January 1, 2017, or the earliest time for which records exist, whichever is earlier, to the date of this subpoena, unless otherwise specified.

8. The scope of any given request should not be limited or narrowed based on the fact that it calls for Documents that are responsive to another request.

9. You are not required to produce exact duplicates of any Documents that have been previously produced to the Securities and Exchange Commission staff in connection with this matter. If you are not producing Documents based upon a prior production, please identify the responsive Documents that were previously produced.

10. For any Documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please complete a business records certification (a sample of which is enclosed) and return it with the Document production.

11. This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the effective ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the request, you should submit a list of what you are not producing. The list should describe each item separately, noting:

    a.     its author(s);
    b.     its date;

3

PRIR_0000361

c.   its subject matter;
d.   the name of the Person who has the item now, or the last Person known to have it;
e.   the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
f.   the basis upon which you are not producing the responsive Document;
g.   the specific request in the subpoena to which the Document relates;
h.   the attorney(s) and the client(s) involved; and
i.   in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

12.   If Documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

## Documents to be Produced

1.   Documents sufficient to identify Taronis' current and former officers and directors, including each person's name, title, job description, dates of employment, and compensation during the Relevant Period;

2.   Documents sufficient to identify any and all bank accounts held, maintained, or controlled by Taronis or on its behalf during the Relevant Period;

3.   Documents sufficient to identify Taronis' sales and revenues during the Relevant Period;

4.   Any and all Documents supporting that Taronis Fuel projects to generate in excess of $50 million in revenues in 2020;

5.   Documents sufficient to identify Taronis' operations at 22 locations across California, Texas, Louisiana, and Florida;

6.   Any and all Documents supporting that Taronis Fuel had revenues of $11 million for the fourth quarter of 2019;

7.   Any and all Documents supporting that Taronis owns "a patented plasma arc technology that enables two primary end use applications for fuel generation and water decontamination";

8.   Any and all Documents supporting that Taronis holds "a 7% royalty on the global use of its fuel generation intellectual property";

4

PRIR_0000362

9. Any and all Documents supporting that after Taronis' treatment of Hibiscus Lake in Clearwater, Florida, cyanobacteria levels have dramatically reduced and the algae bloom was remediated;

10. Any and all Documents supporting that Taronis Water has "made meaningful progress on a strategic relationship with one of the largest global hog producers" to impact hog waste;

11. Any and all Documents supporting that as of March 2020, Taronis is constructing "three new Venturi plasma arc sterilization units" dedicated to serving the hog industry in North Carolina;

12. Any and all Documents supporting that Taronis Health has "acquired a 20% stake in Taurus Therapeutics, an immuno-oncology biotechnology company developing new drugs that target immunosuppressive adenosine in the tumor microenvironment (TME) for the treatment of resistant cancers";

13. Any and all Documents supporting that Taronis Health owns a warrant to acquire an additional 13.3% of Taurus Therapeutics up until an initial public offering (IPO);

14. Any and all Documents supporting that "Taurus is actively preparing for an IPO as early as before year-end 2020";

15. Any "final technical briefing" delivered by Taronis to the United States Department of Agriculture ("USDA") in February 2020;

16. Any presentation by Taronis to the USDA to fund a commercial pilot project to address the hog waste produced in North Carolina;

17. Any Communications between Taronis and the USDA concerning the process of becoming an approved vendor on the USDA best practices list;

18. Any and all Documents supporting that Taronis had a binding Agreement with the City of San Diego at any point before February 12, 2020;

19. Any and all Documents supporting that Taronis had binding Agreement with the City of San Diego as of January 28, 2020;

20. Any and all Documents supporting that MagneGas is a safer, eco-friendly alternative to acetylene;

PRIR_0000363

21. Any and all Documents supporting or discussing Taronis' decision to "correct its prior [SEC] disclosure" Concerning the "major city contract for the adoption of the [Taroni]'s metal cutting fuels" with the City of San Diego;

22. Any and all Documents supporting that as of February 1, 2019 Taronis had "driven 600% revenue growth and expanded across the US in 13 months through 7 acquisitions";

23. Any and all Documents supporting that as of February 13, 2019 Taronis had "increased [its] annualized revenues by over 700% in just over a year while also increasing [its] client base by over 1000% to more than 30,000 active customers";

24. Any and all Documents supporting that Taronis' sales as of January 2019 was 468% higher than sales as of January 2018;

25. Any and all Documents supporting that Taronis Technologies has a $165 million binding Agreement with a Turkish organization;

26. Any and all Documents supporting that Taronis Technologies, Inc. entered a binding multi-year regional marketing agreement with MC Consulting Teknoloji Enerji Danismanlik Sanayl ve Ticaret Limited Sirketi;

27. Any and all Documents supporting that, under the Agreement between Taronis and MC Consulting Teknoloji Enerji Danismanlik Sanayl ve Ticaret Limited Sirketi, Taronis immediately sold a 300KW Venturi plasma arc gasification unit to MC Consulting for $5 million;

28. Any and all Documents supporting that the 300KW Venturi plasma arc gasification unit sold to MC Consulting for $5 million under the aforementioned Agreement was delivered to MC Consulting;

29. Any and all Documents supporting that Taronis acquired Complete Cutting & Welding Supplies, Inc., including Documents sufficient to reflect the terms of the acquisition;

30. Any and all Documents supporting that as of February 26, 2019 "[a]fter completing nine acquisitions in the past thirteen months, [Taronis] ha[s] increased [its] revenue run rate by 800%";

31. Any and all Documents supporting that "[o]n August 21, 2019, [Taronis] was notified by the Nasdaq Capital Market that the Company needed to revised (sic) the record date for the Company's proposed spin-off of Taronis Fuels, Inc. because Nasdaq is unable to process

6

PRIR_0000364

reverse stock splits while spin-offs are pending";

32. Documents sufficient to identify independent distributors of MagneGas;

33. Documents sufficient to reflect an Agreement between Taronis and Wendy's;

34. Documents sufficient to reflect an Agreement between Taronis and Popeye's;

35. Documents sufficient to reflect an Agreement between Taronis and Holiday Inn;

36. Any and all Documents supporting that as of May 27, 2020 Taronis acquired "one of the largest independent specialty industrial gas distributors in the United States today" for $8 million;

37. Any and all Documents supporting that the "TGS Acquisition" referenced in Request Number 36 "ha[d] an immediate, significantly positive financial impact on the [Taronis'] overall financial outlook";

38. Any and all Documents supporting that the TGS Acquisition "brings in approximately $300,000 in added monthly EBITDA";

39. Any and all Documents supporting that "TGS generated $8 million in revenues in 2019 and is experiencing rapid growth due to the increased work-from-home policies implemented during the COVID-19 pandemic";

40. Any and all Documents supporting that because of the TGS Acquisition, "Taronis is now able to generate positive EBITDA cash flows across its combined US operations";

41. Any and all Documents supporting that because of the TGS Acquisition, Taronis "can now enter entirely new markets for a very limited capital investment, and quickly become profitable in these new locations using high-margin HVAC gas sales to fund organic growth";

42. Any and all Documents supporting any Agreement between Taronis and Tech Capital;

43. Any and all private placement memorandum, subscription agreement, and investor list(s) associated with the "$10.4 million private placement of [Taronis] common stock" that closed in or around November 2020;

7

PRIR_0000365

44. Any and all Documents supporting that in the third quarter of 2020 Taronis generated $9.7 million in revenues representing an 80% increase in sales compared to the third quarter of 2019;

45. Any and all Documents supporting that in the third quarter of 2020 Taronis generated $6.3 million in gross income representing a 125% increase compared to the same period in 2019;

46. Any and all Documents supporting that Taronis had "significant cash on hand" as of April 2020;

47. Any and all investor lists reflecting contact information, date of investment, investment instrument, and amount invested;

48. Any and all Documents supporting that Taronis secured a long term lease for a 65,000 square foot manufacturing facility in Peoria, Arizona;

49. Any and all Documents supporting that as of January 2, 2020 Taronis "expected to receive $1.3 million in royalty payments over the next 90-100 days";

50. List all independent directors who resigned from BBHC, Inc. in or around October 2020 and provide the reason for their resignation; and

51. Any and all organizational charts for Taronis and/or any parents, subsidiaries, predecessors, and successors, including the title, location, and contact information for any officer, director, employee, agent, general partner or limited partner thereof.

8

PRIR_0000366

## DECLARATION OF [*Insert Name*] CERTIFYING RECORDS OF REGULARLY CONDUCTED BUSINESS ACTIVITY

I, the undersigned, [*insert name*], pursuant to 28 U.S.C. § 1746, declare that:

1. I am employed by Taronis Technologies, Inc. as [*insert position*] and by reason of my position am authorized and qualified to make this declaration. [*if possible supply additional information as to how person is qualified to make declaration, e.g., I am custodian of records, I am familiar with the company's recordkeeping practices or systems, etc.*]

2. I further certify that the documents [*attached hereto or submitted herewith*] and stamped [*insert bates range*] are true copies of records that were:

    (a) made at or near the time of the occurrence of the matters set forth therein, by, or from information transmitted by, a person with knowledge of those matters;

    (b) kept in the course of regularly conducted business activity; and

    (c) made by the regularly conducted business activity as a regular practice.

I declare under penalty of perjury that the foregoing is true and correct. Executed on [*date*].

_____
[*Name*]

PRIR_0000367



**U.S. Securities and Exchange Commission**

**Data Delivery Standards**

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC).    ***Any questions or proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission.***

General Instructions ....................................................................................................................................... 1

Delivery Formats ............................................................................................................................................ 2

    I.   Imaged Productions ........................................................................................................................... 3

        1.  Images ...................................................................................................................................... 3

        2.  Image Cross-Reference File ................................................................................................... 3

        3.  Data File .................................................................................................................................. 3

        4.  Text ......................................................................................................................................... 3

        5.  Linked Native Files ................................................................................................................ 3

    II.  Native File Productions without Load Files ...................................................................................... 4

    III.  Adobe PDF File Productions ............................................................................................................ 4

    IV.  Audio Files ........................................................................................................................................ 4

    V.  Video Files ......................................................................................................................................... 4

    VI.  Electronic Trade and Bank Records .................................................................................................. 4

    VII. Electronic Phone Records .................................................................................................................. 4

    VIII. Audit Workpapers ............................................................................................................................. 5

    IX.  Mobile Device Data .......................................................................................................................... 5

**General Instructions**

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business. For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. *(Note: An Adobe PDF file is not considered a native file unless the document was initially created as a PDF.)*

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR) during the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF). If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name and file location and, 2) make that unique metadata part of your production to the SEC.

PRIR_0000368

General requirements for **ALL** document productions are:

1. A cover letter must be included with each production and should include the following information:
    a. Case number, case name and requesting SEC staff member name
    b. A list of each piece of media included in the production with its unique production volume number
    c. A list of custodians, identifying the Bates range for each custodian
    d. The time zone in which the emails were standardized during conversion.
    e. Whether the production contains native files produced from Mac operating system environments
2. Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
    a. Case number
    b. Production date
    c. Producing party
    d. Bates range (if applicable)
3. All submissions must be organized by **custodian** unless otherwise instructed.
4. All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5. All load-ready collections should include only one data load file and one image pointer file.
6. All load-ready text must be produced as separate document-level text files.
7. All load-ready collections should account for custodians in the custodian field.
8. All load-ready collections must provide the extracted contents of any container files to ensure all relevant files are produced as separate records.
9. Audio files should be separated from data files if both are included in the production.
10. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
11. All electronic productions submitted on media must be produced using industry standard self-extracting encryption software.
12. Electronic productions may be submitted via Secure File Transfer. The SEC **cannot** accept productions made using file sharing sites such as Google Drive, Microsoft Office 365 or Dropbox.
13. Productions containing BSA or SAR material must be delivered on encrypted physical media. The SEC **cannot** accept electronic transmission of BSA or SAR material. Any BSA or SAR material produced should be segregated and appropriately marked as BSA or SAR material, or should be produced separately from other case related material.
14. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a separate cover letter from the media.
15. All electronic productions should be produced free of computer viruses.
16. Before producing forensically collected images, parties should reach out to the requesting SEC staff member in order to discuss appropriate handling.
17. Before producing unique data sets (large sets of relational data, website reconstruction, chat room data, etc.), parties should reach out to the requesting SEC staff member in order to discuss an appropriate production format.
18. Additional technical descriptions can be found in the addendum to this document.

**\*Please note that productions sent to the SEC via United States Postal Service are subject to Mail Irradiation, and as a result electronic productions may be damaged.\***

2

Rev 06/2019

PRIR_0000369

U.S. Securities and Exchange Commission
Data Delivery Standards

**Delivery Formats**

## I.  Imaged Productions

The SEC prefers that all scanned paper and electronic file collections be produced in a structured format including industry standard load files, Bates numbered image files, native files and searchable document-level text files.

### 1.  Images

  a.  Black and white images must be 300 DPI Group IV single-page TIFF files.
  b.  Color images must be produced in JPEG format.
  c.  File names cannot contain embedded spaces or special characters (including the comma).
  d.  Folder names cannot contain embedded spaces or special characters (including the comma).
  e.  All image files must have a unique file name, i.e. Bates number.
  f.  Images must be endorsed with sequential Bates numbers in the lower right corner of each image.
  g.  The number of image files per folder should not exceed 2,000 files.
  h.  Excel spreadsheets should have a placeholder image named by the Bates number of the file.
  i.  AUTOCAD/photograph files should be produced as a single page JPEG file.

### 2.  Image Cross-Reference File

The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

*ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

### 3.  Data File

The data file (.DAT) contains all of the fielded information that will be loaded into the database.

  a.  The first line of the .DAT file must be a header row identifying the field names.
  b.  The .DAT file must use the following *Concordance®* default delimiters:
      Comma ¶ ASCII character (020)
      Quote þ ASCII character (254)
  c.  If the .DAT file is produced in Unicode format it must contain the byte order marker
  d.  Date fields should be provided in the format: mm/dd/yyyy
  e.  Date and time fields must be two separate fields.
  f.  The time zone must be included in all time fields
  g.  If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments.
  h.  An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media.  The text file must be named after the FIRSTBATES.  Do not include the text in the .DAT file.
  i.  For productions with native files, a LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the FIRSTBATES.
  j.  BEGATTACH and ENDATTACH fields must be two separate fields.
  k.  A complete list of metadata fields is available in **Addendum A** to this document.

### 4.  Text

Text must be produced as separate document-level text files, not as fields within the .DAT file. The text files must be named per the FIRSTBATES/Image Key and the full path to the text file (OCRPATH) should be included in the .DAT file. Text files may be in either ANSI or Unicode format, however, ALL text files must be in the same format within the same production. Note that productions containing text with foreign characters must produce text files in Unicode format to preserve the foreign characters. Text files must be in a separate folder, and the number of text files per folder should not exceed 2,000 files. There should be no special characters (including commas) in the folder names. For redacted documents, provide the full text for the redacted version.

### 5.  Linked Native Files

Copies of original email and native file documents/attachments must be included for all electronic productions.
  a.  Native file documents must be named per the FIRSTBATES number.
  b.  The full path of the native file must be provided in the .DAT file for the LINK field.
  c.  The number of native files per folder should not exceed 2,000 files.

3

Rev 06/2019

PRIR_0000370

U.S. Securities and Exchange Commission
Data Delivery Standards

**II.    Native File Production without Load Files**

With prior approval, native files may be produced without load files. The native files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, Outlook (.PST) and Lotus Notes (.NSF) email files may be produced in native file format.  A separate folder should be provided for each custodian.

**III.    Adobe PDF File Production**

With prior approval, Adobe PDF files may be produced in native file format.

1.  All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
2.  PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
3.  All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4.  If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

**IV.    Audio Files**

Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

| | | |
|---|---|---|
| 1) | Caller Name: | Caller's name or account/identification number |
| 2) | Originating Number: | Caller's phone number |
| 3) | Called Party Name: | Called party's name |
| 4) | Terminating Number: | Called party's phone number |
| 5) | Date: | Date of call |
| 6) | Time: | Time of call |
| 7) | Filename: | Filename of audio file |

**V.    Video Files**

Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

**VI.    Electronic Trade and Bank Records**

When producing electronic trade records, bank records, or financial statements, provide the files in one of the following formats:

1.  MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2.  Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

**VII.    Electronic Phone Records**

When producing electronic phone records, provide the files in the following format:

1.  MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.  Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).

    a.  The metadata that must be included is outlined in **Addendum B** of this document. Each field of data must be loaded into a separate column.  For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information.  Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

4

Rev 06/2019

PRIR_0000371

U.S. Securities and Exchange Commission
Data Delivery Standards

## VIII. Audit Workpapers

The SEC prefers for workpapers to be produced in two formats: (1) With Bates numbers in accordance with the SEC Data Delivery Standards; and (2) in native format or if proprietary software was used, on a standalone laptop with the appropriate software loaded so that the workpapers may be reviewed as they would have been maintained in the ordinary course of business. When possible, the laptop should be configured to enable a Virtual Machine (VM) environment.

## IX. Mobile Device Data

Before producing mobile device data (including but not limited to text messages) parties should reach out to the requesting SEC staff member in order to discuss the appropriate production format.

5

Rev 06/2019

PRIR_0000372

U.S. Securities and Exchange Commission
Data Delivery Standards

## ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email **The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email **This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments **The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided Native: Name of the individual or department from whose files the document originated |
| FROM | John Smith | Email: Sender Native: Author(s) of document **semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s) **semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s) **semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s) **semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent Native: (empty) |
| TIME_SENT/TIME _ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion. Native: (empty) **This data must be a separate field and cannot be combined with the DATE_SENT field |

6

Rev 06/2019

PRIR_0000373

U.S. Securities and Exchange Commission
Data Delivery Standards

| Field | Value | Description |
|---|---|---|
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion. Email: Time zone Native: (empty) |
| LINK | D:\001\EDC0000001.msg | Hyperlink to the email or native file document **The linked file must be named per the FIRSTBATES number |
| MIME_TYPE | application/msword | The content type of an Email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the Email or native file document; will vary depending on the email format |
| AUTHOR | John Smith | Email: (empty) Native: Author of the document |
| LAST_AUTHOR | Jane Doe | Email: (empty) Native: Last Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty) Native: Date the document was created |
| TIME_CREATED/TIME/ZONE | 10:25 AM GMT | Email: (empty) Native: Time the document was created including time zone **This data must be a separate field and cannot be combined with the DATE_CREATED field |
| DATE_MOD | 10/12/2010 | Email: (empty) Native: Date the document was last modified |
| TIME_MOD/TIME ZONE | 07:00 PM GMT | Email: (empty) Native: Time the document was last modified including the time zone **This data must be a separate field and cannot be combined with the DATE_MOD field |
| DATE_ACCESSD | 10/12/2010 | Email: (empty) Native: Date the document was last accessed |
| TIME_ACCESSD/TIME_ZONE | 07:00 PM GMT | Email: (empty) Native: Time the document was last accessed including the time zone **This data must be a separate field and cannot be combined with the DATE_ACCESSD field |
| PRINTED_DATE | 10/12/2010 | Email: (empty) Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty) Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name. |
| INTMSGID | <000805c2c71b$75977050$cb8306d1@MSN> | Email: Unique Message ID Native: (empty) |

7

Rev 06/2019

PRIR_0000374

U.S. Securities and Exchange Commission
Data Delivery Standards

| HEADER | Return-Path: <example_from@dc.edu> X-SpamCatcher-Score:1[X] Received:from[136.167.40.119] (HELO dc.edu) by fe3.dc.edu (CommuniGate Pro SMTP4.1.8) with ESMTP-TLS id 61258719 for example_to@mail.dc.edu; Mon, 23 Aug 2004 11:40:10 -0400 Message-ID: <4129F3CA.2020509@dc.edu> Date: Mon, 23 Aug 2005 11:40:36 -400 From: Taylor Evans <example_from@dc.edu> User-Agent:Mozilla/5.0 (Windows;U; Windows NT 5.1; en-US;rv:1.0.1) Gecko/20020823 Netscape/7.0 X-Accept-Language:en-us,en MIME-Version:1.0 To: Jon Smith <example_to@mail.dc.edu> Subject:Business Development Meeting Content-Type: text/plain;charset=us-ascii; format=flowed Content-Transfer-Encoding:7bit | Email: The email header information Native: (empty) |
|---|---|---|
| MD5HASH | d131dd02c5e6eec4693d9a069 8aff95c 2fcab58712467eab4004583eb 8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Cross-Reference File:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,,
IMG0000004,,E:\001\IMG0000004.TIF,Y,,,
IMG0000005,,E:\001\IMG0000005.TIF,Y,,,
IMG0000006,,E:\001\IMG0000006.TIF,,,,,
```

8

Rev 06/2019

PRIR_0000375

U.S. Securities and Exchange Commission
Data Delivery Standards

## ADDENDUM B

For Electronic Phone Records, include the following fields in separate columns:
For Calls:
1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating– Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating- Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable

For Text messages:
1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating– Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating- Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable

For Mobile Data Usage:
1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

9

Rev 06/2019

PRIR_0000376

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

### Supplemental Information for Persons Requested to Supply
### Information Voluntarily or Directed to Supply Information
### Pursuant to a Commission Subpoena

**A. False Statements and Documents**

Section 1001 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

Section 1519 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . ., or in relation to or contemplation of any such matter.

**B. Testimony**

If your testimony is taken, you should be aware of the following:

1. *Record.* Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2. *Counsel.* You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied, represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3. *Transcript Availability.* Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however,* That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4. *Perjury.* Section 1621 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever--

SEC 1662 (08-16)

PRIR_0000377

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true.

5.    *Fifth Amendment and Voluntary Testimony.* Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6.    *Formal Order Availability.* If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

**C. Submissions and Settlements**

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

in the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

**D. Freedom of Information Act**

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

2

PRIR_0000378

**E. Authority for Solicitation of Information**

*Persons Directed to Supply Information Pursuant to Subpoena.* The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily.* One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

**F. Effect of Not Supplying Information**

*Persons Directed to Supply Information Pursuant to Subpoena.* If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, Section 21(c) of the Securities Exchange Act of 1934, Section 42(c) of the Investment Company Act of 1940, and Section 209(c) of the Investment Advisers Act of 1940 provide that fines and terms of imprisonment may be imposed upon any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

**G. Principal Uses of Information**

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

**H. Routine Uses of Information**

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1. To appropriate agencies, entities, and persons when (a) it is suspected or confirmed that the security or confidentiality of information in the system of records has been compromised; (b) the SEC has determined that, as a result of the suspected or confirmed compromise, there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the SEC or another agency or entity) that rely upon the compromised information; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

2. To other federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3. To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4. By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

3

PRIR_0000379

5.  In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6.  In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7.  To a bar association, state accountancy board, or other federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8.  To a federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9.  To a federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10.  To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11.  To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 – 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100-1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12.  To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13.  To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14.  In reports published by the Commission pursuant to authority granted in the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15.  To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16.  To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 200.735-18, and who assists in the investigation by the Commission of possible violations of the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

17.  To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18.  To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

4

PRIR_0000380

19. To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20. To respond to subpoenas in any litigation or other proceeding.

21. To a trustee in bankruptcy.

22. To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

* * * * *

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

5

PRIR_0000381

# EXHIBIT
# 6

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
801 BRICKELL AVENUE, SUITE 1950
MIAMI, FLORIDA 33131

MIAMI
REGIONAL OFFICE

DIVISION OF ENFORCEMENT

Chanel T. Rowe
Counsel
(305) 416-6277
rowech@sec.gov

January 11, 2021

VIA OVERNIGHT DELIVERY
Taronis Fuels, Inc.
c/o Tyler B. Wilson, General Counsel
24980 N. 83rd Avenue, Suite 100
Peoria, Arizona 85383

Re: Taronis Technologies, Inc. (FL-04237)

Dear Mr. Wilson:

The enclosed subpoena has been issued pursuant to a formal order entered by the United States Securities and Exchange Commission. Pursuant to Rule 8 of the United States Securities and Exchange Commission's Rules Relating to Investigations, 17 C.F.R. § 203.8, I have enclosed a subpoena for documents issued to Taronis Fuels, Inc., in connection with the above-referenced investigation.

The enclosed subpoena requires Taronis Fuels, Inc. to produce documents to the SEC by January 22, 2021. Please deliver the materials by January 22, 2021 at 5:00 p.m. to:

ENF-CPU
U.S. Securities and Exchange Commission
6315 Bren Mar Drive, Suite 175
Alexandria, VA 22312

For smaller electronic productions under 10MB in size, the materials may be emailed to the following email address: ENF-CPU@sec.gov.

Please also provide a duplicate copy of any document production cover letters to me at rowech@sec.gov. Additionally, please include the SEC matter number and the name of the requesting attorney when responding.

Please carefully read the subpoena attachment, which contains, among other things, important instructions related to the manner of producing documents. In particular, if Taronis Fuels, Inc. prefers to send us copies of original documents, **the staff requests that you scan and**

PRIR_0000382

produce hard copy documents, as well as electronic documents, in an electronic format consistent with the SEC Data Delivery Standards attached hereto. All electronic documents responsive to the subpoena, **including all metadata, should also be produced in their native software format**. If you have any questions concerning the production of documents in an electronic format, please contact me as soon as possible and in any event before producing documents. For security reasons, we strongly encourage the encryption of sensitive documents before production.

In your cover letter(s) accompanying the production of responsive documents, please enclose a list briefly describing each item you send. The list should identify the paragraph(s) in the subpoena attachment to which each item responds. Please also state in the cover letter(s) whether you believe Taronis Fuels, Inc. has met the obligations of the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us.

A copy of the subpoena should be included with the documents that are produced. Correspondence should reference case number, case name and requesting SEC staff member.

Passwords for documents, files, compressed archives, and encrypted media should be provided separately either via email addressed to ENF-CPU@sec.gov, or in a separate cover letter mailed separately from the data. Password correspondence should reference case number, case name and requesting SEC staff member.

Please also provide a narrative description describing what was done to identify and collect documents responsive to the subpoena. At a minimum, the narrative should describe:

- who searched for documents;
- who reviewed documents found to determine whether they were responsive;
- which custodians were searched;
- what sources were searched (e.g., computer files, CDs, DVDs, thumb drives, flash drives, online storage media, hard copy files, diaries, datebooks, planners, filing cabinets, storage facilities, home offices, work offices, voice mails, home email, webmail, work email, backup tapes or other media);
- what search terms, if any, were employed to identify responsive documents;
- what firms and/or persons, if any, assisted in analyzing the data collected;
- what third parties, if any, were contacted to obtain responsive documents (e.g., phone companies for phone records, brokerage firms for brokerage records); and
- where the original electronic and hardcopy documents are maintained and by whom.

In addition, for any documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please have the appropriate representative(s) of Taronis Fuels, Inc. complete a business records certification (a sample of which is enclosed) and return it with the document production.

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents

2

PRIR_0000383

responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

Enclosed is a copy of the Commission's Form 1662, entitled "Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena." This form explains how we may use the information that Taronis Fuels, Inc. provides to the Commission and has other important information.

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation does not mean that we have concluded that anyone has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity, or security.

If you have any questions or would like to discuss this matter, you may contact me at (305) 416-6277.

Sincerely,

/s *Chanel T. Rowe*

Chanel T. Rowe
Counsel
Division of Enforcement

Enclosures:     Subpoena and Attachment
                SEC Data Delivery Standards
                SEC Form 1662
                Business Records Certification

3

PRIR_0000384



# SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

### Taronis Technologies, Inc. (FL-04237)

**To:**   Taronis Fuels, Inc.
c/o Tyler B. Wilson, General Counsel
24980 N. 83rd Avenue, Suite 100
Peoria, Arizona 85383

---

☒    **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below:

ENF-CPU, U.S. Securities and Exchange Commission, 6315 Bren Mar Drive, Suite 175, Alexandria, VA 22312, no later than January 22, 2021 at 5:00 p.m.

---

☐    **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

---

### FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.
If you do not comply with this subpoena, the SEC may bring an action in Federal Court to enforce this subpoena.
Failure to comply with a court order enforcing this subpoena may result in the court imposing a fine, imprisonment, or both.

---

By:   /s *Chanel T. Rowe*                          Date:    January 11, 2021
        Chanel T. Rowe, Counsel
        U.S. Securities and Exchange Commission
        Miami Regional Office
        801 Brickell Avenue, Suite 1950
        Miami, FL 33131

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS: If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

PRIR_0000385

## SUBPOENA ATTACHMENT FOR TARONIS FUELS, INC.

Taronis Technologies, Inc. (FL-04237)

January 11, 2021

### Definitions

As used in this subpoena, the words and phrases listed below shall have the following meanings:

1.  "Taronis" means the entity doing business under the name "Taronis Fuels Inc.", including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

2.  "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

3.  A "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants, attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

4.  "Document" shall include, but is not limited to, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, facsimiles, messages of any type, telephone messages, text messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

5.  "Communication" means any correspondence, contact, discussion, e-mail, instant message, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

6.  "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in

PRIR_0000386

connection with, commenting on, relating to, regarding, discussing, showing, describing, analyzing or reflecting.

7. An "Agreement" means any actual or contemplated (i) written or oral Agreement; (ii) term or provision of such Agreement; or (iii) amendment of any nature or termination of such Agreement. A request for any Agreement among or between specified parties includes a request for all Documents Concerning (i) any actual or contemplated Agreement among or between such parties, whether or not such Agreement included any other Person; (ii) the drafting or negotiation of any such Agreement; (iii) any actual or contemplated demand, request or application for any such Agreement, and any response thereto; and (iv) any actual or contemplated objection or refusal to enter into any such Agreement, and any response thereto.

8. The term "you" and "your" means the Person to whom or entity to which this subpoena was issued.

9. To the extent necessary to bring within the scope of this this subpoena any information or Documents that might otherwise be construed to be outside its scope:
    a. the word "or" means "and/or";
    b. the word "and" means "and/or";
    c. the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;
    d. the masculine gender includes the female gender and the female gender includes the masculine gender; and
    e. the singular includes the plural and the plural includes the singular.

10. "Relevant Period" means the time period beginning January 1, 2019 and continuing to the present, unless otherwise specified.

## Instructions

1. Unless otherwise specified, this subpoena calls for production of the original Documents and all copies and drafts of same. Documents responsive to this subpoena may be in electronic or paper form. Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All responsive electronic Documents, **including all metadata**, should also be produced in their native software format.

2. For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us photocopies of the Documents in paper format. If you choose to send copies, you <u>must</u> secure and retain the originals and store them in a safe place. The staff may later request or require that you produce the originals.

2

3.      Whether you scan or photocopy Documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a Document differ in any way, they are considered separate Documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

4.      In producing a photocopy of an original Document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original Document, photocopies of the original Document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

5.      Documents should be produced as they are kept in the ordinary course of business or be organized and labeled to correspond with the categories in this request. In that regard, Documents should be produced in a unitized manner, i.e., delineated with staples or paper clips to identify the Document boundaries.

6.      Documents should be labeled with sequential numbering (bates-stamped).

7.      You must produce all Documents created during, or Concerning, the period from January 1, 2019 to the date of this subpoena, unless otherwise specified.

8.      The scope of any given request should not be limited or narrowed based on the fact that it calls for Documents that are responsive to another request.

9.      You are not required to produce exact duplicates of any Documents that have been previously produced to the Securities and Exchange Commission staff in connection with this matter. If you are not producing Documents based upon a prior production, please identify the responsive Documents that were previously produced.

10.     For any Documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please complete a business records certification (a sample of which is enclosed) and return it with the Document production.

11.     This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the effective ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the request, you should submit a list of what you are not producing. The list should describe each item separately, noting:

    a.      its author(s);
    b.      its date;
    c.      its subject matter;
    d.      the name of the Person who has the item now, or the last Person known to have it;

3

PRIR_0000388

      e.    the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;

      f.    the basis upon which you are not producing the responsive Document;

      g.    the specific request in the subpoena to which the Document relates;

      h.    the attorney(s) and the client(s) involved; and

      i.    in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

12.    If Documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

### Documents to be Produced

1. Documents sufficient to identify Taronis' current and former officers and directors, including each person's name, title, job description, dates of employment, and compensation during the Relevant Period;

2. Documents sufficient to identify any and all bank accounts held, maintained, or controlled by Taronis or on its behalf during the Relevant Period;

3. Documents sufficient to identify Taronis' sales and revenues during the Relevant Period;

4. Any and all Documents supporting that Taronis projects to generate in excess of $50 million in revenues in 2020;

5. Any and all Documents supporting that as of May 27, 2020 Taronis acquired "one of the largest independent specialty industrial gas distributors in the United States today" for $8 million;

6. Any and all Documents supporting that the "TGS Acquisition" referenced in Request Number 5 "ha[d] an immediate, significantly positive financial impact on the [Taronis'] overall financial outlook";

7. Any and all Documents supporting that the TGS Acquisition "brings in approximately $300,000 in added monthly EBITDA";

8. Any and all Documents supporting that "TGS generated $8 million in revenues in 2019 and is experiencing rapid growth due to the increased work-from-home policies implemented during the COVID-19 pandemic";

9. Any and all Documents supporting that because of the TGS Acquisition, "Taronis is now able to generate positive EBITDA cash flows across its combined US operations";

10. Any and all Documents supporting that because of the TGS Acquisition, Taronis "can now enter entirely new markets for a very limited capital investment, and quickly become

4

PRIR_0000389

profitable in these new locations using high-margin HVAC gas sales to fund organic growth";

11. Any and all Documents supporting any Agreement between Taronis and Tech Capital;

12. Any and all private placement memorandum, subscription agreement, and investor list(s) associated with the "$10.4 million private placement of [Taronis] common stock" that closed in or around November 2020;

13. Any and all private placement memorandum, subscription agreement, and investor list(s) associated the private placement that closed in or around October 2020;

14. Any and all private placement memorandum, subscription agreement, and investor list(s) associated the private placement that closed in or around July or August 2020;

15. Any and all Documents supporting that in the third quarter of 2020 Taronis generated $9.7 million in revenues representing an 80% increase in sales compared to the third quarter of 2019;

16. Any and all Documents supporting that in the third quarter of 2020 Taronis generated $6.3 million in gross income representing a 125% increase compared to the same period in 2019;

17. Any and all Documents supporting that Taronis had "significant cash on hand" as of April 2020;

18. Any and all investor lists reflecting contact information, date of investment, investment instrument, and amount invested;

19. Any and all Documents supporting that Taronis secured a long term lease for a 65,000 square foot manufacturing facility in Peoria, Arizona;

20. Any and all Documents supporting that as of January 2, 2020 Taronis "expected to receive $1.3 million in royalty payments over the next 90-100 days"; and

21. Any and all organizational charts for Taronis and/or any parents, subsidiaries, predecessors, and successors, including the title, location, and contact information for any officer, director, employee, agent, general partner or limited partner thereof.

5

PRIR_0000390

# EXHIBIT
# 7



MIAMI
REGIONAL OFFICE

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
801 BRICKELL AVENUE, SUITE 1950
MIAMI, FLORIDA 33131

**DIVISION OF ENFORCEMENT**

Chanel T. Rowe
Counsel
(305) 416-6277
rowech@sec.gov

February 12, 2021

<u>VIA OVERNIGHT DELIVERY</u>
Taronis Fuels, Inc.
c/o Tyler B. Wilson, General Counsel
24980 N. 83rd Avenue, Suite 100
Peoria, Arizona 85383

Re: <u>Taronis Technologies, Inc. (FL-04237)</u>

Dear Mr. Wilson:

The enclosed subpoena has been issued pursuant to a formal order entered by the United States Securities and Exchange Commission. Pursuant to Rule 8 of the United States Securities and Exchange Commission's Rules Relating to Investigations, 17 C.F.R. § 203.8, I have enclosed a subpoena for documents issued to Taronis Fuels, Inc., in connection with the above-referenced investigation.

The enclosed subpoena requires Taronis Fuels, Inc. to produce documents to the SEC by March 5, 2021. Please deliver the materials by March 5, 2021 at 5:00 p.m. to:

ENF-CPU
U.S. Securities and Exchange Commission
6315 Bren Mar Drive, Suite 175
Alexandria, VA 22312

For smaller electronic productions under 10MB in size, the materials may be emailed to the following email address: ENF-CPU@sec.gov.

Please also provide a duplicate copy of any document production cover letters to me at rowech@sec.gov. Additionally, please include the SEC matter number and the name of the requesting attorney when responding.

Please carefully read the subpoena attachment, which contains, among other things, important instructions related to the manner of producing documents. In particular, if Taronis Fuels, Inc. prefers to send us copies of original documents, **the staff requests that you scan and**

PRIR_0000393

**produce hard copy documents, as well as electronic documents, in an electronic format consistent with the SEC Data Delivery Standards attached hereto. All electronic documents responsive to the subpoena, <u>including all metadata</u>, should also be produced in their native software format.** If you have any questions concerning the production of documents in an electronic format, please contact me as soon as possible and in any event before producing documents. For security reasons, we strongly encourage the encryption of sensitive documents before production.

In your cover letter(s) accompanying the production of responsive documents, please enclose a list briefly describing each item you send. The list should identify the paragraph(s) in the subpoena attachment to which each item responds. Please also state in the cover letter(s) whether you believe Taronis Fuels, Inc. has met the obligations of the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us.

A copy of the subpoena should be included with the documents that are produced. Correspondence should reference case number, case name and requesting SEC staff member.

Passwords for documents, files, compressed archives, and encrypted media should be provided separately either via email addressed to ENF-CPU@sec.gov, or in a separate cover letter mailed separately from the data. Password correspondence should reference case number, case name and requesting SEC staff member.

Please also provide a narrative description describing what was done to identify and collect documents responsive to the subpoena. At a minimum, the narrative should describe:

- who searched for documents;
- who reviewed documents found to determine whether they were responsive;
- which custodians were searched;
- what sources were searched (e.g., computer files, CDs, DVDs, thumb drives, flash drives, online storage media, hard copy files, diaries, datebooks, planners, filing cabinets, storage facilities, home offices, work offices, voice mails, home email, webmail, work email, backup tapes or other media);
- what search terms, if any, were employed to identify responsive documents;
- what firms and/or persons, if any, assisted in analyzing the data collected;
- what third parties, if any, were contacted to obtain responsive documents (e.g., phone companies for phone records, brokerage firms for brokerage records); and
- where the original electronic and hardcopy documents are maintained and by whom.

In addition, for any documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please have the appropriate representative(s) of Taronis Fuels, Inc. complete a business records certification (a sample of which is enclosed) and return it with the document production.

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive

2

PRIR_0000394

to Commission subpoenas and formal and informal document requests in this matter have been produced.

Enclosed is a copy of the Commission's Form 1662, entitled "Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena." This form explains how we may use the information that Taronis Fuels, Inc. provides to the Commission and has other important information.

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation does not mean that we have concluded that anyone has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity, or security.

If you have any questions or would like to discuss this matter, you may contact me at (305) 416-6277.

Sincerely,

/s *Chanel T. Rowe*

Chanel T. Rowe
Counsel
Division of Enforcement

Enclosures:    Subpoena and Attachment
                SEC Data Delivery Standards
                SEC Form 1662
                Business Records Certification

3

PRIR_0000395



# SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

### Taronis Technologies, Inc. (FL-04237)

**To:**    Taronis Fuels, Inc.
c/o Tyler B. Wilson, General Counsel
24980 N. 83rd Avenue, Suite 100
Peoria, Arizona 85383

---

☒    **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below:

ENF-CPU, U.S. Securities and Exchange Commission, 6315 Bren Mar Drive, Suite 175, Alexandria, VA 22312, no later than March 5, 2021 at 5:00 p.m.

---

☐    **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

---

### FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.
If you do not comply with this subpoena, the SEC may bring an action in Federal Court to enforce this subpoena.
Failure to comply with a court order enforcing this subpoena may result in the court imposing a fine, imprisonment, or both.

---

By:    /s *Chanel T. Rowe*          Date:    February 12, 2021
Chanel T. Rowe, Counsel
U.S. Securities and Exchange Commission
Miami Regional Office
801 Brickell Avenue, Suite 1950
Miami, FL 33131

---

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS: If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

PRIR_0000396

**SUBPOENA ATTACHMENT FOR TARONIS FUELS, INC.**

<u>Taronis Fuels, Inc. (FL-04237)</u>

February 12, 2021

**<u>Definitions</u>**

As used in this subpoena, the words and phrases listed below shall have the following meanings:

1.  "Taronis" means the entity doing business under the name "Taronis Fuels Inc.", including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

2.  "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

3.  A "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants, attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

4.  "Document" shall include, but is not limited to, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, facsimiles, messages of any type, telephone messages, text messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

5.  "Communication" means any correspondence, contact, discussion, e-mail, instant message, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

6.  "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in connection with, commenting on, relating to, regarding, discussing, showing, describing,

PRIR_0000397

analyzing or reflecting.

7.  An "Agreement" means any actual or contemplated (i) written or oral Agreement; (ii) term or provision of such Agreement; or (iii) amendment of any nature or termination of such Agreement. A request for any Agreement among or between specified parties includes a request for all Documents Concerning (i) any actual or contemplated Agreement among or between such parties, whether or not such Agreement included any other Person; (ii) the drafting or negotiation of any such Agreement; (iii) any actual or contemplated demand, request or application for any such Agreement, and any response thereto; and (iv) any actual or contemplated objection or refusal to enter into any such Agreement, and any response thereto.

8.  The term "you" and "your" means the Person to whom or entity to which this subpoena was issued.

9.  To the extent necessary to bring within the scope of this this subpoena any information or Documents that might otherwise be construed to be outside its scope:
    a.  the word "or" means "and/or";
    b.  the word "and" means "and/or";
    c.  the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;
    d.  the masculine gender includes the female gender and the female gender includes the masculine gender; and
    e.  the singular includes the plural and the plural includes the singular.

### Instructions

1.  Unless otherwise specified, this subpoena calls for production of the original Documents and all copies and drafts of same. Documents responsive to this subpoena may be in electronic or paper form. Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All responsive electronic Documents, **including all metadata**, should also be produced in their native software format.

2.  For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us photocopies of the Documents in paper format. If you choose to send copies, you <u>must</u> secure and retain the originals and store them in a safe place. The staff may later request or require that you produce the originals.

3.  Whether you scan or photocopy Documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a Document differ in any way, they are considered separate Documents and you must send each one. For

2

PRIR_0000398

example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

4.    In producing a photocopy of an original Document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original Document, photocopies of the original Document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

5.    Documents should be produced as they are kept in the ordinary course of business or be organized and labeled to correspond with the categories in this request. In that regard, Documents should be produced in a unitized manner, i.e., delineated with staples or paper clips to identify the Document boundaries.

6.    Documents should be labeled with sequential numbering (bates-stamped).

7.    You must produce all Documents created during, or Concerning, the period from January 1, 2019 to the date of this subpoena, unless otherwise specified.

8.    The scope of any given request should not be limited or narrowed based on the fact that it calls for Documents that are responsive to another request.

9.    You are not required to produce exact duplicates of any Documents that have been previously produced to the Securities and Exchange Commission staff in connection with this matter. If you are not producing Documents based upon a prior production, please identify the responsive Documents that were previously produced.

10.   For any Documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please complete a business records certification (a sample of which is enclosed) and return it with the Document production.

11.   This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the effective ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the request, you should submit a list of what you are not producing. The list should describe each item separately, noting:

a.    its author(s);
b.    its date;
c.    its subject matter;
d.    the name of the Person who has the item now, or the last Person known to have it;
e.    the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
f.    the basis upon which you are not producing the responsive Document;
g.    the specific request in the subpoena to which the Document relates;

3

PRIR_0000399

h.    the attorney(s) and the client(s) involved; and

i.    in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

12.    If Documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

### Documents to be Produced

1.    All Documents and Communications Concerning the alleged breaches of fiduciary duties or any other violations by Mary Pat Thompson or Tobias Welo, as referenced in the Form 8-K dated December 23, 2020, including but not limited to notes, emails, Board of Directors meeting minutes, or any Documents created by, or for, the Board of Directors or the "special committee";

2.    All Documents and Communications Concerning the "irregularities in [Taronis'] financial statements" that Mary Pat Thompson described in Exhibit 99.1 of the Form 8-K filing dated December 23, 2020, including but not limited to the Documents and Communications that Mary Pat Thompson and/or Taronis' accounting staff relied upon to "expose" the alleged "instances in which Mr. Mahoney apparently directed improvements to [Taronis'] cost of goods sold without any substantiation, thereby substantially overstating [Taronis'] gross profits and gross margin in its public filing," as described in Exhibit 99.2 of the Form 8-K filing dated December 23, 2020;

3.    All Documents and Communications, including but not limited to minutes, notes, and emails, related to the December 18, 2020 conference call referenced in Exhibit 99.2 of the Form 8-K filing dated December 23, 2020;

4.    All Documents and Communications, including but not limited to any emails, from Scott Mahoney "directing the allegedly fraudulent actions" that were presented to the Board of Directors as described in Exhibit 99.2 of the Form 8-K filing dated December 23, 2020;

5.    All Documents and Communications Concerning the "many other financial irregularities that likely caused [Taronis'] financial results to be misstated, which [Mary Pat Thompson] attempted, unsuccessfully, to bring to the attention of the Audit Committee" as described in Exhibit 99.2 of the Form 8-K filing dated December 23, 2020;

6.    All Documents sufficient to reflect the names of all "Audit Committee" members as described in Exhibit 99.2 of the Form 8-K filing dated December 23, 2020;

7.    All Documents and Communications Concerning any investigation by Taronis or the "Audit Committee" into the allegations made by Mary Pat Thompson as referenced in Exhibit 99.2 of the Form 8-K filing dated December 23, 2020;

4

PRIR_0000400

8. All Documents sufficient to reflect the names, mailing addresses, phone numbers, dates of investment, and amounts invested for all Persons who invested in the offerings for which Forms D were filed on or about June 18, 2020, August 10, 2020, October 14, 2020, and November 24, 2020;

9. All Documents and Communications supporting that Taronis has a lease Agreement with the Port of Amsterdam in North Holland, Netherlands;

10. All Documents created on or before November 19, 2020 and supporting that Taronis has an Agreement with the Turkish Ministry of Trade and Finance;

11. All Documents created on or before August 2, 2020 and supporting that "Taronis has been asked by the government of El Salvador to develop an entirely new fuel product intended to replace propane for residential uses";

12. All Documents and Communications Concerning the $3 million gasification unit sale by Taronis to its former parent, BBHC Inc., as disclosed in footnote 14 of the Form 10-Q filed by Taronis for the second quarter of 2020;

13. All Documents and Communications Concerning the $2.3 million in unit sales for activities related to the fulfillment of initial contracts in the Republic of Turkey as disclosed in the "Results of Operations" section of the Form 10-Q filed by Taronis for the third quarter of 2020;

14. All Documents and Communications Concerning all Board of Director meetings, including but not limited to all minutes, notes, draft minutes, agendas, and materials provided to the Board of Directors; and

15. The Chart of Accounts and General Ledgers for the quarterly and annual fiscal periods ended December 31, 2019 and December 31, 2020.

5

PRIR_0000401

**DECLARATION OF [*Insert Name*] CERTIFYING RECORDS**
**OF REGULARLY CONDUCTED BUSINESS ACTIVITY**

I, the undersigned, [*insert name*], pursuant to 28 U.S.C. § 1746, declare that:

1.  I am employed by Taronis Fuels, Inc. as [*insert position*] and by reason of my position am authorized and qualified to make this declaration. [*if possible supply additional information as to how person is qualified to make declaration, e.g., I am custodian of records, I am familiar with the company's recordkeeping practices or systems, etc.*]

2.  I further certify that the documents [*attached hereto or submitted herewith*] and stamped [*insert bates range*] are true copies of records that were:

> (a) made at or near the time of the occurrence of the matters set forth therein, by, or from information transmitted by, a person with knowledge of those matters;

> (b) kept in the course of regularly conducted business activity; and

> (c) made by the regularly conducted business activity as a regular practice.

I declare under penalty of perjury that the foregoing is true and correct. Executed on [*date*].

_____
[*Name*]

PRIR_0000402



**U.S. Securities and Exchange Commission**

**Data Delivery Standards**

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC).     ***Any questions or proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission.***

General Instructions ........................................................................................................................... 1

Delivery Formats ............................................................................................................................... 2

   I.   Imaged Productions ................................................................................................................. 3

      1.  Images ......................................................................................................................... 3

      2.  Image Cross-Reference File ....................................................................................... 3

      3.  Data File ..................................................................................................................... 3

      4.  Text ............................................................................................................................ 3

      5.  Linked Native Files ................................................................................................... 3

   II.  Native File Productions without Load Files ........................................................................... 4

   III.  Adobe PDF File Productions ................................................................................................ 4

   IV.  Audio Files ............................................................................................................................ 4

   V.  Video Files ............................................................................................................................. 4

   VI.  Electronic Trade and Bank Records ...................................................................................... 4

   VII. Electronic Phone Records ...................................................................................................... 4

   VIII. Audit Workpapers ................................................................................................................ 5

   IX. Mobile Device Data ............................................................................................................... 5

**General Instructions**

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business. For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. *(Note: An Adobe PDF file is **not** considered a native file unless the document was initially created as a PDF.)*

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR) during the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF). If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name and file location and, 2) make that unique metadata part of your production to the SEC.

PRIR_0000403

General requirements for **ALL** document productions are:

1.  A cover letter must be included with each production and should include the following information:
    a.  Case number, case name and requesting SEC staff member name
    b.  A list of each piece of media included in the production with its unique production volume number
    c.  A list of custodians, identifying the Bates range for each custodian
    d.  The time zone in which the emails were standardized during conversion.
    e.  Whether the production contains native files produced from Mac operating system environments
2.  Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
    a.  Case number
    b.  Production date
    c.  Producing party
    d.  Bates range (if applicable)
3.  All submissions must be organized by **custodian** unless otherwise instructed.
4.  All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5.  All load-ready collections should include only one data load file and one image pointer file.
6.  All load-ready text must be produced as separate document-level text files.
7.  All load-ready collections should account for custodians in the custodian field.
8.  All load-ready collections must provide the extracted contents of any container files to ensure all relevant files are produced as separate records.
9.  Audio files should be separated from data files if both are included in the production.
10. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
11. All electronic productions submitted on media must be produced using industry standard self-extracting encryption software.
12. Electronic productions may be submitted via Secure File Transfer. The SEC **cannot** accept productions made using file sharing sites such as Google Drive, Microsoft Office 365 or Dropbox.
13. Productions containing BSA or SAR material must be delivered on encrypted physical media. The SEC **cannot** accept electronic transmission of BSA or SAR material. Any BSA or SAR material produced should be segregated and appropriately marked as BSA or SAR material, or should be produced separately from other case related material.
14. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a separate cover letter from the media.
15. All electronic productions should be produced free of computer viruses.
16. Before producing forensically collected images, parties should reach out to the requesting SEC staff member in order to discuss appropriate handling.
17. Before producing unique data sets (large sets of relational data, website reconstruction, chat room data, etc.), parties should reach out to the requesting SEC staff member in order to discuss an appropriate production format.
18. Additional technical descriptions can be found in the addendum to this document.

   **\*Please note that productions sent to the SEC via United States Postal Service are subject to Mail Irradiation, and as a result electronic productions may be damaged.\***

PRIR_0000404

U.S. Securities and Exchange Commission
Data Delivery Standards

**Delivery Formats**

## I.    Imaged Productions

The SEC prefers that all scanned paper and electronic file collections be produced in a structured format including industry standard load files, Bates numbered image files, native files and searchable document-level text files.

### 1.    Images
a.  Black and white images must be 300 DPI Group IV single-page TIFF files.
b.  Color images must be produced in JPEG format.
c.  File names cannot contain embedded spaces or special characters (including the comma).
d.  Folder names cannot contain embedded spaces or special characters (including the comma).
e.  All image files must have a unique file name, i.e. Bates number.
f.  Images must be endorsed with sequential Bates numbers in the lower right corner of each image.
g.  The number of image files per folder should not exceed 2,000 files.
h.  Excel spreadsheets should have a placeholder image named by the Bates number of the file.
i.  AUTOCAD/photograph files should be produced as a single page JPEG file.

### 2.    Image Cross-Reference File
The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

*ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

### 3.    Data File
The data file (.DAT) contains all of the fielded information that will be loaded into the database.

a.  The first line of the .DAT file must be a header row identifying the field names.
b.  The .DAT file must use the following *Concordance®* default delimiters:
    Comma ¶ ASCII character (020)
    Quote þ ASCII character (254)
c.  If the .DAT file is produced in Unicode format it must contain the byte order marker
d.  Date fields should be provided in the format: mm/dd/yyyy
e.  Date and time fields must be two separate fields.
f.  The time zone must be included in all time fields
g.  If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments.
h.  An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media. The text file must be named after the FIRSTBATES. Do not include the text in the .DAT file.
i.  For productions with native files, a LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the FIRSTBATES.
j.  BEGATTACH and ENDATTACH fields must be two separate fields.
k.  A complete list of metadata fields is available in **Addendum A** to this document.

### 4.    Text
Text must be produced as separate document-level text files, not as fields within the .DAT file. The text files must be named per the FIRSTBATES/Image Key and the full path to the text file (OCRPATH) should be included in the .DAT file. Text files may be in either ANSI or Unicode format, however, ALL text files must be in the same format within the same production. Note that productions containing text with foreign characters must produce text files in Unicode format to preserve the foreign characters. Text files must be in a separate folder, and the number of text files per folder should not exceed 2,000 files. There should be no special characters (including commas) in the folder names. For redacted documents, provide the full text for the redacted version.

### 5.    Linked Native Files
Copies of original email and native file documents/attachments must be included for all electronic productions.
a.  Native file documents must be named per the FIRSTBATES number.
b.  The full path of the native file must be provided in the .DAT file for the LINK field.
c.  The number of native files per folder should not exceed 2,000 files.

Rev 06/2019

PRIR_0000405

**II.   Native File Production without Load Files**
With prior approval, native files may be produced without load files. The native files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, Outlook (.PST) and Lotus Notes (.NSF) email files may be produced in native file format.  A separate folder should be provided for each custodian.

**III.  Adobe PDF File Production**
With prior approval, Adobe PDF files may be produced in native file format.
1. All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
2. PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
3. All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4. If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

**IV.  Audio Files**
Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

| | | |
|---|---|---|
| 1) Caller Name: | Caller's name or account/identification number |
| 2) Originating Number: | Caller's phone number |
| 3) Called Party Name: | Called party's name |
| 4) Terminating Number: | Called party's phone number |
| 5) Date: | Date of call |
| 6) Time: | Time of call |
| 7) Filename: | Filename of audio file |

**V.   Video Files**
Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

**VI.  Electronic Trade and Bank Records**
When producing electronic trade records, bank records, or financial statements, provide the files in one of the following formats:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2. Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

**VII. Electronic Phone Records**
When producing electronic phone records, provide the files in the following format:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.  Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).
   a. The metadata that must be included is outlined in **Addendum B** of this document. Each field of data must be loaded into a separate column.  For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information.  Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

4

Rev 06/2019

PRIR_0000406

U.S. Securities and Exchange Commission
Data Delivery Standards

**VIII. Audit Workpapers**

The SEC prefers for workpapers to be produced in two formats: (1) With Bates numbers in accordance with the SEC Data Delivery Standards; and (2) in native format or if proprietary software was used, on a standalone laptop with the appropriate software loaded so that the workpapers may be reviewed as they would have been maintained in the ordinary course of business. When possible, the laptop should be configured to enable a Virtual Machine (VM) environment.

**IX. Mobile Device Data**

Before producing mobile device data (including but not limited to text messages) parties should reach out to the requesting SEC staff member in order to discuss the appropriate production format.

5

Rev 06/2019

PRIR_0000407

## ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email<br>**The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email<br>**This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments<br>**The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided<br>Native: Name of the individual or department from whose files the document originated |
| FROM | John Smith | Email: Sender<br>Native: Author(s) of document<br>**semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s)<br>**semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email<br>Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent<br>Native: (empty) |
| TIME_SENT/TIME _ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion.<br>Native: (empty)<br>**This data must be a separate field and cannot be combined with the DATE_SENT field |

6

Rev 06/2019

PRIR_0000408

U.S. Securities and Exchange Commission
Data Delivery Standards

| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion.<br>Email: Time zone<br>Native: (empty) |
|---|---|---|
| LINK | D:\001\EDC0000001.msg | Hyperlink to the email or native file document<br>**The linked file must be named per the FIRSTBATES number |
| MIME_TYPE | application/msword | The content type of an Email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the Email or native file document; will vary depending on the email format |
| AUTHOR | John Smith | Email: (empty)<br>Native: Author of the document |
| LAST_AUTHOR | Jane Doe | Email: (empty)<br>Native: Last Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty)<br>Native: Date the document was created |
| TIME_CREATED/TIME/ZONE | 10:25 AM GMT | Email: (empty)<br>Native: Time the document was created including time zone<br>**This data must be a separate field and cannot be combined with the DATE_CREATED field |
| DATE_MOD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last modified |
| TIME_MOD/TIME_ZONE | 07:00 PM GMT | Email: (empty)<br>Native: Time the document was last modified including the time zone<br>**This data must be a separate field and cannot be combined with the DATE_MOD field |
| DATE_ACCESSD | 10/12/2010 | Email: (empty)<br>Native: Date the document was last accessed |
| TIME_ACCESSD/TIME_ZONE | 07:00 PM GMT | Email: (empty)<br>Native: Time the document was last accessed including the time zone<br>**This data must be a separate field and cannot be combined with the DATE_ACCESSD field |
| PRINTED_DATE | 10/12/2010 | Email: (empty)<br>Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty)<br>Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name.<br>Native: (empty) |
| INTMSGID | <000805c5c2c71b$75977050$cb8306d1@MSN> | Email: Unique Message ID<br>Native: (empty) |

7

PRIR_0000409

U.S. Securities and Exchange Commission
Data Delivery Standards

| HEADER | Return-Path:<br><example_from@dc.edu><br>X-SpamCatcher-Score:1[X]<br>Received:from[136.167.40.119]<br>(HELO dc.edu)<br>by fe3.dc.edu (CommuniGate<br>Pro SMTP4.1.8)<br>with ESMTP-TLS id 61258719<br>for example_to@mail.dc.edu;<br>Mon, 23 Aug 2004 11:40:10 -<br>0400<br>Message-ID:<br><4129F3CA.2020509@dc.edu><br>Date: Mon, 23 Aug 2005<br>11:40:36 -400<br>From: Taylor Evans<br><example_from@dc.edu><br>User-Agent:Mozilla/5.0<br>(Windows;U; Windows NT 5.1;<br>en-US;rv:1.0.1)<br>Gecko/20020823 Netscape/7.0<br>X-Accept-Language:en-us,en<br>MIME-Version:1.0<br>To: Jon Smith<br><example_to@mail.dc.edu><br>Subject:Business Development<br>Meeting<br>Content-Type:<br>text/plain;charset=us-ascii;<br>format=flowed<br>Content-Transfer-Encoding:7bit | Email: The email header information<br>Native: (empty) |
| MD5HASH | d131dd02c5e6eec4693d9a069<br>8aff95c<br>2fcab58712467cab4004583eb<br>8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Cross-Reference File:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,
IMG0000004,,E:\001\IMG0000004.TIF,Y,,,
IMG0000005,,E:\001\IMG0000005.TIF,Y,,,
IMG0000006,,E:\001\IMG0000006.TIF,,,,
```

Rev 06/2019

PRIR_0000410

## ADDENDUM B

For Electronic Phone Records, include the following fields in separate columns:

For Calls:
1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating– Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating- Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable

For Text messages:
1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating– Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating- Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable

For Mobile Data Usage:
1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

9

Rev 06/2019

PRIR_0000411

**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**Supplemental Information for Persons Requested to Supply**
**Information Voluntarily or Directed to Supply Information**
**Pursuant to a Commission Subpoena**

**A. False Statements and Documents**

Section 1001 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

Section 1519 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . ., or in relation to or contemplation of any such matter.

**B. Testimony**

If your testimony is taken, you should be aware of the following:

1.  *Record.* Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2.  *Counsel.* You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied, represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3.  *Transcript Availability.* Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however,* That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4.  *Perjury.* Section 1621 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever--

SEC 1662 (08-16)

PRIR_0000412

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true.

5.   *Fifth Amendment and Voluntary Testimony*. Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6.   *Formal Order Availability*. If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

## C. Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## D. Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

2

PRIR_0000413

### E. Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena.* The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily.* One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

### F. Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to Subpoena.* If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, Section 21(c) of the Securities Exchange Act of 1934, Section 42(c) of the Investment Company Act of 1940, and Section 209(c) of the Investment Advisers Act of 1940 provide that fines and terms of imprisonment may be imposed upon any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

### G. Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

### H. Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1. To appropriate agencies, entities, and persons when (a) it is suspected or confirmed that the security or confidentiality of information in the system of records has been compromised; (b) the SEC has determined that, as a result of the suspected or confirmed compromise, there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the SEC or another agency or entity) that rely upon the compromised information; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

2. To other federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3. To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4. By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

3

PRIR_0000414

5.  In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6.  In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7.  To a bar association, state accountancy board, or other federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8.  To a federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9.  To a federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10.  To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11.  To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 – 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100-1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12.  To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13.  To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14.  In reports published by the Commission pursuant to authority granted in the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15.  To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16.  To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 200.735-18, and who assists in the investigation by the Commission of possible violations of the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

17.  To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18.  To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

4

PRIR_0000415

19.  To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20.  To respond to subpoenas in any litigation or other proceeding.

21.  To a trustee in bankruptcy.

22.  To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

\* \* \* \* \*

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

5

PRIR_0000416

# EXHIBIT
# 8



DIVISION OF
ENFORCEMENT

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
MIAMI REGIONAL OFFICE
801 BRICKELL AVENUE
SUITE 1950
MIAMI, FLORIDA 33131

June 30, 2020

**Via UPS Next Day Delivery**

Taronis Technologies, Inc.
c/o Scott Mahoney, Chief Executive Officer
11885 44th Street N
Clearwater, Florida 33762

Re:    Taronis Technologies, Inc
       (FL-04237)

Dear Mr. Mahoney:

The staff of the United States Securities and Exchange Commission is conducting an investigation relating to the above-referenced matter to determine if violations of the federal securities laws have occurred. In connection with this investigation, we request that Taronis Technologies, Inc. ("Taronis") immediately preserve, and voluntarily provide us with, the information and documents set forth in the Request Attachment by July 27, 2020.

Please send the materials to:

ENF-CPU
U.S. Securities and Exchange Commission
6315 Bren Mar Drive, Suite 175
Alexandria, VA 22312

In addition, the SEC staff requests that you voluntarily appear at the Commission's offices at 801 Brickell Avenue, Suite 1950, Miami, Florida, 33130 at 10:00 a.m. on July 27, 2020 to testify under oath.

Please carefully read this letter, the enclosed Form 1662, and Request Attachment. The Request Attachment contains, among other things, important instructions related to the manner of producing documents. In particular, if Taronis prefers to send us copies of original documents, **the staff requests that Taronis scan and produce hard copy documents, as well as electronic documents, in an electronic format consistent with the SEC Data Delivery Standards attached hereto. All electronic documents responsive to the document request, including all metadata, should also be produced in their native software format.** If you have any questions

PRIR_0000331

Taronis Technologies, Inc.
Page 2

concerning the production of documents in an electronic format, please contact me as soon as possible and in any event before producing documents.

In your cover letter(s) accompanying the production of responsive documents, please enclose a list briefly describing each item you send. The list should state to which paragraph(s) in the attachment each item responds. Please also state in the cover letter(s) whether Taronis has met its obligations under the document request by searching carefully and thoroughly for everything called for by the request, and sending it all to us.

Please also provide a narrative description describing what was done to identify and collect documents responsive to the request. At a minimum, the narrative should describe:

- who searched for documents;
- who reviewed documents found to determine whether they were responsive;
- which custodians were searched;
- what sources were searched (e.g., computer files, CDs, DVDs, thumb drives, flash drives, online storage media, hard copy files, diaries, datebooks, planners, filing cabinets, storage facilities, home offices, work offices, voice mails, home email, webmail, work email, backup tapes or other media);
- what search terms, if any, were employed to identify responsive documents;
- what firms and/or persons, if any, assisted in analyzing the data collected;
- what third parties, if any, were contacted to obtain responsive documents (e.g., phone companies for phone records, brokerage firms for brokerage records); and
- where the original electronic and hardcopy documents are maintained and by whom.

In addition, for any documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please have the appropriate representative(s) of your firm complete a business records certification (a sample of which is enclosed) and return it with the document production.

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

This investigation is a non-public, fact-finding inquiry. The investigation does not mean that we have concluded that you or anyone else has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity, or security. Enclosed is a copy of the Commission's Form 1662 entitled "Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena." Form 1662 explains how we may use the information you provide to the Commission and has other important information for you.

Thank you in advance for your anticipated cooperation. If you have any questions or would like to discuss this matter, you may call me at 305.416.6277.

PRIR_0000332

Taronis Technologies, Inc.
Page 3

Sincerely,

/s/ *Chanel T. Rowe*

Chanel T. Rowe
Counsel
Division of Enforcement

Enclosures:     Request Attachment
                SEC Data Delivery Standards
                SEC Form 1662
                Business Records Certification

PRIR_0000333

**REQUEST ATTACHMENT FOR TARONIS**
**June 30, 2020**

A.    **Definitions**

As used in this document request, the words and phrases listed below shall have the following meanings:

1.    "Taronis" means the entity doing business under the name "Taronis Technologies, Inc." including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

2.    "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

3.    A "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants, attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

4.    "Document" shall include, but is not limited to, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, telegrams, facsimiles, messages of any type, telephone messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

5.    "Communication" means any correspondence, contact, discussion, e-mail, instant message, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

6.    "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, reflecting, evaluating, substantiating, concerning, referring to, alluding to, in connection with, commenting on, relating to, regarding, discussing, showing, describing, analyzing or reflecting.

7.    The term "you" and "your" means the Person or entity to whom this request was issued.

PRIR_0000334

8.  To the extent necessary to bring within the scope of this request any information or Documents that might otherwise be construed to be outside its scope:

    a.  the word "or" means "and/or";

    b.  the word "and" means "and/or";

    c.  the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;

    d.  the masculine gender includes the female gender and the female gender includes the masculine gender; and

    e.  the singular includes the plural and the plural includes the singular.

## B.  Instructions

1.  Unless otherwise specified, the Document request calls for production of the original Documents and all copies and drafts of same. Documents responsive to this request may be in electronic or paper form. Electronic Documents such as email should be produced in accordance with the attached document entitled SEC Data Delivery Standards. All electronic Documents responsive to the Document request, including all metadata, should also be produced in their native software format.

2.  For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, we request that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us photocopies of the Documents in paper format. If you choose to send copies, you must secure and retain the originals and store them in a safe place. We may later request or require that you produce the originals.

3.  Whether you scan or photocopy Documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a Document differ in any way, they are considered separate Documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

4.  In producing a photocopy of an original Document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original Document, photocopies of the original Document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

5.  Documents should be produced as they are kept in the ordinary course of business or be organized and labeled to correspond with the categories in this request. In that regard, Documents should be produced in a unitized manner, *i.e.*, delineated with staples or paper clips to identify the Document boundaries.

PRIR_0000335

6.  Documents should be labeled with sequential numbering (bates-stamped).

7.  The scope of any given request should not be limited or narrowed based on the fact that it calls for Documents that are responsive to another request.

8.  You are not required to produce exact duplicates of any Documents that have been previously produced to the Securities and Exchange Commission staff **in connection with this matter**. If you are not producing Documents based upon a prior production, please identify the responsive Documents that were previously produced.

9.  For any Documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please have the appropriate representative(s) of your firm complete a business records certification (a sample of which is enclosed) and return it with the Document production.

10. **If the Document production contains Bank Secrecy Act materials, please segregate and label those materials within the production.**

11. This request covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the effective ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the request, you should submit a list of what it is not producing. The list should describe each item separately, noting:

    a.  its author(s);
    b.  its date;
    c.  its subject matter;
    d.  the name of the Person who has the item now, or the last Person known to have it;
    e.  the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
    f.  the basis upon which you are not producing the responsive Document;
    g.  the specific request in the request to which the Document relates;
    h.  the attorney(s) and the client(s) involved; and
    i.  in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

12. If Documents responsive to this request no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

PRIR_0000336

C.    **Documents to be Produced**

For the time-period, January 1, 2017 through the date of your response, please produce all documents concerning the following requests:

1.  Documents sufficient to identify Taronis's current and former officers and directors, including each person's name, title, job description, dates of employment, and compensation;

2.  Documents sufficient to identify any and all bank accounts held, maintained, or controlled by Taronis or on its behalf;

3.  Documents sufficient to identify Taronis's sales and revenues;

4.  Any and all documents supporting that Taronis Fuel projects to generate in excess of $50 million in revenues in 2020;

5.  Documents sufficient to identify Taronis's operations at 22 locations across California, Texas, Louisiana, and Florida;

6.  Any and all documents supporting that Taronis Fuel had revenues of $11 million for the fourth quarter of 2019;

7.  Any and all documents supporting that Taronis owns "a patented plasma arc technology that enables two primary end use applications for fuel generation and water decontamination;"

8.  Any and all documents supporting that Taronis holds "a 7% royalty on the global use of its fuel generation intellectual property;"

9.  Any and all documents supporting that after Taronis's treatment of Hibiscus Lake in Clearwater, Florida, cyanobacteria levels have dramatically reduced and the algae bloom was remediated;

10. Any and all documents supporting that Taronis Water has "made meaningful progress on a strategic relationship with one of the largest global hog producers" to impact hog waste;

11. Any and all documents supporting that as of March 2020, Taronis is constructing "three new Venturi plasma arc sterilization units" dedicated to serving the hog industry in North Carolina;

12. Any and all documents supporting that Taronis Health has "acquired a 20% stake in Taurus Therapeutics, an immuno-oncology biotechnology company developing new drugs that target immunosuppressive adenosine in the tumor microenvironment (TME) for the treatment of resistant cancers;"

13. Any and all documents supporting that Taronis Health owns a warrant to acquire an additional 13.3% of Taurus Therapeutics up until an initial public offering (IPO);

PRIR_0000337

14. Any and all documents supporting that "Taurus is actively preparing for an IPO as early as before year-end 2020;"

15. Any "final technical briefing" delivered by Taronis to to the United States Department of Agriculture ("USDA") in February 2020;

16. Any presentation by Taronis to the USDA to fund a commercial pilot project to address the hog waste produced in North Carolina;

17. Any communications between Taronis and the USDA concerning the process of becoming an approved vendor on the USDA best practices list;

18. Any and all documents supporting that Taronis had a binding contract with the City of San Diego at any point before February 12, 2020;

19. Any and all documents supporting that Taronis had a contract or a purchase order with the City of San Diego as of January 28, 2020;

20. Any and all documents supporting that Magnegas is a safer, eco-friendly alternative to acetylene;

21. Any and all documents supporting or discussing Taronis's decision to "correct its prior [SEC] disclosure" concerning the "major city contract for the adoption of the [Taroni]'s metal cutting fuels" with the City of San Diego;

22. Any and all documents supporting that as of February 1, 2019 Taronis had "driven 600% revenue growth and expanded aross the US in 13 months through 7 acquisitions";

23. Any and all documents supporting that as of February 13, 2019 Taronis had "increased [its] annualized revenues by over 700% in just over a year while also increasing [its] client base by over 1000% to more than 30,000 active customers";

24. Any and all documents supporting that Taronis sales as of January 2019 was 468% higher than sales as of January 2018;

25. Any and all documents supporting that Taronis Technologies has a $165 million binding contract with a Turkish organization;

26. Any and all documents supporting that Taronis Technologies, Inc. entered a binding multi-year regional marketing agreement with MC Consulting Teknoloji Enerji Danismanlik Sanayl ve Ticaret Limited Sirketi;

27. Any and all documents supporting that, under the agreement between Taronis and MC Consulting Teknoloji Enerji Danismanlik Sanayl ve Ticaret Limited Sirketi, Taronis immediately sold a 300KW Venturi plasma arc gasification unit to MC Consulting for $5 million.

PRIR_0000338

28. Any and all documents supporting that the 300KW Venturi plasma arc gasification unit sold to MC Consulting for $5 million under the aforementioned agreement was delivered to MC Consulting;

29. Any and all documents supporting that Taronis acquired Complete Cutting & Welding Supplies, Inc., including documents sufficient to reflect the terms of the acquisition;

30. Any and all documents supporting that as of February 26, 2019 "[a]fter completing nine acquisitions in the past thirteen months, [Taronis] ha[s] increased [its] revenue run rate by 800%";

31. Any and all documents supporting that "[o]n August 21, 2019, [Taronis] was notified by the Nasdaq Capital Market that the Company needed to revised (sic) the record date for the Company's proposed spin-off of Taronis Fuels, Inc. because Nasdaq is unable to process reverse stock splilts while spin-offs are pending";

32. Documents sufficient to identify independent distributors of MagneGas;

33. Documents sufficient to reflect a contractual relationship between Taronis and Wendy's;

34. Documents sufficient to reflect a contractual relationship between Taronis and Popeye's;

35. Documents sufficient to reflect a contractual relationship between Taronis and Holiday Inn;

36. Any and all documents supporting that as of May 27, 2020 Taronis acquired "one of the largest independent specialty industrial gas distributors in the United States today" for $8 million;

37. Any and all documents supporting that the "TGS Acquisition" referenced in Voluntary Request Number 36 "ha[d] an immediate, significantly positive financial impact on the [Taronis'] overall financial outlook";

38. Any and all documents supporting that the TGS Acquisition "brings in approximately $300,000 in added monthly EBITDA";

39. Any and all documents supporting that "TGS generated $8 million in revenues in 2019 and is experiencing rapid growth due to the increased work-from-home policies implemented during the COVID-19 pandemic";

40. Any and all documents supporting that because of the TGS Acquisition, "Taronis is now able to generate positive EBITDA cash flows across its comibined US operations"; and

41. Any and all documents supporting that because of the TGS Acquisition, Taronis "can now enter entirely new markets for a very limited capital investment, and quickly become profitable in these new locations using high-margiin HVAC gas sales to fund organic growth."

PRIR_0000339

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

### Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena

**A. False Statements and Documents**

Section 1001 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

Section 1519 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . ., or in relation to or contemplation of any such matter.

**B. Testimony**

If your testimony is taken, you should be aware of the following:

1. *Record.* Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2. *Counsel.* You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied, represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3. *Transcript Availability.* Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however,* That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4. *Perjury.* Section 1621 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever--
> (1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify

SEC 1662 (08-16)

PRIR_0000340

truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true.

5.    *Fifth Amendment and Voluntary Testimony.* Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6.    *Formal Order Availability.* If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

**C. Submissions and Settlements**

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

> Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

> In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

**D. Freedom of Information Act**

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

2

PRIR_0000341

### E. Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena.* The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily.* One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

### F. Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to Subpoena.* If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, Section 21(c) of the Securities Exchange Act of 1934, Section 42(c) of the Investment Company Act of 1940, and Section 209(c) of the Investment Advisers Act of 1940 provide that fines and terms of imprisonment may be imposed upon any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

### G. Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

### H. Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1. To appropriate agencies, entities, and persons when (a) it is suspected or confirmed that the security or confidentiality of information in the system of records has been compromised; (b) the SEC has determined that, as a result of the suspected or confirmed compromise, there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the SEC or another agency or entity) that rely upon the compromised information; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

2. To other federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3. To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4. By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

5. In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

3

PRIR_0000342

6. In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7. To a bar association, state accountancy board, or other federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8. To a federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9. To a federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10. To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11. To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 – 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100-1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12. To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13. To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14. In reports published by the Commission pursuant to authority granted in the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15. To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16. To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 200.735-18, and who assists in the investigation by the Commission of possible violations of the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

17. To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18. To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

19. To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20. To respond to subpoenas in any litigation or other proceeding.

21. To a trustee in bankruptcy.

4

PRIR_0000343

22.  To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

* * * * *

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

5

PRIR_0000344



# U.S. Securities and Exchange Commission

## Data Delivery Standards

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC).  ***Any questions or proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission.***

General Instructions ........................................................................................................................ 1

Delivery Formats .......................................................................................................................... 2

   I.  Imaged Productions ............................................................................................................ 3

      1.  Images .......................................................................................................................... 3

      2.  Image Cross-Reference File ....................................................................................... 3

      3.  Data File ...................................................................................................................... 3

      4.  Text .............................................................................................................................. 3

      5.  Linked Native Files .................................................................................................... 3

   II.  Native File Productions without Load Files ...................................................................... 4

   III.  Adobe PDF File Productions ........................................................................................... 4

   IV.  Audio Files ....................................................................................................................... 4

   V.  Video Files ......................................................................................................................... 4

   VI.  Electronic Trade and Bank Records ................................................................................ 4

   VII.  Electronic Phone Records .............................................................................................. 4

   VIII.  Audit Workpapers ......................................................................................................... 5

   IX.  Mobile Device Data ......................................................................................................... 5

**General Instructions**

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business. For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. *(Note:  An Adobe PDF file is __not__ considered a native file unless the document was initially created as a PDF.)*

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR) during the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF).  If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name and file location and, 2) make that unique metadata part of your production to the SEC.

Rev 06/2019

PRIR_0000345

U.S. Securities and Exchange Commission
Data Delivery Standards

General requirements for **ALL** document productions are:

1.  A cover letter must be included with each production and should include the following information:
    a.  Case number, case name and requesting SEC staff member name
    b.  A list of each piece of media included in the production with its unique production volume number
    c.  A list of custodians, identifying the Bates range for each custodian
    d.  The time zone in which the emails were standardized during conversion
    e.  Whether the production contains native files produced from Mac operating system environments
2.  Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
    a.  Case number
    b.  Production date
    c.  Producing party
    d.  Bates range (if applicable)
3.  All submissions must be organized by **custodian** unless otherwise instructed.
4.  All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5.  All load-ready collections should include only one data load file and one image pointer file.
6.  All load-ready text must be produced as separate document-level text files.
7.  All load-ready collections should account for custodians in the custodian field.
8.  All load-ready collections must provide the extracted contents of any container files to ensure all relevant files are produced as separate records.
9.  Audio files should be separated from data files if both are included in the production.
10. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
11. All electronic productions submitted on media must be produced using industry standard self-extracting encryption software.
12. Electronic productions may be submitted via Secure File Transfer. The SEC **cannot** accept productions made using file sharing sites such as Google Drive, Microsoft Office 365 or Dropbox.
13. Productions containing BSA or SAR material must be delivered on encrypted physical media. The SEC **cannot** accept electronic transmission of BSA or SAR material. Any BSA or SAR material produced should be segregated and appropriately marked as BSA or SAR material, or should be produced separately from other case related material.
14. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a cover letter apart from the media.
15. All electronic productions should be produced free of computer viruses.
16. Before producing forensically collected images, parties should reach out to the requesting SEC staff member in order to discuss appropriate handling.
17. Before producing unique data sets (large sets of relational data, website reconstruction, chat room data, etc.), parties should reach out to the requesting SEC staff member in order to discuss an appropriate production format.
18. Additional technical descriptions can be found in the addendum to this document.

**\*Please note that productions sent to the SEC via United States Postal Service are subject to Mail Irradiation, and as a result electronic productions may be damaged.\***

2

Rev 06/2019

PRIR_0000346

U.S. Securities and Exchange Commission
Data Delivery Standards

**Delivery Formats**

**I.    Imaged Productions**

The SEC prefers that all scanned paper and electronic file collections be produced in a structured format including industry standard load files, Bates numbered image files, native files and searchable document-level text files.

**1.    Images**
   a.   Black and white images must be 300 DPI Group IV single-page TIFF files
   b.   Color images must be produced in JPEG format
   c.   File names cannot contain embedded spaces or special characters (including the comma)
   d.   Folder names cannot contain embedded spaces or special characters (including the comma)
   e.   All image files must have a unique file name. i.e. Bates number
   f.   Images must be endorsed with sequential Bates numbers in the lower right corner of each image
   g.   The number of image files per folder should not exceed 2,000 files
   h.   Excel spreadsheets should have a placeholder image named by the Bates number of the file
   i.   AUTOCAD/photograph files should be produced as a single page JPEG file

**2.    Image Cross-Reference File**

The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

   *ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

**3.    Data File**

The data file (.DAT) contains all of the fielded information that will be loaded into the database.

   a.   The first line of the .DAT file must be a header row identifying the field names
   b.   The .DAT file must use the following *Concordance®* default delimiters:
         Comma ¶ ASCII character (020)
         Quote þ ASCII character (254)
   c.   If the .DAT file is produced in Unicode format it must contain the byte order marker
   d.   Date fields should be provided in the format: mm/dd/yyyy
   e.   Date and time fields must be two separate fields
   f.   The time zone must be included in all time fields
   g.   If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments
   h.   An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media. The text file must be named after the FIRSTBATES. Do not include the text in the .DAT file.
   i.   For productions with native files, a LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the FIRSTBATES.
   h.   BEGATTACH and ENDATTACH fields must be two separate fields
   i.   A complete list of metadata fields is available in **Addendum A** to this document

**4.    Text**

Text must be produced as separate document-level text files, not as fields within the .DAT file. The text files must be named per the FIRSTBATES/Image Key and the full path to the text file (OCRPATH) should be included in the .DAT file. Text files may be in either ANSI or Unicode format, however, ALL text files must be in the same format within the same production. Note that productions containing text with foreign characters must produce text files in Unicode format to preserve the foreign characters. Text files must be in a separate folder, and the number of text files per folder should not exceed 2,000 files. There should be no special characters (including commas) in the folder names. For redacted documents, provide the full text for the redacted version.

**5.    Linked Native Files**

Copies of original email and native file documents/attachments must be included for all electronic productions.
   a.   Native file documents must be named per the FIRSTBATES number
   b.   The full path of the native file must be provided in the .DAT file for the LINK field
   c.   The number of native files per folder should not exceed 2,000 files

3

Rev 06/2019

PRIR_0000347

**II.    Native File Production without Load Files**

With prior approval, native files may be produced without load files. The native files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, Outlook (.PST) and Lotus Notes (.NSF) email files may be produced in native file format.  A separate folder should be provided for each custodian.

**III.    Adobe PDF File Production**

With prior approval, Adobe PDF files may be produced in native file format.

1.    All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
2.    PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
3.    All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4.    If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

**IV.    Audio Files**

Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

| | |
|---|---|
| 1) Caller Name: | Caller's name or account/identification number |
| 2) Originating Number: | Caller's phone number |
| 3) Called Party Name: | Called party's name |
| 4) Terminating Number: | Called party's phone number |
| 5) Date: | Date of call |
| 6) Time: | Time of call |
| 7) Filename: | Filename of audio file |

**V.    Video Files**

Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

**VI.    Electronic Trade and Bank Records**

When producing electronic trade records, bank records, or financial statements, provide the files in one of the following formats:

1.    MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2.    Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

**VII. Electronic Phone Records**

When producing electronic phone records, provide the files in the following format:

1.    MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.  Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).

a.    The metadata that must be included is outlined in **Addendum B** of this document. Each field of data must be loaded into a separate column.  For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information.  Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

4

Rev 06/2019

PRIR_0000348

**VIII. Audit Workpapers**

The SEC prefers for workpapers to be produced in two formats: (1) With Bates numbers in accordance with the SEC Data Delivery Standards; and (2) in native format or if proprietary software was used, on a standalone laptop with the appropriate software loaded so that the workpapers may be reviewed as they would have been maintained in the ordinary course of business. When possible, the laptop should be configured to enable a Virtual Machine (VM) environment.

**IX. Mobile Device Data**

Before producing mobile device data (including but not limited to text messages) parties should reach out to the requesting SEC staff member in order to discuss the appropriate production format.

5

Rev 06/2019

PRIR_0000349

U.S. Securities and Exchange Commission
Data Delivery Standards

## ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email<br>**The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email<br>**This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments<br>**The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided<br>Native: Name of the individual or department from whose files the document originated |
| FROM | John Smith | Email: Sender<br>Native: Author(s) of document<br>**semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s)<br>**semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email<br>Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent<br>Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion.<br>Native: (empty)<br>**This data must be a separate field and cannot be combined with the DATE_SENT field |
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion.<br>Email: Time zone<br>Native: (empty) |

6

Rev 06/2019

PRIR_0000350

U.S. Securities and Exchange Commission
Data Delivery Standards

| LINK | D:\001\EDC0000001.msg | Hyperlink to the email or native file document **The linked file must be named per the FIRSTBATES number |
|------|------|------|
| MIME_TYPE | application/msword | The content type of an email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the email or native file document; will vary depending on the format |
| AUTHOR | John Smith | Email: (empty) Native: Author of the document |
| LAST_AUTHOR | Jane Doe | Email: (empty) Native: Last Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty) Native: Date the document was created |
| TIME_CREATED/TIME_ZONE | 10:25 AM GMT | Email: (empty) Native: Time the document was created including time zone **This data must be a separate field and cannot be |
| DATE_MOD | 10/12/2010 | Email: (empty) Native: Date the document was last modified |
| TIME_MOD/TIME_ZONE | 07:00 PM GMT | Email: (empty) Native: Time the document was last modified including the time zone **This data must be a separate field and cannot be |
| DATE_ACCESSD | 10/12/2010 | Email: (empty) Native: Date the document was last accessed |
| TIME_ACCESSD/TIME_ZONE | 07:00 PM GMT | Email: (empty) Native: Time the document was last accessed including the time zone **This data must be a separate field and cannot be |
| PRINTED_DATE | 10/12/2010 | Email: (empty) Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty) Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name. Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$cb 8306d1@MSN> | Email: Unique Message ID Native: (empty) |

7

Rev 06/2019

PRIR_0000351

U.S. Securities and Exchange Commission
Data Delivery Standards

| HEADER | Return-Path:<br><example_from@dc.edu><br>X-SpamCatcher-Score:1[X]<br>Received:from[136.167.40.119]<br>(HELO dc.edu)<br>by fe3.dc.edu (CommuniGate<br>Pro SMTP4.1.8)<br>with ESMTP-TLS id 61258719<br>for example_to@mail.dc.edu;<br>Mon, 23 Aug 2004 11:40:10 -<br>0400<br>Message-ID:<br><4129F3CA.2020509@dc.edu><br>Date: Mon. 23 Aug 2005<br>11:40:36 -400<br>From:    Taylor    Evans<br><example_from@dc.edu><br>User-Agent:Mozilla/5.0<br>(Windows;U; Windows NT 5.1;<br>en-US;rv:1.0.1)<br>Gecko/20020823 Netscape/7.0<br>X-Accept-Language:en-us,en<br>MIME-Version:1.0<br>To:    Jon    Smith<br><example_to@mail.dc.edu><br>Subject:Business Development<br>Meeting<br>Content-Type:<br>text/plain;charset=us-ascii;<br>format=flowed<br>Content-Transfer-Encoding:7bit | Email: The email header information<br>Native: (empty) |
|---|---|---|
| MD5HASH | d131dd02c5e6eec4693d9a069<br>8aff95c<br>2fcab58712467eab4004583eb<br>8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Cross-Reference File:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,
IMG0000004,,E:\001\IMG0000004.TIF,Y,,,
IMG0000005,,E:\001\IMG0000005.TIF,Y,,,
IMG0000006,,E:\001\IMG0000006.TIF,,,,
```

8

Rev 06/2019

PRIR_0000352

U.S. Securities and Exchange Commission
Data Delivery Standards

## ADDENDUM B

For Electronic Phone Records, include the following fields in separate columns:

For Calls:

1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating – Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating – Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable

For Text messages:

1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating – Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating - Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable

For Mobile Data Usage:

1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

9

Rev 06/2019

PRIR_0000353

[FOR DOMESTIC U.S. RECORDS]

**DECLARATION OF [*Insert Name*] CERTIFYING RECORDS**
**OF REGULARLY CONDUCTED BUSINESS ACTIVITY**

I, the undersigned, [*insert name*], pursuant to 28 U.S.C. § 1746, declare that:

1. I am employed by [*insert name of company*] as [*insert position*] and by reason of my position am authorized and qualified to make this declaration. [*if possible supply additional information as to how person is qualified to make declaration, e.g., I am custodian of records, I am familiar with the company's recordkeeping practices or systems, etc.*]

2. I further certify that the documents [*attached hereto or submitted herewith*] and stamped [*insert bates range*] are true copies of records that were:

    (a) made at or near the time of the occurrence of the matters set forth therein, by, or from information transmitted by, a person with knowledge of those matters;

    (b) kept in the course of regularly conducted business activity; and

    (c) made by the regularly conducted business activity as a regular practice.

I declare under penalty of perjury that the foregoing is true and correct. Executed on [*date*].


_____
[*Name*]

PRIR_0000354

# EXHIBIT 9



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
801 BRICKELL AVENUE, SUITE 1950
MIAMI, FLORIDA 33131

MIAMI
REGIONAL OFFICE

**DIVISION OF ENFORCEMENT**

Thierry Olivier Desmet
Assistant Regional Director
(305) 982-6374
desmett@sec.gov

January 13, 2021

<u>VIA EMAIL</u>
Taronis Technologies, Inc.
c/o Tyler Wilson, General Counsel
300 W. Clarendon Avenue, Suite 230
Phoenix, AZ 85013
Email: tylerwilson@taronisfuels.com

Re:    **Taronis Technologies, Inc. (FL-04237)**

Dear Mr. Wilson:

We are writing to inform you of deficiencies in the productions by Taronis Technologies, Inc. ("Taronis") to the United States Securities and Exchange Commission (the "SEC"), in response to the June 30, 2020 voluntary request and December 14, 2020 subpoena to Taronis (the "Subpoena"), in the above referenced matter. The below list of deficiencies is not exhaustive, but highlights some of the deficiencies we have identified in our review to date of Taronis's productions:

- Failure to produce Native files for all emails, and instead producing some emails that have been printed and saved as Adobe PDF files or copied and pasted into Microsoft Word, thus permitting potential alteration of those emails, as well as providing copies of emails without the related family group and attachments;[1] and

---

[1]    Per Subpoena Instruction No. 1, "Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All responsive Electronic Documents, including all metadata, should also be produced in their native software format."

PRIR_0000391

- Failure to produce metadata for all spreadsheets and other electronic documents, which was explicitly compelled by the Subpoena (as Ms. Rowe explained to you in a December 14, 2020 email communication). [2]

In addition, it is unclear from the voluntary production, initial correspondence that came with the voluntary production, or subsequent correspondence sent in lieu of the subpoena production whether any documents were withheld on the basis of any privilege. The Subpoena Instructions state in part, "If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the request, you should submit a list of what you are not producing." That instruction then outlines the information that should be included in that list. Please advise whether any documents were withheld on the basis of any applicable privilege, including work product, and if so, please provide a list or log of those documents.

Please note that, in any matter in which an enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation does not mean that we have concluded that anyone has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity, or security.

If you have any questions, or would like to discuss this matter, please contact me at (305) 982-6374 or Chanel T. Rowe at (305) 416-6277.

Sincerely,

/s *Thierry Olivier Desmet*

Thierry Olivier Desmet
Assistant Regional Director
Division of Enforcement

cc: Chanel T. Rowe, Counsel, Enforcement Division

---

[2]    See *supra* footnote 1.

2

PRIR_0000392

# EXHIBIT
# 10

**COVER LETTER**

Taronis Technologies, Inc. (FL-04237)

Chanel T. Rowe, Counsel, Division Enforcement


We have examined originals, or copies certified or otherwise identified to our satisfaction, of the following documents (collectively, the "Documents"):

1. List of prior and current directors and officers from 10K filing SEC Q10001-SEC Q10088
2. Question 2 Narrative page and Taronis Fuels Inc. and subsidiaries bank statements SEC Q0001-SEC Q20052
3. Question 3 Narrative and Taronis Sales from 2017- current SEC Q30001- SEC Q30151
4. Question 4 Narrative page and Internal Projection Model SEC Q40001 – SEC Q40011
5. Question 5 listing out Taronis Fuels Inc. locations SEC Q50001
6. Question 6 Narrative page and the Form 10 and 10K filings SEC Q60001- SEC Q60333
7. Question 7 Narrative page including a Patent Schedule and two (2) IP opinion letters SEC Q70001- SEC Q70011
8. Question 8 Narrative page and Restated License Agreement SEC Q80001- SEC Q80016
9. Question 9 Narrative page and Hibiscus Lake Project Report with Appendix A-E SEC Q90001- SEC Q90362
10. Question 10 Narrative page and three Emails with their respective attachments SEC Q100001 – SEC Q100040
11. Question 11 Narrative page and 300 KW PO April 2020 SEC Q110001-SEC Q110002
12. Question 12 Narrative page and Private Placement Subscription Agreement between Taronis Health, LLC and Tarus Therapeutics Inc.  SEC Q120001- SEC Q120021
13. Question 13 and Warrant to Purchase Stock, between Taronis Health, LLC and Tarus Therapeutics, Inc. SEC Q130001 -SEC Q130009
14. Question 14 Narrative page and Email with attachments, SEC Q140001-SEC Q140002, SEC Q140002_0001-SEC Q140002_0079
15. Question 15 Narrative page and USDA Conservation Innovation Grant Project Report, Proposal Outline and Presentation SEC Q150001- SEC Q150052
16. Question 16 Narrative page and USDA Proposal with attachments SEC Q160001- SEC Q160052
17. Question 17 Narrative page SEC Q170001
18. Question 18 Narrative page and Emails with the City of San Diego SEC Q180001- SEC Q180005
19. Question 19 Narrative page and Emails with the City of San Diego SEC Q190001- SEC Q190005
20. Question 20 Narrative page and Safety Data Sheet for MagneGas2 SEC Q200001- SEC Q200008
21. Question 21 Narrative page and
22. Question 22 Narrative page and Copy of 2019 Sales SEC Q220001 – SEC Q220010
23. Question 23 Narrative page and Copy of 2019 Sales SEC Q230001 – SEC Q230010
24. Question 24 Narrative page and Copy of 2019 Sales SEC Q240001-SEC Q240010

PRIR_0000420

**COVER LETTER**

25. Question 25 Narrative and executed Gasifier Purchase Agreement, SEC Q250001-SEC Q250034
26. Question 26 Narrative page and executed Gasifier Purchase Agreement with marketing information SEC Q260001- SEC Q260021
27. Question 27 Narrative page and executed Gasifier Purchase Agreement with marketing information SEC Q270001- SEC Q270021
28. Question 28 Narrative page and Commercial Invoices, signed bills of lading by drivers, invoices from international shipping and certificates of origin SEC Q280001- SEC Q2800
29. Question 29 Narrative page and Asset Purchase Agreement SEC Q290001-SEC Q290101
30. Question 30 Narrative page and Copy of 2019 Sales SEC Q300001-SEC Q300010
31. Question 31 Narrative page and the email received August 21, 2019 from NASDAQ SEC Q310001- SEC Q310003
32. Question 32 Narrative page and Distributor Agreements for AWISCO Corp and Sidney Lee SEC Q320001-SEC Q320019
33. Question 33 Narrative page and an email with information about the relations of Water Pilot and Wendy's and an invoice for installation SEC Q330001- SEC Q330008
34. Question 34 Narrative page and executed SOW, the invoice for Popeye's and an additional estimate of services SEC Q340001-SEC Q340007
35. Question 35 Narrative page and emails between Taronis and Holiday inn and an installation invoice. SEC Q350001- SECQ350008
36. Question 36 Narrative page and Transaction documents related to Tech-Gas Solutions, LLC and Taronis Fuels, Inc. SEC Q360001- SEC Q360112
37. Question 37 Narrative page and Taronis Fuels P &L 07.20.20 SEC Q370001 – SEC Q370007
38. Question 38 Narrative page and Taronis Fuels P &L 07.20.20 SEC Q380001 – SEC Q380007
39. Question 39 Narrative page and 2019 Eoy Statement SEC Q390001 – SEC Q390012
40. Question 40 Narrative page and Taronis Fuels P &L 07.20.20 SEC Q400001 – SEC Q400007
41. Question 41 Narrative page and 2019 Eoy Statement SEC Q41001- SEC Q410012

Taronis Fuels, Inc. has met its obligations under the document request by searching carefully and thoroughly for everything called for by the request, and sending to the SEC.

Scott Mahoney, Tyler Wilson, Richard Conz and Jennifer Johnson searched for the responsive documents. Tyler Wilson has reviewed and determined the produced documents were responsive. Emails, file folders were all sources that were searched using the key words in the questions for the searches. No additional firms or persons assisted in the search. All the original electronic and hardcopy documents are being maintained at the corporate headquarters by Jennifer Johnson, Paralegal.

PRIR_0000421